**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| LOUIS ANTHONY GALLO, *Administrator* *of the Estate of Anthony Edward Gallo, deceased,* | } } } | No. 2:19-cv-01260-RJC |
| Plaintiff, | } } | Judge Colville |
| vs. | } } } | |
| CHAD WEAVER, *in his Individual Capacity*; JOSEPH RUGGERY; DALE BROWN; STEVEN DRISCOLL; JOHN KEAN, *all in their Individual Capacities*; JOHN DOE, *Captain/Commanding Officer of Troop B*; JOHN DOE, *Criminal Investigation Section Commander*; JOHN DOE, *Patrol Section Commander*; JOHN DOE, *Staff Services Section Commander*; JOHN DOE, *Sergeant*, and JOHN DOE, *Corporal, all in their Individual Capacities*, | } } } } } } } } } } | |
| Defendants. | } } | ***Electronically Filed.*** |

**PSP DEFENDANTS' MOTION FOR JUDGMENT
AS A MATTER OF LAW IN A JURY TRIAL PURSUANT TO Fed. R.Civ. P. 50**

AND NOW, come the Defendants Weaver, Ruggery, Brown, Driscoll and Kean ("the PSP Defendants"), by their attorneys, Scott A. Bradley, Senior Deputy Attorney General, and Amelia J. Goodrich, Deputy Attorney General, and file the within Motion for Judgment as a Matter of Law in a Jury Trial Pursuant to Fed. R.Civ. P. 50 and, in support thereof, aver as follows:

1. This civil rights action commenced with the filing of a counseled Complaint [ECF 1] on September 13, 2021.

2. The Complaint [ECF 1] asserted civil rights violations after Plaintiff's decedent was shot and killed by a PSP Trooper.

3. The PSP Defendants filed their Answer [ECF 11] on February 19, 2020.

4. No dispositive motions were filed; accordingly, this matter was scheduled for a jury trial on Plaintiff's claims of Excessive Force (Count I) and Supervisory Liability (Count II).

5.  A trial by jury in this matter commenced on May 20, 2024.  Plaintiff has presented his case in chief beginning on Tuesday, May 21, 2024, through Friday, May 24, 2024.  It is anticipated that Plaintiff will rest his case when trial resumes on Tuesday, May 28, 2024.

6.  Rule 50 of the Federal Rules of Civil Procedure provides for, *inter alia*, Judgment as a Matter of Law in a Jury Trial.  See Fed. R.Civ. P. 50.  See also Karlo v. Pittsburgh Glass Works, LLC, 2016 WL 2901588, *1 (W.D.Pa. 2016).

7.  Rule 50(a) states in pertinent part as follows:

> (1) *In General.* If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:
>
> (A) resolve the issue against the party; and
>
> (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.
>
> (2) *Motion.* A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury. The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment.

Fed. R.Civ. P. 50(a).

8.  This Court has explained the applicable standard in the following terms:

> 'Courts apply the same standard to motions made before the jury verdict pursuant to Rule 50(a) and after the jury verdict made pursuant to Rule 50(b).'  Sallitt v. Stankus, 720 F.Supp.2d 645, 648 (M.D.Pa. 2010)(*citing* McDaniels v. Flick, 59 F.3d 446, 453 (3d Cir. 1995)).  'Such a motion should be granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability.'  Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993)(*citing* Wittekamp v. Gulf & W., Inc., 991 F.2d 1137, 1141 (3d Cir. 1993)).  '[I]n performing this narrow inquiry, [the court] must refrain from weighing the evidence, determining the credibility of witnesses, or substituting [its] own version of the facts

for that of the jury.' <u>Marra v. Philadelphia Hous. Auth.</u>, 497 F.3d 286, 300 (3d Cir. 2007)(*citing* <u>Lightning Lube, Inc.</u>, 4 F.3d at 1166).

'Although judgment as a matter of law should be granted sparingly, a scintilla of evidence will not enable the non-movant to survive a Rule 50 motion.' <u>Goodman v. Pennsylvania Tpk. Comm'n</u>, 293 F.3d 655, 665 (3d Cir. 2002)(*citing* <u>Lightning Lube, Inc.</u>, 4 F.3d at 1166). '"The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party."' <u>Lightning Lube, Inc.</u>, 4 F.3d at 1166 (*quoting* <u>Patzig v. O'Neil</u>, 577 F.2d 841, 846 (3d Cir. 1978)). Accordingly, '[s]uch a judgment should only be granted if "the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief."' <u>Raiczyk v. Ocean Cty. Veterinary Hosp.</u>, 377 F.3d 266, 269 (3d Cir. 2004)(*quoting* <u>Trabal v. Wells Fargo Armored Serv. Corp.</u>, 269 F.3d 243, 249 (3d Cir. 2001)).

<u>Karlo v. Pittsburgh Glass Works, LLC</u>, 2016 WL 2901588, at *1-*2. <u>Cf.</u> <u>Dupree v. Younger</u>, 598 U.S. 729, 731-732 (2023)("This standard largely 'mirrors' the summary-judgment standard, the difference being that district courts evaluate Rule 50(a) motions in light of the trial record rather than the discovery record")(*citing* <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250-251 (1986)).

9.   Plaintiff having been fully heard on his claims, the PSP Defendants now move for judgment as a matter of law on Plaintiff's Fourth Amendment claim against Trooper Weaver at Count I and on Plaintiff's supervisory liability claim against PSP Defendants Ruggery, Brown, Driscoll and Kean at Count II.

## ARGUMENT

**I.     Trooper Weaver is entitled to qualified immunity on Plaintiff's claim of excessive force because he did not violate Anthony Gallo's Fourth Amendment rights or, in the alternative, because his use of deadly force on October 1, 2017, did not violate any clearly established right of Anthony Gallo's at the time.**

*A. The Qualified Immunity Standard.*  This Court has recently confirmed that "[Police] Officers, when faced with conduct posing a serious, immediate threat to themselves and to public safety, must be allowed to respond commensurately." Daniels v. City of Pittsburgh, 2022 WL 952855, *1 (W.D.Pa. 2022), *aff'd*, 2023 WL 2707178 (3d Cir. 2023), *cert. denied sub nom.* Daniels v. City of Pittsburgh, Pennsylvania, ___ U.S. ___, 144 S.Ct. 561 (2024).  Trooper Weaver submits that Plaintiff, having been fully heard on the issue, cannot proceed with his claim of excessive force under the Fourth Amendment.  Specifically, Trooper Weaver asserts that under the facts and circumstances presented at trial, he is entitled to qualified immunity.

One court has summarized the applicable standard as follows:

> 'Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct.' Ashcroft v. al-Kidd, 563 U.S. 731, 735, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011)(*quoting* Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).  In order to determine whether a right was clearly established, the Court must ask 'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' See Schmidt v. Creedon, 639 F.3d 587, 598 (3d Cir. 2011).  'If it would not have been clear to a reasonable officer what the law required under the facts alleged, then he is entitled to qualified immunity.' Id.  Stated differently, for a right to be clearly established, 'existing precedent must have placed the statutory or constitutional question beyond debate.' See al-Kidd, 563 U.S. at 741, 131 S.Ct. 2074.  As the Supreme Court recently noted, '[t]his demanding standard protects "all but the plainly incompetent or those who knowingly violate the law."' See District of Columbia v. Wesby, ─── U.S. ───, 138 S.Ct. 577, 199 L.Ed.2d 453 (2018)(*quoting* Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).  That means that 'there must be

> sufficient precedent at the time of action, factually similar to the
> plaintiff's allegations, to put [the] defendant on notice that his or her
> conduct is constitutionally prohibited.' <u>See</u> <u>Mammaro v. N.J. Div.</u>
> <u>of Child Prot. & Permanency</u>, 814 F.3d 164, 169 (3d Cir.
> 2016)(*quoting* <u>McLaughlin v. Watson</u>, 271 F.3d 566, 572 (3d Cir.
> 2001)).
>
>   The United States Supreme Court's decision in <u>White v. Pauly</u>, —
> – U.S. ——, 137 S.Ct. 548, 196 L.Ed.2d 463 (2017), clarifies the
> Court's inquiry in this regard.   In that case, the Supreme Court
> reaffirmed that its precedent 'do[es] not require a case directly on
> point' for a right to be clearly established, but, rather, 'existing
> precedent must have placed the statutory or constitutional question
> beyond debate.  <u>See</u> <u>id.</u> (internal quotation marks omitted)(quoting
> <u>Mullenix v. Luna</u>, —— U.S. —— (2015)).   The Supreme Court
> reiterated that the clearly established law 'must be "particularized"
> to the facts of the case,' and cautioned that the fact that a case
> presents a unique set of facts and circumstances is an 'important
> indication' that a defendant's conduct at issue did not violate a
> 'clearly established' right.   <u>See</u> <u>id.</u>   The Supreme Court has
> emphasized that 'the "specificity" of the rule is "especially
> important in the Fourth Amendment context."'  <u>See</u> <u>Wesby</u>, ——
> U.S. at ——, 138 S.Ct. 577 (*quoting* <u>Mullenix</u>, —— U.S. at ——).

<u>Gregor v. Johnsen</u>, 2019 WL 3549603, *3-*4 (M.D.Pa. 2019)(footnote omitted).  <u>See also</u> <u>Kelley</u>

<u>v. O'Malley</u>, 2024 WL 1208080, at *2-*3 (3d Cir. 2024)(*citing and quoting* <u>Spady v. Bethlehem</u>

<u>Area School District</u>, 800 F.3d 633, 637 (3d Cir. 2015)).

**B. Trooper Weaver did not violate Anthony Gallo's Fourth Amendment rights.**  Plaintiff

has asserted a Fourth Amendment claim against Trooper Weaver, alleging that Trooper Weaver

violated decedent's constitutional rights when he shot and killed decedent on October 1, 2017.

The Third Circuit has initially observed that "excessive force in the course of an arrest is properly

analyzed under the Fourth Amendment, not under substantive due process."  <u>Abraham v. Raso</u>,

183 F.3d 279, 288 (3d Cir. 1999)(*citing* <u>Graham v. Connor</u>, 490 U.S. 386, 393-394 (1989)).

> The Fourth Amendment provides, 'The right of the people to be
> secure in their persons ... against unreasonable searches and
> seizures, shall not be violated.'  To state a claim for excessive force
> as an unreasonable seizure under the Fourth Amendment, a plaintiff
> must show that a 'seizure' occurred and that it was unreasonable.

> Brower v. County of Inyo, 489 U.S. 593, 599, 109 S.Ct. 1378, 1382–83, 103 L.Ed.2d 628 (1989).  [Plaintiff] obviously was 'seized' when shot.  As the Supreme Court recognized in Tennessee v. Garner, 471 U.S. 1, 7, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985), 'there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment.'  The pivotal question is when the use of deadly force is reasonable.
>
>   Deadly force will only be considered reasonable, the Court held in Garner, when 'it is necessary to prevent escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'  471 U.S. at 3, 105 S.Ct. at 1697.   Applying this rule, Garner held unconstitutional a state statute that authorized officers to use deadly force, as the law in many states did at the time, against any felon fleeing or resisting arrest.  The specific use of force challenged in Garner was a police officer's decision to shoot an eighth grader who had broken into an unoccupied house and stolen ten dollars and a purse, a crime that indisputably constituted a felony under state law.

Abraham v. Raso, 183 F.3d 279, 288 (3d Cir. 1999).

In Daniels v. City of Pittsburgh, *supra*, upon a review of the underlying facts and circumstances, this Court concluded that

> [i]n light of the aforementioned legal authority, it is unsurprising that Officer Macioce also enjoys qualified immunity.  As already seen, Defendants have shown that there was no violation of a constitutional right.  Plaintiff also cannot show a violation of clearly established law.  As long has been the case, '[w]here [an] officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force.'  Tennessee v. Garner, 471 U.S. 1, 11-12 (1985).

Daniels v. City of Pittsburgh, 2022 WL 952855, at *5 (footnote omitted).[1]

---

[1] In *Daniels*, two police officers observed an individual exiting a commercial establishment during early morning hours.  The officers believed that the individual was acting suspiciously. The officers subsequently encountered the individual on a nearby street and one of the officers exchanged gunfire simultaneously with the subject, although no one was hit.  The subject then ran from the scene.  The officers pursued and encountered the same individual standing on a corner, speaking with a female.  After the subject refused to comply with repeated verbal commands and instead turned to run, the officer who had fired his weapon earlier again pointed his gun at the

In addressing the asserted constitutional violation, the *Daniels* court set forth the applicable analysis for the review of a claim of excessive force under the Fourth Amendment:

> [T]he reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.... [T]he question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.... [T]he Supreme Court [has] held that deadly force is not justified in circumstances where a fleeing suspect poses no immediate threat to the officer and no threat to others....
>
> [A]dditional factors ... include the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he actively is resisting arrest or attempting to evade arrest by flight.... Other relevant factors are the physical injury to the plaintiff, the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time.

Daniels v. City of Pittsburgh, 2022 WL 952855, at *5 (*quoting* Jefferson v. Lias, 21 F.4th 74, 78-79 (3d Cir. 2021)(citations, quotations and internal punctuation and alterations omitted)(footnote omitted).

The evidence presented to the jury in this case shows that on the afternoon of October 1, 2017, Trooper Weaver and Trooper Matt Shaffer responded to the Mark II Trailer Court after a 911 call was placed.  The caller indicated that there was an individual running around a trailer park, threatening people and going into their homes.  Although it was reported that this individual had a weapon, it initially wasn't clear whether he had a knife or a firearm.

Trooper Weaver arrived at the scene first, with Trooper Shaffer pulling in behind.  Trooper Weaver retrieved his service issued AR-15 rifle from the back seat of his vehicle.  Trooper Shaffer

---

subject and shot four times.  Only one of the shots struck the fleeing subject; however, the bullet hit an artery and the subject died.  See Daniels v. City of Pittsburgh, 2022 WL 952855, at *1.

also retrieved his AR-15 rifle from his vehicle.  Both troopers asked where the individual was and he was immediately pointed out by bystanders, standing at the doorway of a trailer that was not the suspect's residence.  Upon seeing the suspect, Trooper Shaffer observed that Anthony Gallo was armed with a knife.

Both Troopers gave Anthony Gallo specific directions to show his hands and get on the ground, he failed to comply and instead fled into the trailer home, slamming the door behind him. Not knowing who else was in that residence, Trooper Weaver and Trooper Shaffer went to the door and made entry, with Trooper Weaver again taking the lead.  Once inside the trailer home, both Trooper Weaver and Trooper Shaffer continued to give verbal direction to Anthony Gallo to show his hands or drop the knife, and to get on the ground.  Again, he refused to comply; he then turned and moved away from the Troopers, saying "Shoot me; shoot me."

The two troopers advanced down the hallway, with Trooper Weaver still in the lead position and Trooper Shaffer close behind him. They reached the end bedroom just as Anthony Gallo stopped.  As Trooper Weaver stopped in the doorway, the threshold into that room, Anthony Gallo had stopped with his back to Trooper Weaver.  Anthony Gallo then turned toward Trooper Weaver and began to take a step while at the same time raising the knife toward Trooper Weaver. At that instant, fearing for his life, Trooper Weaver fired his weapon, striking Anthony Gallo and causing him to fall backward on a nearby bed.  Although he had fallen back onto the bed, Anthony Gallo still held the knife in his right hand.  Trooper Weaver again ordered him to drop the knife. At that point, Anthony Gallo made a move to come up off the bed with the knife still in his hand. Again believing that Anthony Gallo intended to stab him, Trooper Weaver fired again.

Using the rubric adopted by this Court in *Daniels*, the relevant factors show that, initially, "[t]he Supreme Court's recognition that deadly force is not justified where a fleeing suspect poses

no immediate threat to the officer, or others, is inapplicable" where the evidence and testimony presented in this case clearly shows that Anthony Gallo was armed with a knife at all times during the encounter with Trooper Weaver.

With regard to "[t]he severity of the crime at issue," the 911 call reported that Anthony Gallo was going into the homes of others, armed with a knife and threatening others. The evidence further shows that this behavior had been ongoing for some time. The seriousness of the situation is further reflected in the fact that one of the residents had armed herself with a firearm based on Anthony Gallo's actions. Consequently, the trial record shows that Anthony Gallo had committed serious felony offenses.

"Whether the suspect pose[d] an immediate threat to the safety of the officers or others": as above, Anthony Gallo was armed with a knife when Trooper Weaver arrived on scene and was in the vicinity of numerous residents of the trailer court.

"Whether he actively is resisting arrest or attempting to evade arrest by flight":  after initially refusing to comply with verbal commands given by Trooper Weaver and Trooper Shaffer, Anthony Gallo immediately fled into a trailer belonging to another within seconds of the Troopers' arrival on the scene.

Physical injury to Anthony Gallo is not disputed.

As in *Daniels*, "[t]he possibility that the person subject to the police action was violent or dangerous, again is a given" based on the foregoing.

"The duration of the action": here, it is undisputed that Trooper Weaver's encounter with Anthony Gallo transpired exigently, with the entire episode taking less than a minute.

"Whether the action takes place in the context of effecting an arrest":  as in *Daniels*, Anthony Gallo's arrest "was imminent had he complied with the officers' commands."

"The possibility that the suspect may be armed":  the evidence is undisputed that Anthony Gallo was armed with a deadly weapon, a knife, throughout his encounter with Trooper Weaver.

Finally, as in *Daniels*, "[t]he number of persons with whom the police officers must contend at one time, is a non factor" because, although there were numerous bystanders present at the scene, Trooper Weaver's focus was on and remained on Anthony Gallo as soon he made contact.

Based on this record and relying on this Court's decision in *Daniels*, Trooper Weaver submits that his use of excessive force was reasonable under the facts and circumstances with which he was presented and, accordingly, there was no violation of Anthony Gallo's Fourth Amendment rights.  Nevertheless, assuming that the Court does not accept this conclusion, Trooper Weaver contends that he is entitled to qualified immunity under the second prong of the applicable analysis. There is no robust consensus of case law with analogous facts that would place Trooper Weaver on notice that his actions in the trailer would be unlawful. Oppositely, existing case law indicates that Trooper Weaver is entitled to qualified immunity for responding to danger and resorting to deadly forced when faced with a deadly weapon.

**C.  Trooper Weaver's use of deadly force on October 1, 2017, did not violate any clearly established right of Anthony Gallo's at the time.**  Here, the question is whether Trooper Weaver was on notice from prior court rulings that his conduct was unlawful.  Trooper Weaver would argue that there was not a robust consensus of persuasive authority as of October 1, 2017, that would have prohibited his use of deadly force against Anthony Gallo.  Indeed, relevant court decisions discussing the use of deadly force in similar circumstances support his actions in this case.

As the Third Circuit has explained:

[w]hen framing the constitutional right at issue, the Supreme Court has 'repeatedly told courts ... not to define clearly established law at a high level of generality.'  al-Kidd, 563 U.S. at 742.  Rather, we must frame the right at issue with 'a high "degree of specificity,"' District of Columbia v. Wesby, 583 U.S. 48, 63 (2018)(*quoting* Mullenix v. Luna, 577 U.S. 7, 13 (2015)(*per curiam*)), accounting for both the 'specific facts at issue,' Kisela, 138 S.Ct. at 1153,[2] and the 'specific context' facing the officers, Spady, 800 F.3d at 638. Specificity is 'particularly important in excessive force cases,' City of Escondido v. Emmons, 139 S. Ct. 500, 503 (2019)(*per curiam*), because 'it is sometimes difficult for an officer to determine how the relevant legal doctrine ... will apply to the factual situation the officer confronts,' Kisela, 138 S.Ct. at 1152 (*quoting* Mullenix, 577 U.S. at 12).

*        *        *        *        *        *        *        *

 Next, we turn to whether 'the violative nature of particular conduct was clearly established.'  James[ v. New Jersey State Police], 957 F.3d [165,] at 169 [(3d Cir. 2020)] (cleaned up)(*quoting* Ziglar v. Abbasi, 582 U.S. 120, 151 (2017)).  Appellants 'may satisfy this standard by "identify[ing] a case where an officer acting under similar circumstances as [Appellees] [were] held to have violated"' the Fourth Amendment.  Id. at 169-70 (*quoting* White, 580 U.S. at 79).  'For qualified-immunity purposes, clearly established rights are derived either from binding Supreme Court and Third Circuit precedent or from a robust consensus of cases of persuasive authority in the Courts of Appeals.'  Id. (internal quotation marks omitted)(*quoting* Bland v. City of Newark, 900 F.3d 77, 84 (3d Cir. 2018)).  'Use of excessive force is an area of the law "in which the result depends very much on the facts of each case," and thus police officers are entitled to qualified immunity unless existing precedent "squarely governs" the specific facts at issue.'  Kisela, 138 S. Ct. at 1153 (*quoting* Mullenix, 577 U.S. at 13).

Kelley v. O'Malley, 2024 WL 1208080, at *3-*4.

In this instance, there is no robust consensus of case law establishing that a police officer's conduct is unlawful where the use of deadly force occurred when an armed suspect was pursued into the home of another where the deadly force was used only when the suspect was in close proximity to the officer and posed an immediate threat to the police officer's safety.  For example,

---

2  Kisela v. Hughes, 584 U.S. 100, 138 S.Ct. 1148 (2018)(*per curiam*)

in Williams v. City of Scranton, 2013 WL 1339027 (M.D.Pa. 2013), *aff'd*, 566 F.App'x 129 (3d

Cir. 2014), the court found that

> [t]he undisputed facts show that [the plaintiff] rapidly approached
> Officer Smith with a knife, ignored the officers' warnings to stop
> and drop the knife, and was within several feet of Officer Smith
> when she was shot.  In light of the totality of the circumstances, the
> police officers had probable cause to believe that [the plaintiff]
> posed a significant threat of death or serious physical injury to
> Officer Smith or any other officer on the scene. The Court thus finds
> that it was objectively reasonable for the officers to believe that the
> use of deadly force against [the plaintiff] was necessary.

Williams v. City of Scranton, 2013 WL 1339027, at *6.  See also Brown v. United States, 256

U.S. 335, 343 (1921)(Holmes, J.)("Detached reflection cannot be demanded in the presence of an

uplifted knife").

In Gregor v. Johnsen, *supra*, the court found that a police officer was entitled to qualified

immunity where he had shot the plaintiff during a confrontation where the plaintiff was armed

with a knife:

> Magistrate Judge Carlson found that the factual circumstances in the
> instant case are much more similar to those in cases in which courts
> have found that the officer-defendants were entitled to qualified
> immunity. ([Report & Recommendation] at 18-19)(*citing* Plumhoff
> v. Rickard, 572 U.S. 765, 777, 134 S.Ct. 2012, 188 L.Ed.2d 1056
> (2014); Untalan v. City of Lorain, 430 F.3d 312, 315 (6th Cir. 2005);
> Mullins v. Cyranek, 805 F.3d 760, 768 (6th Cir. 2015)).
> Accordingly, Magistrate Judge Carlson concluded 'that a reasonable
> officer in [the Defendant Officer's] position would not have known
> beyond debate that firing those second and third shots would have
> constituted excessive force.' (Id. at 19)(*citing* Plumhoff, 572 U.S. at
> 777-78, 134 S.Ct. 2012; Lamont[ v. New Jersey], 637 F.3d [177,] at
> 183 [(3d Cir. 2011)]. Magistrate Judge Carlson found that 'although
> [Plaintiff] claims that some facts remain in dispute, he has failed to
> produce any evidence to establish that [the Defendant Officer] could
> not reasonably have believed that his use of force was permissible
> under the circumstances.'

Gregor v. Johnsen, 2019 WL 3549603, at *1-*2.

More recently, in <u>Kelley v. O'Malley</u>, *supra*, the Third Circuit addressed a claim of qualified immunity where the decedent was shot after he killed a police K-9 dog with a knife during an encounter with police.  The Third Circuit determined that

> the appropriate framing here is the right to be free from being shot by police officers after refusing their commands, violently stabbing their K-9 with a knife, and being within eight feet of a nearby officer with knife still in hand after previously engaging in a struggle with police officers, fending off several non-lethal attempts at capture, and pointing a knife at an approaching officer.

<u>Kelley v. O'Malley</u>, 2024 WL 1208080, at *3.

Framing the inquiry in that manner, in a decision that was issued on March 21, 2024, the Third Circuit affirmed the district court's grant of summary judgment in favor of the police officers.  However, relevant to the instant case, the Third Circuit observed that "Appellants do not point to a single case from any court clearly establishing the right at issue, further noted,

> [t]o the contrary, the Supreme Court, this Court, and other courts hold there is no clearly established right against the use of deadly force where a victim brandishes a lethal weapon, defies commands to surrender, and the officer has probable cause to believe a person is in imminent danger.

<u>Kelley v. O'Malley</u>, 2024 WL 1208080, at *4 n. 5 (3d Cir. 2024)(*citing* <u>Kisela v. Hughes</u>, 584 U.S. 100, 104-406 (2018)(*per curiam*); <u>City of Tahlequah v. Bond</u>, 595 U.S. 9, at 10-14 (2021)(*per curiam*); <u>James v. New Jersey State Police</u>, 957 F.3d 165, 168, 170-173 (3d Cir. 2020); Harris v. Serpas, 745 F.3d 767, 772-773 (5th Cir. 2014).  Cf. <u>Birkeland as Trustee for Birkeland v. Jorgensen</u>, 971 F.3d 787, 792 (8th Cir. 2020)(finding police officer did not violate a clearly established right where "[t]he undisputed facts establish that [plaintiff] was in possession of a knife, he refused to comply with the officer's commands to drop the knife, he was in a confined area in close proximity to the officers, and he used the knife to stab a police dog in the face").

The decision in <u>Kisela v. Hughes</u>, *supra*, is particularly instructive because in that case, decided several months after the incident in this case, the Court found that the officer was entitled to qualified immunity:

> Kisela says he shot Hughes because, although the officers themselves were in no apparent danger, he believed she was a threat to Chadwick. Kisela had mere seconds to assess the potential danger to Chadwick. He was confronted with a woman who had just been seen hacking a tree with a large kitchen knife and whose behavior was erratic enough to cause a concerned bystander to call 911 and then flag down Kisela and Garcia. Kisela was separated from Hughes and Chadwick by a chain-link fence; Hughes had moved to within a few feet of Chadwick; and she failed to acknowledge at least two commands to drop the knife. Those commands were loud enough that Chadwick, who was standing next to Hughes, heard them. This is far from an obvious case in which any competent officer would have known that shooting Hughes to protect Chadwick would violate the Fourth Amendment.
>
> The Court of Appeals made additional errors in concluding that its own precedent clearly established that Kisela used excessive force. To begin with, 'even if a controlling circuit precedent could constitute clearly established law in these circumstances, it does not do so here.' <u>Sheehan</u>, supra, at ——, 135 S.Ct., at 1776. In fact, the most analogous Circuit precedent favors Kisela. <u>See</u> <u>Blanford v. Sacramento County</u>, 406 F.3d 1110 (9th Cir. 2005). In *Blanford*, the police responded to a report that a man was walking through a residential neighborhood carrying a sword and acting in an erratic manner. <u>Id.</u>, at 1112. There, as here, the police shot the man after he refused their commands to drop his weapon (there, as here, the man might not have heard the commands). <u>Id.</u>, at 1113. There, as here, the police believed (perhaps mistakenly), that the man posed an immediate threat to others. <u>Ibid.</u> There, the Court of Appeals determined that the use of deadly force did not violate the Fourth Amendment. <u>Id.</u>, at 1119. Based on that decision, a reasonable officer could have believed the same thing was true in the instant case.

<u>Kisela v. Hughes</u>, 584 U.S. 105-106.

To the extent Plaintiff would contend that the second volley fired by Trooper Weaver was excessive, that argument is foreclosed by <u>Gregor v. Johnsen</u>, *supra* and <u>Salaam v. Wolfe</u>, 806 F.App'x 90 (3d Cir. 2020). In those cases, both decided after the underlying incident in this case,

the issue was whether shots fired after the initial shot(s) were fired were excessive.   As set forth

above, the *Gregor* court "concluded 'that a reasonable officer in [the Defendant Officer's] position

would not have known beyond debate that firing those second and third shots would have

constituted excessive force.'"   Gregor v. Johnsen, 2019 WL 3549603, at *1-*2 (citation to record

omitted)(*citing* Plumhoff, 572 U.S. at 777-778; Lamont v. New Jersey, 637 F.3d at 183).   In

*Salaam*, the Third Circuit addressed a claim that "assuming the initial use of force was objectively

reasonable, the officers' continued use of force after he fell to the ground was unjustified." Salaam

v. Wolfe, 806 F.App'x at 93.  The initial use of force was found reasonable, with the court saying

> [w]ith the knowledge that Salaam failed to comply with the
> instruction to stop and disarm, a reasonable officer could believe
> that when Salaam started to turn towards them, with his gun in the
> leading-hand, that he posed a serious risk of harm to them and those
> around them. See Kisela, 138 S. Ct. at 1152 ("Where the officer has
> probable cause to believe that the suspect poses a threat of serious
> physical harm, either to the officer or to others, it is not
> constitutionally unreasonable to prevent escape by using deadly
> force").  Even assuming, as Salaam maintains, that he did not even
> turn halfway before the shooting began, the defendants' split-second
> decision to employ deadly force was objectively reasonable.
> Graham, 490 U.S. at 397, 109 S.Ct. 1865; see Lamont v. New
> Jersey, 637 F.3d 177, 183 (3d Cir. 2011)("Waiting [for the suspect
> who moves toward a gun to draw it] could well prove fatal. Police
> officers do not enter into a suicide pact when they take an oath to
> uphold the Constitution")(*citing* Krueger v. Fuhr, 991 F.2d 435, 439
> (8th Cir. 1993)(shooting was reasonable where, during a foot chase
> of an armed assault suspect, the suspect suddenly reached into his
> waistband despite having been ordered to freeze)).

Salaam v. Wolfe, 806 F.App'x at 93-94.

   The Third Circuit then concluded that the successive shots were also reasonable:

> Salaam maintains that he dropped the gun when he was first shot
> and that the officers continued to fire several of the bullets after he
> was unarmed and on the ground.  For support, he relies on our
> decision in *Lamont*, where we determined that the defendant state
> troopers were not entitled to qualified immunity for their continued
> use of deadly force after the threat from the suspect was eliminated.

637 F.3d at 185.  In that case, we held that the troopers acted reasonably in their initial use of deadly force when the suspect quickly pulled his right hand out of his waistband 'as though he were drawing a pistol.'  Id. at 184.  However, although the suspect's 'weaponless right hand was fully visible immediately after the troopers began firing, the troopers continued to fire for roughly 10 seconds, shooting a total of 39 rounds,' and '11 of the 18 bullets that struck [the suspect] hit him from behind.'  Id.  We held that, under the circumstances, a reasonable jury could determine that 'the troopers improperly continued firing after [the suspect] had turned away from them and no longer posed a threat.'  Id. at 184-85.

Salaam v. Wolfe, 806 F.App'x at 94.

Here, the evidence presented at trial established that Anthony Gallo still held the knife in his right hand after Trooper Weaver first fired, that he continued to move and that he did not drop the knife despite continued commands to do so.  On this record, Trooper Weaver would submit that the second volley was also reasonable and that, in any event, he is entitled to qualified immunity based on the decisions in *Gregor* and *Salaam*.

Thus, based on the forgoing, when the question is framed at the appropriate level of inquiry, based on the caselaw that would have been available to Trooper Weaver as of October 1, 2017, he could have reasonably believed that his use of deadly force against Anthony Gallo did not violate the Fourth Amendment.  Accordingly, Trooper Weaver requests that judgment be entered in his favor on Plaintiff's Fourth Amendment claim.

II.   **PSP Defendants Ruggery, Brown, Driscoll and Kean are entitled to judgment as a matter of law on Plaintiff's supervisory liability claim against at Count II because Plaintiff is unable to present any evidence to establish their deliberate indifference to the risk that Trooper Weaver would use deadly force in violation of Anthony Gallo's Fourth Amendment rights.**

At trial, testimony of the PSP Defendants Ruggery, Brown, Driscoll and Kean was taken outside the presence of the jury.  In that testimony, PSP Defendants Ruggery, Brown, Driscoll and

Kean testified that they were not familiar with and had not seen Plaintiff Exhibit No. 45[3] (or any document like it) prior to October 1, 2017.  PSP Defendant Ruggery testified that he had seen and became familiar with such documents when he served as Director of PSP's Bureau of Integrity and Professional Standards (which includes IAD), but that was not until after October 1, 2017.  Each of these PSP Defendants further testified that they were not from any source personally aware of any complaints or incidents of excessive force attributed to Trooper Weaver.

Based on the testimony of these defendants, the Court sustained an objection to the admission of Plaintiff Exhibit No. 45 and any other evidence or testimony related to other instances of alleged misconduct or complaints of excessive force to the extent it is offered against the supervisory liability claim against PSP Defendants Ruggery, Brown, Driscoll and Kean.  Absent such evidence, Plaintiff cannot succeed in his claim against these defendants.

Initially,

> [i]t is well established that a 'plaintiff cannot rely solely on a *respondeat superior* theory of liability against a defendant for Section 1983 liability.'  Ruiz v. N.J. Dep't of Corr., No. 15-3304, 2016 WL 3450813, at *3 (D.N.J. June 21, 2016).  'Instead, a plaintiff must allege that a supervisor had a personal involvement in the alleged wrongs.'  Id. (*citing* Rode v. Dellaciprete, 845 F.2d 1195, 1207 (3d Cir. 1988)).  'Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence.'  Id. (*quoting* Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005)).

O'Neal v. Middletown Twp., 2019 WL 77066, *7 (D.N.J. 2019).

Further, to prove this supervisory liability claim, Plaintiff must establish that the PSP Defendants Ruggery, Brown, Driscoll and Kean were deliberately indifferent to an unreasonable risk of the ultimate injury.  See, e.g., Hockett v. Stanga, 2023 WL 11226619, *8 (W.D.Pa. 2023),

---

[3] Plaintiff Exhibit No. 45 was identified as a 6-page document compiled by PSP's Internal Affairs Division ("IAD") and labeled "Concise Officer History" for "Tpr Chad W Weaver."

*report and recommendation adopted*, 2024 WL 1892818 (W.D.Pa. 2024)(*citing and quoting* Sullivan v. Warminster Township, 2010 WL 2164520, *5 (E.D.Pa. 2010)).

Relying on its prior decision in Sample v. Diecks, 885 F.2d 1099 (3d Cir. 1989), the Third Circuit set forth the following rubric for supervisory liability claims based on a theory of failure to supervise:

> (1) identify the specific supervisory practice or procedure that the supervisor failed to employ, and show that (2) the existing custom and practice without the identified, absent custom or procedure created an unreasonable risk of the ultimate injury, (3) the supervisor was aware that this unreasonable risk existed, (4) the supervisor was indifferent to the risk; and (5) the underling's violation resulted from the supervisor's failure to employ that supervisory practice or procedure.

Brown v. Muhlenberg Township, 269 F.3d 205, 216 (3d Cir. 2001)(dismissing Section 1983 supervisory liability claim where there was "no evidence that [the police chief] had knowledge of any prior excessive use of force ... by [the officer]")(*citing* Sample v. Diecks, 885 F.2d at 1118).

The *Brown* identified an alternative construction of such a claim in the following terms:

> Put another way, the inmate must identify the supervisor's specific acts or omissions demonstrating the supervisor's deliberate indifference to the inmate's risk of injury and must establish a link between the supervisor, the act, and the injury.

Brown v. Muhlenberg Township, 269 F.3d 205, 216 (*citing* Sample v. Diecks, 885 F.2d at 1118). See Chavarriaga v. New Jersey Department of Corrections, 806 F.3d 210, 227 (3d Cir. 2015).  See also Miller v. Chester County Commissioners, 2024 WL 1096530, *5 (E.D.Pa. 2024).

Finally, "[u]nder this standard, supervisory liability may only be imposed when a plaintiff proves 'both (1) contemporaneous knowledge of the offending incident *or knowledge of a prior pattern of similar incidents*, and (2) circumstances under which the supervisor's inaction could be found to have communicated a message of approval.'"  Love v. New Jersey Division of Youth &

<u>Family Services</u>, 2010 WL 2950019, *3 (D.N.J. 2010)(emphasis added)(*quoting* <u>C.H. v. Oliva</u>, 226 F.3d 198, 202 (3d Cir. 2000)(*en banc*).

Based on the record available to the Court at this point in the trial, Plaintiff cannot establish that prior to October 1, 2017, PSP Defendants Ruggery, Brown, Driscoll and Kean were aware of any complaints or disciplinary issues involving uses of excessive force by Trooper Weaver, including his IAD history as represented in Plaintiff Exhibit No. 45 and the specific incidents Plaintiff sought to offer in support of his supervisory liability claim. Accordingly, these defendants are entitled to judgment as a matter of law on Plaintiff's Supervisory Liability claim at Count II.[4]

---

[4]   Further, these supervisory defendants are also entitled to qualified immunity. There is not, because there cannot be, a robust consensus of case law putting them on notice that their conduct was unlawful. There is no case law establishing liability in the first place, and, thus, there cannot be a robust consensus of case law that with analogous facts that would defeat qualified immunity in the face of the discrete facts at hand.

WHEREFORE, the PSP Defendants respectfully request that this Honorable Court enter an Order granting the instant Motion for Judgment as a Matter of Law in a Jury Trial Pursuant to Fed. R.Civ. P. 50.

Respectfully submitted,

MICHELLE A. HENRY
Attorney General

By:    /s/ Scott A. Bradley
SCOTT A. BRADLEY
Senior Deputy Attorney General
Pa. I.D. 44627

OFFICE OF ATTORNEY GENERAL          Amelia J. Goodrich
1251 Waterfront Place               Deputy Attorney General,
Mezzanine Level                     Civil Litigation Section
Pittsburgh, PA 15222

Date:  May 27, 2024