## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LOUIS ANTHONY GALLO, *Administrator* | ) | |
| *of the Estate of Anthony Edward Gallo, deceased*, | ) | No. 2:19-cv-01260-RJC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| CHAD WEAVER, *in his Individual Capacity*, | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

Robert J. Colville, United States District Judge

Before the Court are several post-trial motions filed by the parties in this action.  Plaintiff Louis Anthony Gallo, Administrator of the Estate of Anthony Edward Gallo, deceased, has filed a Motion for Delay Damages (ECF No. 128) and a related Motion at ECF No. 155 noting that the original Motion remains uncontested, a Petition for Attorneys' Fees and Costs (ECF No. 134), and a Petition for Enhancement of Award of Attorneys' Fees (ECF No. 135).  Defendant Chad Weaver ("Defendant"),[1] who has been sued in his individual capacity, has filed a Motion for Judgment as a Matter of Law and/or for a New Trial (ECF No. 140), as well as a Brief in Support (ECF No. 146).  Plaintiff filed a Response (ECF No. 154) to that Motion on October 7, 2024.  The deadlines for any other responsive briefing have passed, and the Court considers this matter ripe for disposition.

---

[1] After Plaintiff rested, the Court granted a Rule 50 Motion for Judgment as a Matter of Law (ECF No. 115) as to Plaintiff's supervisory liability claims against former defendants Joseph Ruggery, Dale Brown, Steven Driscoll, and John Kean, but denied that Motion as to Plaintiff's claims against Defendant Weaver.  As Defendant Weaver is the lone remaining Defendant, the Court shall refer to him as "Defendant."

## I.    Background

On September 30, 2019, Plaintiff filed a Complaint against Defendant setting forth a claim under 42 U.S.C. § 1983 for excessive force in violation of the Fourth Amendment.   More specifically, Plaintiff alleged that Defendant, a Trooper with the Pennsylvania State Police, used unreasonably excessive force on October 1, 2017, when he shot and killed Plaintiff's decedent, Anthony Edward Gallo.  This matter proceeded to a jury trial before the undersigned on May 20, 2024.  At the close of Plaintiff's case, each of the Defendants moved for judgment as a matter of law under Federal Rule of Civil Procedure 50.  As noted, the Court granted that Motion as to Plaintiff's claims against former defendants Joseph Ruggery, Dale Brown, Steven Driscoll, and John Kean, and entered judgment in their favor.  The Court denied the Motion as to Defendant, and the jury ultimately returned a verdict in Plaintiff's favor and against Defendant, awarding $3,000,000.00 in compensatory damages to Plaintiff on a survival theory, $7,000,000.00 in compensatory damages for Plaintiff's wrongful death claim, and $11,000,000.00 in punitive damages.  Defendant now renews his Rule 50 motion, or, in the alternative, seeks a new trial pursuant to Rule 59(a) or remittitur under Rule 59(e).

## II.    Legal Standard

### Rule 50

With respect to motions for judgment as a matter of law, Federal Rule of Civil Procedure 50 provides:

**(a) Judgment as a Matter of Law.**

> **(1) *In General.*** If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:

>> **(A)** resolve the issue against the party; and

**(B)** grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

**(2)** *Motion.* A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury. The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment.

**(b) Renewing the Motion After Trial; Alternative Motion for a New Trial.** If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment--or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged--the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59. In ruling on the renewed motion, the court may:

**(1)** allow judgment on the verdict, if the jury returned a verdict;

**(2)** order a new trial; or

**(3)** direct the entry of judgment as a matter of law.

Fed. R. Civ. P. 50. "[A] judgment notwithstanding the verdict may be granted under Fed. R. Civ. P. 50(b) only if, as a matter of law, the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief." *In re Lemington Home for the Aged*, 777 F.3d 620, 626 (3d Cir. 2015) (quoting *Trabal v. Wells Fargo Armored Serv. Corp.*, 269 F.3d 243, 249 (3d Cir. 2001). In resolving such a motion, "all evidence and inferences most favorable to the party against whom the motion is made must be indulged." *Mihalchak v. Am. Dredging Co.*, 266 F.2d 875, 878 (3d Cir. 1959). "When evaluating 'whether the evidence is sufficient to sustain liability, the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version.'" *Kars 4 Kids Inc. v. Am. Can!*, 8 F.4th 209, 218 (3d Cir. 2021) (quoting *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993)).

**Rule 59(a)**

With respect to grounds for a new trial, Federal Rule of Civil Procedure 59(a) provides that

a "court may, on motion, grant a new trial on all or some of the issues -- and to any party . . . after

a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in

federal court . . . ." Fed. R. Civ. P. 59(a)(1)(A). The Third Circuit has explained:

> While a court may grant a new trial under Rule 59 "for any reason for which a new
> trial has heretofore been granted in an action at law in federal court," Fed. R. Civ.
> P. 59(a)(1)(A), it should do so only when "the great weight of the evidence cuts
> against the verdict and . . . [ ] a miscarriage of justice would result if the verdict
> were to stand," *Springer v. Henry*, 435 F.3d 268, 274 (3d Cir. 2006) (internal
> quotation marks omitted); *see Williamson v. Consol. Rail Corp.*, 926 F.2d 1344,
> 1352–53 (3d Cir. 1991) (new trial should be granted only where the verdict "cries
> out to be overturned" or "shocks [the] conscience"). A district court's power to
> grant a new trial is limited "to ensure that [it] does not substitute its judgment of
> the facts and the credibility of the witnesses for that of the jury." *Delli Santi v. CNA
> Ins. Cos.*, 88 F.3d 192, 201 (3d Cir. 1996) (internal quotation marks omitted). Our
> power is similarly limited and we review the grant or denial of a motion for a new
> trial for abuse of discretion. *Olefins Trading, Inc. v. Han Yang Chem. Corp.*, 9 F.3d
> 282, 289 (3d Cir. 1993).

*Leonard v. Stemtech Int'l Inc*, 834 F.3d 376, 386 (3d Cir. 2016).

With respect to Rule 59 motions, the United States District Court for the Eastern District

of Pennsylvania has explained:

> While the Rule is not precise in its language as to the grounds for a new trial, case
> law has established that a court has the clear authority to order a new trial where,
> among other things, the verdict was against the weight of the evidence, where the
> size of the verdict was too large or too small, where new evidence has been
> discovered, where the judge or any attorney has engaged in misconduct, and where
> a prejudicial error of law was made.

*Agere Sys., Inc. v. Atmel Corp.*, No. CIV.A. 02-CV-864, 2005 WL 2994702, at *15 (E.D. Pa. Aug.

17, 2005). While the standard for granting a new trial is less stringent than the standard for granting

judgment as a matter of law:

> As the Third Circuit has said, "new trials because the verdict is against the weight
> of the evidence are proper only when the record shows that the jury's verdict

resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." In so determining, a court is permitted to consider the credibility of witnesses and to weigh the evidence. A court may not, however, grant a new trial merely because it would have reached a different verdict than the jury.

*Agere Sys., Inc.*, 2005 WL 2994702, at *15.

**Rule 59(e)**

With respect to remittitur, the United States District Court for the Middle District of

Pennsylvania has aptly explained:

> Under Rule 59(e), a party may seek alteration or amendment of the verdict. "The rationalization for, and use of, the remittitur is well established as a device employed when the trial judge finds that a decision of the jury is clearly unsupported and/or excessive." *Spence v. Bd. of Educ. of Christina Sch. Dist.*, 806 F.2d 1198, 1201 (3d Cir. 1986) (citing *Kazan v. Wolinski*, 721 F.2d 911 (3d Cir.1983); *Keystone Floor Products Co., Inc. v. Beattie Mfg. Co.*, 432 F.Supp. 869 (E.D. Pa. 1977)). "A jury verdict which is 'so grossly excessive as to shock the judicial conscience' can be the basis for either a new trial or remittitur" and the "[v]erdicts that shock the judicial conscience are those that bear no rational relationship to the evidence presented." *Glass v. Snellbaker*, 2008 WL 4371760, at *6 (D.N.J. Sept. 17, 2008) (Simandle, J.) (citing *Gumbs v. Pueblo Int'l, Inc.*, 823 F.2d 768, 773 (3d Cir. 1987); *Williams v. Martin Marietta Alumina, Inc.*, 817 F.2d 1030, 1038 (3d Cir.1987)). If appropriate, when considering and fixing a remittitur, the court is to "consider similar cases, evaluate the evidence, determine a damages figure related to that evidence, while being 'mindful that the determination of that amount may not be precisely calculated." [*Evans v. Port Authority of New York and New Jersey*, 273 F.3d 346, 352 (3d Cir. 2001)] (citing *Blakey v. Continental Airlines, Inc.*, 992 F. Supp. 731, 739 (D.N.J. 1998)) (internal citations omitted).

*Borrell v. Bloomsburg Univ.*, 207 F. Supp. 3d 454, 471 (M.D. Pa. 2016).

**A. Defendant's Motions**

**1. Rule 50 Motion**

Defendant argues that, under the facts of this case, judgment as a matter of law should be

entered in Defendant's favor because he is entitled to qualified immunity on Plaintiff's Section

1983 claim. Mot. ¶ 11, ECF No. 140. In support, Defendant argues that Plaintiff "cannot point to

clearly established legal authority that would have told Trooper Weaver that the use of deadly

force was unreasonable under the circumstances" presented in this case. He further argues that Plaintiff failed to sufficiently prove the elements of a Section 1983 claim.

Initially, the Court reiterates that, in reviewing a Rule 50 motion, "all evidence and inferences most favorable to the party against whom the motion is made must be indulged." *Mihalchak*, 266 F.2d at 878. "When evaluating 'whether the evidence is sufficient to sustain liability, the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version.'" *Kars 4 Kids Inc.*, 8 F.4th at 218. In this manner, the standard is materially similar to that which would apply to a motion for summary judgment, which, the Court notes, is where most of the cases that address qualified immunity first consider and rule upon the issue, as the applicability of qualified immunity is a question of law. *See Carswell v. Borough of Homestead*, 381 F.3d 235, 242 (3d Cir. 2004) ("The court must make the ultimate determination on the availability of qualified immunity as a matter of law.").

### i.    Factual Background

Following a thorough review of the record, the Court provides as follows with respect to the incident at issue in this case:

Anthony Gallo was 34 years old on October 1, 2017. ECF No. 131 at 57. Approximately three months prior to the incident at issue, Anthony Gallo was involved in an automobile accident. *Id.* at 58-59. He was sitting in the backseat of a vehicle operated by his mother, Betty Gray, when the car struck a tractor-trailer head-on. *Id.* Anthony Gallo was propelled from the backseat, and his head struck the windshield of his mother's vehicle. *Id.* In the weeks and months following the automobile accident and leading up to the incident at issue in this case, Anthony Gallo's mother and other family members noticed a marked shift in Anthony's behavior, noting that he exhibited paranoia that neighbors were utilizing nail holes to spy on him. *Id.* at 59. Following the accident,

Anthony Gallo lived with his mother, but, on October 1, 2017, he was with his grandmother, Shirley Gray, in her residence in the Mark II Trailer Court in Canton Township, Pennsylvania. *Id.* at 60.

At around 11:00 a.m. on October 1, 2017, Shirley Gray texted Betty Gray, who was at home, asking Betty to come to the trailer court because Anthony Gallo's behavior and demeanor, and notably his paranoia, had taken a turn for the worse. ECF No. 131 at 60-61; 73. Specifically, Anthony Gallo claimed to be in the Navy, though he was never in the Navy, and stated repeatedly that he needed to "protect his troops." *Id.* at 61. At approximately 1:15 p.m. on October 1, 2017, Betty Gray received a ride to the Mark II Trailer Court, *id.* at 73, where she met with Anthony Gallo, Shirley Gray, Paul Neiman (a friend), and Harriet Southall (Betty's sister), in Shirley Gray's residence. *Id.* When she arrived, Betty Gray observed Anthony Gallo display unusual behavior, including taking clocks off of walls, instructing family members to count, and asking questions about the sun. *Id.* at 74; 76. He spoke loudly while interacting with individuals at that time. *Id.* at 76. Betty Gray spoke with Anthony Gallo and advised him that he needed to seek psychiatric treatment. *Id.* at 61-62. Betty and Anthony initially discussed the possibility that Betty might drive Anthony to treatment the next day. *Id.* at 75. That said, Anthony eventually agreed to be transported by ambulance, as opposed to Betty driving him, for psychiatric treatment on the day in question, and Harriet Southall dialed 911 at approximately 3:30 p.m. in an effort to arrange for a 302 psychiatric commitment. *Id.* at 61-62; 74; 76.

At some point, Anthony Gallo left Shirley Gray's trailer, and Betty Gray followed Anthony into the trailer court. ECF No. 131 at 62-63. Betty observed Anthony approaching individuals in the trailer court and urging them to "get to safety" in an effort to "protect his troops." *Id.* at 63. During this time, Anthony Gallo asked individuals if he could enter their trailers so that

he could protect them, and he entered trailers belonging to individuals other than his grandmother. *Id.* at 63-65. Anthony Gallo was not acting erratically while interacting with the neighbors at this juncture. *Id.* at 74. Betty Gray did not observe Anthony Gallo threaten anyone. *Id.* at 64. During Betty's interactions with him, Anthony Gallo collected various knives, including butter knives, steak knives, and paring knives, as well as a fork and a baseball bat, again citing a need to protect his troops. *Id.* at 64; 76. He did nothing with the knives that he collected, and he did not gesture with them in any way or threaten other trailer court residents with the knives. *Id.* at 64-65. Betty Gray requested that Anthony Gallo provide her the knives, he provided her with knives in his possession, and she believed that he had given her every such knife upon her request. *Id.* at 64. Eventually, Anthony Gallo expressed suicidal thoughts to Betty Gray because he felt as though he could not "protect his troops." *Id.* at 65.

While Anthony Gallo moved around the trailer court, Betty Gray was made aware that one resident from the other side of the trailer court, in response to the situation, had stated to Harriet Southall that the resident possessed a gun and would come over to shoot Anthony Gallo. ECF No. 131 at 79. Harriet explained to that resident that Anthony Gallo was in the midst of a mental health event, and she instructed the woman to put her gun away and leave. *Id.* The other resident then left. *Id.*

Directly prior to the arrival of Defendant and Trooper Matt Shaffer (the "Troopers"), Anthony Gallo and Betty Gray were standing outside of Trailer 20, which belonged to Shirley Gray's neighbors, and which was positioned diagonally to Shirley Gray's trailer. ECF No. 131 at 65. Betty Gray had just observed Anthony interact with one of the neighbors that lived in Trailer 20. *Id.* at 66-67. During that interaction, Anthony Gallo stated that he wanted to protect that

neighbor and everyone else in the trailer court, and Betty Gray did not observe Anthony behave physically or verbally aggressive toward the neighbor. *Id*.

Betty Gray described her interactions with, and observations of, the Troopers as follows: as she waited for responders to the 911 call near the entrance door of Trailer 20, Betty Gray observed Defendant park and exit his vehicle approximately ten to fifteen feet from where she was standing and approach with an AR-15. ECF No. 131 at 67-68; 78. Betty Gray identified herself as Anthony Gallo's mother and tried to stop Defendant to explain the situation. *Id*. Defendant, trailed by Trooper Shaffer, who was also armed with an AR-15, told Betty Gray to "get the fuck out of the way." *Id*. When Anthony Gallo noticed the Troopers, he left his mother's side and walked into Trailer 20 at a normal walking pace. [2] *Id.* at 69. Trooper Shaffer asked if anyone was in the trailer, to which Betty Gray responded that "there's nobody but my son."[3] *Id.* at 70. Betty Gray was in Trailer 20 a few minutes prior to the Troopers arrival, thus forming the basis for her statement.[4] *Id*. The Troopers then followed Anthony Gallo into the trailer. *Id.* Betty Gray

---

[2] While a literal reading of Betty Gray's testimony would seem to suggest that Anthony Gallo walked straight into Trailer 20 after leaving his mother's side, the record tends to support, and it appears uncontested, that Anthony Gallo stopped and stood near the doorway of Trailer 20 for a period of a few seconds before entering the trailer. *See* ECF No. 131 at 105-123, 151-; *see also id.* at 79 (Betty Gray testifying that she heard the Troopers, seemingly before they entered the trailer, instruct Anthony Gallo to "put his hands up" repeatedly). The Troopers testified that they briefly attempted to interact with Anthony Gallo by shouting commands and further testified about Anthony Gallo's actions during that brief time period. As the Court would find that the Troopers' entry into the trailer was justified regardless of whether Anthony Gallo paused, and because the Troopers testimony about certain of Gallo's actions (or lack thereof) during that brief period are beneficial to Plaintiff's argument about the level of threat he posed, the Court believes that it is necessary to consider testimony involving Anthony Gallo's time standing outside Trailer 20 after the Troopers arrived at the scene in resolving the instant Motion.

[3] Trooper Shaffer testified that he does not recall Betty Gray identifying herself, asking the Troopers to put their guns down, offering to explain the situation, or stating that her son was the only occupant of the trailer. ECF No. 131 at 111-12. Defendant testified similarly. ECF No. 137 at 27; ECF No. 133 at 86. Because the Court must construe all evidence and inferences in a light most favorable to Plaintiff, and because the jury would have been permitted to believe the testimony of Betty Gray as to this issue, the Court presumes for purposes of this analysis that Ms. Gray presented an accurate description of her interaction with the Troopers, particularly where Trooper Shaffer merely testified that he did not recall such statements.

[4] While Betty Gray testified to this fact, it does not follow that the Troopers were, in fact, aware that the trailer was empty except for Anthony Gallo. *Graham v. Connor*, 490 U.S. 386, 396–97 (1989) ("The 'reasonableness' of a

collapsed and was taken to her mother's trailer after hearing gunshots. *Id.* at 71. At the time she heard the gunshots, Harriet Southall, Lauren Olshock, Robert Herring, and Tracy Jenkins were also outside Trailer 20. *Id.* The entire sequence, from the Troopers arrival to the final gunshot, lasted approximately twenty-five seconds.

Turning to the Troopers' description of the events of the day in question, Defendant and Trooper Shaffer were employed by the Pennsylvania State Police and assigned to a patrol section in Washington County, Pennsylvania at all times relevant herein. ECF No. 131 at 89-94; ECF No. 133 at 60. On October 1, 2017, Trooper Shaffer had been a trooper for approximately two years, ECF No. 131 at 168, and Defendant had been a trooper for approximately nine years, ECF No. 137 at 43; 50. Prior to the incident in question, the Troopers received training on the use of force and de-escalation techniques. ECF No. 131 at 114; ECF No. 137 at 38-39; 47; ECF No. 133 at 58-60. Defendant previously participated in training on how to deal with individuals in the midst of mental health episodes, and that training instructed that the officer should pause when dealing with such an individual. ECF No. 133 at 89. Defendant also testified to participating in several other training programs, including trainings on involuntary commitment, barricade situations, and hostage situations. *Id.* at 60. The Troopers were aware that, when faced with a scenario involving a potentially suicidal individual, they could call for a Special Emergency Response Team

---

particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."). The Troopers were confronted with a potentially dangerous scene where an armed individual who had ignored their commands entered a potentially occupied residence seconds after the Troopers' arrival and where he could have harmed an occupant or attempted to arm himself with a firearm. ECF No. 131 at 155-56. The Troopers had to determine whether Betty Gray, who had a potential bias to provide information that would prevent officers armed with AR-15s from entering a confined space with her son, or who simply could have been incorrect, might not have provided accurate information. They were not required to take her at her word in that exigent moment. The Court concludes without hesitation that no reasonable juror could find that the Troopers' entry into the trailer, in and of itself, under the circumstances presented herein was, or proximately caused, a violation of Anthony Gallo's constitutional rights.

("SERT"), which provides specialized backup for someone who is threatening suicide, but the Troopers did not call for a SERT on the day in question. ECF No. 131 at 109; ECF No. 137 at 44.

On October 1, 2017, the Troopers were working a 3:00 p.m. to 11:00 p.m. patrol shift, with each operating their own vehicle. ECF No. 131 at 137; 140; ECF No. 133 at 61. Approximately thirty minutes into their shift, the Troopers received a report from dispatch respecting Harriet Southall's 911 call about Anthony Gallo. ECF No. 131 at 92. Trooper Shaffer may have heard bits and pieces of the 911 call, but he did not hear the substance of the 911 call. *Id.* at 138. Based upon his read of the energy at the police station, Trooper Shaffer perceived this to be an urgent call. *Id.* at 140-41. Defendant testified that, from what he could hear of the 911 call, the woman on the other line (Harriet Southall) sounded flustered. ECF No. 133 at 65.

Defendant testified that he spoke to the dispatcher at the police station, and that she informed him that there was an individual "running around the trailer park" with a knife or a firearm and that the individual was breaking into trailers. ECF No. 133 at 65-66; 71. The Troopers also received information from dispatch over their radios about the 911 call, with Trooper Shaffer describing the sound quality as somewhat "in and out" and "less than ideal." ECF No. 131 at 86; 141-42; *see also* ECF No. 133 at 69. Trooper Shaffer testified that the information he received led him to believe that the individual that was the subject of the call was armed with a knife, breaking into homes, in a panic, and "out of control." ECF No. 131 at 106, 143; *see also id.* at 117 ("I was under the impression that there was a man armed with a knife, going crazy, threatening people[,] and trying to break into other people's homes.").[5] Defendant testified similarly as to his

---

[5] During trial, the jury heard a recording of the dispatch call the Troopers received on the day in question. *See* ECF No. 131 at 87. While Trooper Shaffer testified that he believed that the individual who was the subject of the 911 call, i.e., Anthony Gallo, was "threatening people" based upon the call from dispatch, the dispatcher informed the Troopers during the dispatch call that it was a neighbor and potentially others *who had threatened Anthony Gallo.* Accordingly, the jury would have been free to disbelieve Trooper Shaffer's testimony as to this point.

appreciation of the situation based upon the radio dispatch. ECF No. 137 at 24-26; 28; 38; ECF No. 133 at 71-73. Based upon the information he received from dispatch, Defendant suspected that the individual who was the subject of the 911 call, i.e. Anthony Gallo, was potentially committing the following crimes: felony burglary in progress, recklessly endangering another person, and terroristic threats. ECF No. 133 at 66; 71-72. Defendant cited public and officer safety as concerns associated with such a situation. *Id.*

Based upon the call from dispatch, Trooper Shaffer believed that someone at the scene was potentially armed with a firearm. ECF No. 131 at 143. Trooper Shaffer knew that the individual armed with a knife who was the subject of the 911 call, i.e., Anthony Gallo, was not armed with a firearm, but Trooper Shaffer was concerned that Anthony Gallo may attempt to obtain the firearm or that the individual might use the firearm on Anthony Gallo or someone else. *Id.* at 143-44. Defendant testified that, despite receiving information from dispatch, he remained unaware of whether the subject of the 911 call was armed with a firearm. ECF No. 133 at 72; 85. Defendant also testified that, upon arriving at the scene, he recognized Anthony Gallo as the subject of the 911 call, but still did not know whether Anthony Gallo possessed a firearm. ECF No. 137 at 24; ECF No. 133 at 72-73. Trooper Shaffer was aware that the individual who was the subject of the 911 call was threatening suicide and that the caller wanted the individual to be 302 committed. ECF No. 131 at 110; 112. Defendant testified that he did not know that the subject of the call was threatening suicide, but he did know that the individual's family had called 911 for help.[6] ECF

---

[6] Trooper Shaffer and Defendant each received the same dispatch call, and it bears noting that Trooper Shaffer testified that he was aware that Anthony Gallo had threatened suicide and that he was not the individual who allegedly possessed a firearm. During that call, the dispatcher stated that the subject of the call possessed a knife, and that a neighbor possessed a firearm. The dispatcher further stated that the individual with the knife was threatening suicide. On the call, troopers asked the dispatcher clarifying questions about whether the subject of the call possessed a gun or a knife, and the dispatcher again stated that the subject possessed only a knife. Defendant also testified that he armed himself with his AR-15 to "one-up" Anthony Gallo and gain a tactical advantage, stating: "He has an edged weapon, I need to have something bigger to keep me safe." ECF No. 133 at 74. Defendant testified that, when he arrived on

No. 137 at 26-27; ECF No. 133 at 84.  Trooper Shaffer described his understanding of Anthony Gallo's mental state as he approached the scene as follows: "That he may have been having a health crisis, some sort of mental break himself.  That he was acting irrationally, and he was threatening people, and he was out of control."  ECF No. 131 at 144.

The Troopers drove separately to the Mark II Trailer Court, arriving essentially simultaneously, with Trooper Weaver directly ahead of Trooper Shaffer.  ECF No. 131 at 93; ECF No. 133 at 69-71; 73.  The officers drove quickly and aggressively due to their appreciation of the nature of the incident at issue.  *Id.*   During the entirety of their time at Mark II Trailer Court, Defendant's lapel microphone failed to accurately record audio, purportedly due to a malfunction, ECF No. 137 at 39-40, and Trooper Shaffer was not wearing his lapel microphone, despite being required to do so, ECF No. 131 at 90.  Upon arrival, the Troopers exited their vehicles, each armed with an AR-15 (Defendant's police-issued AR-15 and Trooper Shaffer's personal AR-15[7]), and approached the scene, again with Defendant in the lead.  ECF No. 131 at 149-50.  Several individuals in the trailer court, including Betty Gray, motioned to the Troopers, directing them toward Anthony Gallo's location, as Gallo had moved closer to the door of Trailer 20 after the Troopers' arrival.  *Id.* at 105; 148; ECF No. 133 at 75.

Defendant testified that he was in an excited state upon arrival at the scene.  ECF No. 137 at 29.  Trooper Shaffer described the scene as chaotic, providing: "We had no idea who was doing

---

the scene, he thought that Anthony Gallo matched the description of the individual who was the subject of the 911 call. ECF No. 137 at 24.  The jury would have been permitted to consider these facts, as well as Defendant's potential incentive to mischaracterize his knowledge on the day in question, in weighing Defendant's testimony as to what he was told and what he understood about the incident before he arrived at the scene.

[7] There is some discrepancy about whether Trooper Shaffer had permission to carry his personal AR-15 on the date in question.  *See* ECF No. 131 at 95-98.  That issue is ultimately irrelevant to the Court's inquiry as to Defendant's actions, but the fact that each Trooper was, in fact, armed with an AR-15 is relevant to the Court's consideration of the totality of the circumstances of the incident at issue.

what or who was who, except the description of [Anthony Gallo]. And that another individual [was] armed with a firearm. So[,] upon our arrival our attempt was to control that situation." ECF No. 131 at 112. The Troopers immediately made contact with Anthony Gallo, who was standing by the door of Trailer 20. *Id.* at 123. Trooper Shaffer observed that Anthony Gallo possessed an approximately three-to-four-inch knife, which Gallo held at his side gripped tightly in his right hand. *Id.* at 107-08; 151. Defendant did not see the knife at that point. ECF No. 137 at 23; ECF No. 133 at 75. The Troopers were approximately thirty feet from Anthony Gallo at that juncture, and they had their AR-15s aimed at him as they approached. ECF No. 131 at 109; 115. Trooper Shaffer testified that he did not conduct interviews of anyone else at that time because his focus was on gaining control over the individual that was the subject of the 911 call, i.e., the "out of control" person armed with a knife who was entering other trailer court residents' homes. *Id.* at 152. Defendant testified that, due to the nature of the incident and his focus on Anthony Gallo, he did not have time to ask anyone else on the scene questions about whether Anthony Gallo possessed a firearm. ECF No. 137 at 25. Defendant was also focused on gaining control of the scene. ECF No. 133 at 75.

While outside the trailer, Anthony Gallo made no statement to the Troopers, stood stationary, and made no threats to anyone.[8] ECF No. 131 at 100-109; ECF No. 137 at 23-24. He made no slashing movement with the knife toward any individual, and he did not behave erratically or physically aggressive. ECF No. 131 at 108; ECF No. 137 at 23-24. The Troopers identified themselves and loudly issued commands that Anthony Gallo drop the knife. Gallo did not comply

---

[8] Defendant testified that Anthony Gallo said "come get me, come get me" before entering the trailer. ECF No. 137 at 15-16; ECF No. 133 at 85-86. Both Betty Gray and Trooper Shaffer testified that Anthony Gallo made no such statement. ECF No. 131 at 69; 101. Because all evidence and inferences most favorable to Plaintiff must be indulged, and because the jury certainly would have been permitted to believe the testimony of Betty Gray and Trooper Shaffer over Defendant's testimony, which, it bears noting, is inconsistent with prior statements he provided, the Court has omitted such a statement from its description of the facts. This inconsistency could also be considered by the jury in determining whether Defendant was, generally speaking, a credible witness.

with or respond to the Troopers' commands that he drop the knife and lay down on the ground. *Id.* at 113; 151. The Troopers did not ask Anthony Gallo any questions, and simply issued commands. *Id.* at 118-19. As the Troopers closed the distance between themselves and Anthony Gallo to approximately ten to fifteen feet, Anthony Gallo entered Trailer 20, and the door slammed behind him.[9] *Id.* at 109-11; 153. The Troopers did not know whether the trailer Anthony Gallo entered belonged to him, and they did not know whether anyone else was inside the trailer at that time. *Id.* at 153. Only a few seconds passed between the Troopers' arrival at the scene and Anthony Gallo entering the trailer. *Id.* at 117-18.

Defendant stated to Trooper Shaffer "let's go get him," and the Troopers immediately pursued Anthony Gallo into Trailer 20. ECF No. 133 at 87; ECF No. 131 at 119; 154. As bases for entry, Trooper Shaffer cited a desire to gain Anthony Gallo's compliance and concerns that Gallo may try to arm himself with a firearm or that there could be another person inside of the trailer whom Gallo could harm. ECF No. 131 at 119; 154. Defendant testified that he followed Anthony Gallo into the trailer to arrest him for felony burglary, to maintain a visual on Gallo, to protect the public, and to prevent escalation of an already dangerous situation. ECF No. 133 at 76-77. That said, prior to their arrival, the Troopers did not receive any information that Anthony Gallo had taken a hostage to that point, and they did not know whether anyone else was inside the trailer or whether there was another weapon inside the trailer. ECF No. 131 at 120; ECF No. 133 at 76.

Trooper Shaffer described Trailer 20 as small, dark, and cluttered. ECF No. 131 at 156-57. As to the layout of the trailer, the front door of the trailer opens into a living room area. *Id.* at 157-58. A straight, approximately three-foot wide hallway to the left of the living room ultimately

---

[9] It may be that the door slammed because it was designed to shut automatically after being opened. ECF No. 131 at 153. In any event, it is clear that the Troopers perceived the door to have been slammed by Anthony Gallo.

leads to a bedroom at the end of the trailer. *Id*. Before the bedroom, there are doors on the right side of the hallway that lead to a bathroom, a laundry room, and a storage closet. *Id*. When looking at the bedroom from the living room, only a portion, approximately a quarter, of the bedroom would be visible due to the width of the hallway. *Id.* at 158-59.

When the Troopers entered the trailer, they observed Anthony Gallo to their left at the near end of the hallway. ECF No. 133 at 78. At that point, Defendant was separated from Anthony Gallo by approximately ten feet, and he could not see whether Anthony Gallo possessed a weapon. *Id*. Once inside the trailer, Anthony Gallo continued to move away, without running, from the Troopers down the hallway toward the bedroom. ECF No. 131 at 121; 160. As he retreated, Anthony Gallo said "shoot me, just shoot me" to the Troopers. *Id.* at 120-21; ECF No. 133 at 78. Defendant testified that he found that statement concerning because he believed that it meant that Anthony Gallo was not thinking rationally and that he thus posed a threat of violence to Defendant or someone else. ECF No. 133 at 79. While inside the trailer, the Troopers screamed at Anthony Gallo to drop the knife, show his hands, and identify himself, and Gallo continued to ignore their commands. ECF No. 131 at 121; ECF No. 133 at 78. Defendant was in front of Trooper Shaffer and was thus a few feet closer to Anthony Gallo. ECF No. 131 at 121.

The Troopers pursued Anthony Gallo, whose back was to the Troopers, down the hallway, moving quickly and maintaining a distance of approximately two feet from Gallo. ECF No. 131 at 122. Given the structure of the trailer, the Troopers could have maintained a visual on Anthony Gallo without pursuing him at that point. *Id*. As justification for their pursuit, Trooper Shaffer cited a need to maintain a visual on Gallo and a concern for the possibility that a bystander could have been in the bedroom, and thus at risk of injury, or that Gallo may have been attempting to retrieve a firearm or another weapon. *Id*. Defendant cited his inability to view the entire bedroom,

16

his responsibility to protect others, and his concern that Anthony Gallo could escape out of the back of the trailer as his bases for pursuing Anthony Gallo.  ECF No. 137 at 22; ECF No. 133 at 79.  Defendant did not believe de-escalation techniques were appropriate at that time.  ECF No. 133 at 79.  He testified that, for de-escalation to be appropriate, Anthony Gallo would have needed to stop, turn around, and obey commands.  *Id.* at 79-80.

Defendant did not have pepper spray on his duty belt on the day in question, and the same is a violation of Pennsylvania State Police Policy.  ECF No. 137 at 31.  Defendant regularly did not bring pepper spray when on patrol.  *Id.*  Trooper Shaffer did not use pepper spray or a taser, despite having both in his possession on the day in question.  ECF No. 131 at 125-26.  He testified that the close proximity between the Troopers and Anthony Gallo would have rendered the use of a taser ineffective.  *Id.*; *see also id.* at 162.  Trooper Shaffer did, however, stow his AR-15 and draw his taser as the Troopers pursued Anthony Gallo down the hallway.  *Id.* at 160.  On the day in question, the Troopers were aware of Pennsylvania State Police guidance that instructed officers to maintain a distance of twenty-one feet from an individual armed with a bladed weapon in order to prevent that individual from closing the distance and harming the officer with the weapon.  *Id.* at 126-27; ECF No. 137 at 22.  Nonetheless, the Troopers pursued Anthony Gallo and maintained a constant distance of two feet from him.  ECF No. 131 at 127.

Anthony Gallo reached the bedroom at the end of the hallway, at which time he turned around to face the Troopers, who were, at that point, about two feet to three away from him at the threshold of the bedroom.  ECF No. 131 at 128; ECF No. 133 at 80.  Defendant testified that he did not retreat backwards because Trooper Shaffer was directly behind him and because the threat of danger to him was imminent because Anthony Gallo could move faster forward than Defendant

could move backward. ECF No. 133 at 80. Defendant testified that this was the point that he first saw the knife in Anthony Gallo's hand. *Id.* at 81.

When Anthony Gallo turned around, Trooper Shaffer did not have a good line of vision due to Defendant's position in front of him, but he did maintain a constant visual on Anthony Gallo from the waist up. ECF No. 131 at 163-64; 128-29. Trooper Shaffer testified that he could not see Gallo's hands or arms. *Id.* at 163-64; *but see* ECF No. 138 at 92-93 (Trooper Shaffer's unsworn statement to incident investigator that Trooper Shaffer could see the knife in Anthony Gallo's right hand, supporting Plaintiff's argument that Trooper Shaffer would have been able to observe if Anthony Gallo made an aggressive move with the knife). The Troopers gave several more commands for Anthony Gallo to show his hands, drop the knife, and get on the ground. ECF No. 131 at 163-64; ECF No. 133 at 81. Anthony Gallo did not comply with those commands. ECF No. 131 at 163-64. Anthony Gallo, at this time, was standing stationary and did not make a move toward Defendant with the knife.[10] *Id.* at 128-29.

When Anthony Gallo continued to ignore the Troopers' commands, Defendant fired five shots from his AR-15 at Anthony Gallo's chest at point blank range, hitting Gallo in the chest with

---

[10] Defendant testified that Anthony Gallo took a step toward Defendant and made a move with his right hand as though he were going to attack Defendant with the knife, and that Defendant fired because he was in fear of death or serious bodily injury from being stabbed. ECF No. 137 at 16-19; 46; 53; ECF No. 133 at 81. Trooper Shaffer testified that, while maintaining a constant visual on Anthony Gallo's upper half of his torso (given that Defendant was in front of him and partially obstructing his view) during the entirety of the encounter, he did not observe Anthony Gallo make any movement toward Defendant whatsoever. ECF No. 131 at 128-29. He further testified that he would have been able to see if Anthony Gallo made a move, and that he believes Defendant fired only because Anthony Gallo disregarded Defendant's commands. *Id.* He also provided an unsworn statement during the investigation into the incident that he could see the knife in Anthony Gallo's right hand. ECF No. 138 at 92-93. Again, the evidence must be construed in a light most favorable to Plaintiff, and the jury would have been permitted to believe the testimony of Trooper Shaffer over the Defendant's. Construed in a light most favorable to Plaintiff, the record for purposes of this Motion reflects that Anthony Gallo made no move toward Defendant in the trailer. In his briefing, Defendant repeatedly, and at times grossly, misstates the record on this issue in arguing that he is entitled to judgment in his favor on qualified immunity. *See* ECF No. 146 at 14 ("When Gallo moved toward Trooper Weaver with a knife, the only reasonable step available to Trooper Weaver to stop Gallo was to use deadly force."); *id.* at 15 ("Here, the right at issue is whether an individual has the right to be free from the use of deadly force when he threatens bystanders with a knife, disregards police commands and attempts to flee with a knife, and lunges at police officers with the knife."). Such misstatements ignore the legal standard applicable to a Rule 50 motion, and they carry no weight in the Court's analysis.

each of the shots.  ECF No. 131 at 128-129; ECF No. 133 at 82.  Trooper Shaffer testified that, to his knowledge, Defendant first fired at Anthony Gallo simply due to Gallo's failure to obey approximately sixteen total commands.  ECF No. 131 at 129.  He further testified that Defendant fired almost immediately upon reaching the threshold of the bedroom and issuing commands.  *Id.* at 164; *see also id.* at 163 ("Mr. Gallo, that's when I see Mr. Gallo facing towards us, and that we reach the threshold of his bedroom, and then we continued to issue commands for him to drop the knife.  'Drop the knife,' he says three or four times; we're yelling at him to drop the knife.  And then all of a sudden, when he doesn't do that, then Trooper Weaver fires on him.").  Defendant testified that, when he fired the first volley of five shots, he was in fear of death or serious bodily injury primarily due to the distance between Anthony Gallo and Defendant, approximately two to three feet.  ECF No. 137 at 20-21.

As a result of being hit in the chest by the first volley of shots, Anthony Gallo fell onto a bed, landing on his back.  ECF No. 131 at 129; ECF No. 133 at 82.  Trooper Shaffer and Defendant testified that they were not aware of whether Anthony Gallo had been hit by any of the first five shots.  ECF No. 131 at 166; ECF No. 133 at 82.  Defendant testified that Anthony Gallo appeared incapacitated after the first five shots.  ECF No. 133 at 82.  The Troopers then entered the bedroom, and Trooper Shaffer shifted to the right so that he had a better view of Anthony Gallo.  ECF No. 131 at 165-66.  Anthony Gallo still held the knife in his right hand at all times while on the bed.  *Id.*; ECF No. 133 at 82.  His body was spasming and quivering.  ECF No. 131 at 130; 132.  The Troopers continued to issue commands that Anthony Gallo drop the knife, and Gallo did not comply with those commands.  ECF No. 133 at 82.  Anthony Gallo then pulled his arms in closer to his body, began to roll side-to-side, rolled onto his right side, and appeared as though he was attempting to sit up.  ECF No. 131 at 130; 132; ECF No. 133 at 82-83.

Defendant then fired five more shots at Anthony Gallo, striking him five more times, including three shots in the lower back/hip/buttock area.  ECF No. 131 at 130-32.  Defendant testified that he believed that Anthony Gallo might be "playing dead" when he fired the second volley.  ECF No. 137 at 49.  He also testified that he was concerned that Gallo would stab him with the knife.  ECF No. 133 at 82-83.  Both Troopers testified that Anthony Gallo was still holding the knife after the second volley of shots.  ECF No. 137 at 49; ECF No. 133 at 83; ECF No. 131 at 170-71.  After the second volley, the Troopers were removed from the scene by other officers.  ECF No. 137 at 171-72.  Corporal Joseph Pokorny then used a ballistic shield to remove the knife from Anthony Gallo's hand.  ECF No. 133 at 126.  Anthony Gallo ultimately died as a result of being shot by Defendant.  ECF No. 137 at 147.

The Troopers did not, at any point, warn Anthony Gallo that they would shoot if he did not comply with their commands.  ECF No. 137 at 47-48.  As noted, the entire sequence, from the Troopers' arrival to the second volley of shots, unfolded in approximately twenty-five seconds.  ECF No. 131 at 174.

### ii. **Applicable Law on Qualified Immunity**

In this case, Plaintiff asserted a claim against Defendant under 42 U.S.C. § 1983 for excessive force in violation of the Fourth Amendment.  Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  With respect to Section 1983 claims against law enforcement officers, "a cause of action exists under § 1983 when a law enforcement officer uses force so excessive that it violates the Fourth and Fourteenth Amendments to the United States Constitution."  *Williams v. City of*

*York, Pennsylvania*, 967 F.3d 252, 259 (3d Cir. 2020).  To succeed on a claim for excessive force, a plaintiff must establish that a seizure occurred and that it was unreasonable.  *Id*.  "[A]pprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment."  *Abraham v. Raso*, 183 F.3d 279, 288 (3d Cir. 1999).  It is undisputed that deadly force was utilized in this case, and, accordingly, the Court's analysis will turn on whether Defendant's use of deadly force was reasonable under the circumstances presented herein.  The Third Circuit has explained:

> Because "the victim of deadly force is unable to testify," *Abraham v. Raso*, 183 F.3d 279, 294 (3d Cir.1999), we have recognized that a court ruling on summary judgment in a deadly-force case "should be cautious . . . to 'ensure that the officer[s are] not taking advantage of the fact that the witness most likely to contradict [their] story—the person shot dead—is unable to testify,'" *id.* (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)).  Thus, a court should avoid simply accepting "'what may be a self-serving account by the officer[s].  It must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer[s'] story, and consider whether this evidence could convince a rational fact finder that the officer[s] acted unreasonably.'"  *Id.* (quoting *Scott*, 39 F.3d at 915).

*Lamont v. New Jersey*, 637 F.3d 177, 181–82 (3d Cir. 2011).

In the context of an excessive force claim, "[q]ualified immunity is intended to shield government officials performing discretionary functions, including police officers, 'from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Kopec*, 361 F.3d at 776 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  A defendant bears the burden of establishing that qualified immunity applies.  *Id*.  Courts utilize a two-pronged inquiry in resolving an assertion of qualified immunity: "(1) whether the plaintiff sufficiently alleged the violation of a constitutional right, and (2) whether the right was clearly established at the time of the official's conduct.'"  *Williams*, 967 F.3d at 258 (quoting *L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 241 (3d

Cir. 2016)).  A court may perform this inquiry in the order it deems most appropriate for the case before it.  *Id.*

Because a seizure occurred in this case, the first prong requires consideration of whether Plaintiff submitted evidence sufficient to support a finding that Defendant's use of force was unreasonable.  The Third Circuit has explained:

> The test of reasonableness under the Fourth Amendment is whether under the totality of the circumstances, "the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivations." *Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989).  Thus, if a use of force is objectively reasonable, an officer's good faith is irrelevant and any bad faith motivation on his part is immaterial.  *See* [*Estate of Smith v. Marasco*, 318 F.3d 497, 515 (3d Cir. 2003)]; [*Abraham v. Raso*, 183 F.3d 279, 289 (3d Cir. 1999)].  Factors to consider in making a determination of reasonableness include the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he actively is resisting arrest or attempting to evade arrest by flight.  *See Graham*, 490 U.S. at 396, 109 S.Ct. at 1872.  A court in making a reasonableness assessment also may consider the possibility that the persons subject to the police action are violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time.  *See Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997).  As the Supreme Court has stated,

>> [t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . .  The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

> *Graham*, 490 U.S. at 396–97, 109 S.Ct. at 1872. "[R]easonableness under the Fourth Amendment should frequently remain a question for the jury," *Abraham*, 183 F.3d at 290; however, "'defendants can still win on summary judgment if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances,'" *id.* (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir.1994)); *see also Estate of Smith*, 318 F.3d at 516.

*Kopec v. Tate*, 361 F.3d 772, 776-77 (3d Cir. 2004); *see also Lamont*, 637 F.3d at 183 ("Monday morning quarterbacking is not allowed.").

With respect to the second prong, i.e., violation of a clearly established right, the United States Court of Appeals for the Third Circuit has explained:

> A clearly established right must be so clear that every "reasonable official would [have understood] that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). We do not charge officials with such an understanding unless existing precedent has "placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011). And we examine an official's "particular conduct" *id.* at 742, 131 S.Ct. 2074, in "the specific context of the case." *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (overturned on other grounds); *see also Mullenix v. Luna*, 577 U.S. 7, 136 S. Ct. 305, 308, 193 L.Ed.2d 255 (2015) (noting that specificity is "especially important" in the Fourth Amendment context, where it is sometimes difficult for an officer to determine how relevant legal doctrines will apply to the factual situation before him). In short, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

*Williams*, 967 F.3d at 259. It has further explained:

> "Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, —— U.S. ——, 138 S. Ct. 577, 589, 199 L.Ed.2d 453 (2018) (internal quotation marks and citation omitted). The inquiry is an "objective (albeit fact-specific) question," under which "[an officer]'s subjective beliefs . . . are irrelevant." *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Because the inquiry is from the perspective of a reasonable officer, we "consider [ ] only the facts that were knowable to the defendant officer [ ]." *White v. Pauly*, —— U.S. ——, 137 S. Ct. 548, 550, 196 L.Ed.2d 463 (2017) (citation omitted).

> In rare cases, a plaintiff may show that a right is clearly established if the "violation [is] 'obvious.'" *See Brosseau v. Haugen*, 543 U.S. 194, 199, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (quoting *Hope v. Pelzer*, 536 U.S. 730, 738, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)). In the excessive-force context, "obvious cases" are those that obviously violate *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), and *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). *See Brosseau*, 543 U.S. at 199, 125 S.Ct. 596. "[*Graham*] clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness." *Id.* at

198, 125 S.Ct. 596 (citation omitted).  And *Garner* held that "[deadly] force may not be used unless it is necessary to prevent . . . escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others."  471 U.S. at 3, 105 S.Ct. 1694.

But in most cases, a plaintiff must show that a right is clearly established because "the violative nature of particular conduct [was] clearly established.'"  *Ziglar v. Abbasi*, —— U.S. ——, 137 S. Ct. 1843, 1866, 198 L.Ed.2d 290 (2017) (quoting *Mullenix*, 136 S. Ct. at 308).  In other words, "settled law," *Wesby*, 138 S. Ct. at 590, must "'squarely govern[ ]' the specific facts at issue," *see Kisela v. Hughes*, – —— U.S. ——, 138 S. Ct. 1148, 1152, 200 L.Ed.2d 449 (2018) (quoting *Mullenix*, 136 S. Ct. at 309).  The Supreme Court has explained that a plaintiff may satisfy this standard by "identify[ing] a case where an officer acting under similar circumstances as [the defendant officer] was held to have violated the [constitutional provision at issue]."  *White*, 137 S. Ct. at 552.

For qualified-immunity purposes, "clearly established rights are derived either from binding Supreme Court and Third Circuit precedent or from a 'robust consensus of cases of persuasive authority in the Courts of Appeals.'"  *Bland v. City of Newark*, 900 F.3d 77, 84 (3d Cir. 2018) (citation omitted); *see Wesby*, 138 S. Ct. at 589–90 ("To be clearly established, a legal principle must . . . [be] dictated by controlling authority or a robust consensus of cases of persuasive authority[.]" (citations and internal quotation marks omitted)).  So we first look to factually analogous precedents of the Supreme Court and the Third Circuit.  *See L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 247–48 (3d Cir. 2016).  Then, we examine persuasive authorities, such as our nonprecedential opinions and decisions from other Courts of Appeals.  *See id*.  We may consider all relevant cases under this inquiry, not just those cited by the parties.  *See Elder v. Holloway*, 510 U.S. 510, 516, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994).

*James v. New Jersey State Police*, 957 F.3d 165, 169–70 (3d Cir. 2020).

The Supreme Court has cautioned that courts should "not to define clearly established law at a high level of generality."  *al-Kidd*, 563 U.S. at 742; *see also White*, 580 U.S. 73, 79 (2017) ("The panel majority misunderstood the 'clearly established' analysis: It failed to identify a case where an officer acting under similar circumstances as Officer White was held to have violated the Fourth Amendment.  Instead, the majority relied on *Graham*, *Garner*, and their Court of Appeals progeny, which—as noted above—lay out excessive-force principles at only a general level."); *City & Cnty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 613 (2015) ("Qualified immunity

is no immunity at all if 'clearly established' law can simply be defined as the right to be free from unreasonable searches and seizures.").

### iii. Analysis

In considering qualified immunity as to Defendant's first volley of five shots, the Court will initially constrain its analysis to only the "clearly established right" prong. The Court's analysis below will involve a more fulsome discussion of all of the circumstances at issue, including whether Defendant's reckless or deliberate pre-seizure actions needlessly created the need for deadly force during the incident at issue. Because there is case law that suggests that consideration of such pre-seizure actions might not always be appropriate, and because Plaintiff focuses so heavily on his "obvious case" argument, the Court believes it is both academically and logically sound to address three potential clearly established rights in this case. The Court will, as it is required, more fully define those potential clearly established rights in its more detailed analysis below.

For the sake of simplicity, the Court provides the following overly general summaries of the three potential clearly established rights, relevant and potentially at issue, in this case: (1) The first is whether Anthony Gallo had a clearly established right to be free from the force used on him with respect to the first volley of five shots (assuming Defendant had not, through his own reckless and deliberate conduct, created any exigency which gave rise to the need for the use of deadly force).[11] (2) The second is whether Anthony Gallo, under all of the circumstances, had a right to be free from the use of deadly force resulting from reckless and deliberate officer conduct that gave rise to any exigency that necessitated the use of deadly force in the form of all ten shots, and particularly the first five. (3) Finally, the Court will consider whether, under all the circumstances,

---

[11] In analyzing this first potential clearly established right, the Court will address Plaintiff's argument that this case is an "obvious" one under the guidance of *Garner* and *Graham*.

Anthony Gallo had an independent clearly established right to be free from the second volley of

five shots.  Because the Court finds that the first potential clearly established right at issue in this

case was not, at the time of the incident, in fact, clearly established, its analysis will only involve

consideration of the second prong of the qualified immunity analysis.  Because the Court finds that

the second two potential clearly established rights were clearly established as of October 1, 2017,

the Court will conduct a complete qualified immunity analysis as to those rights.

### a.   First Potential Clearly Established Right

As noted, the Court must first define the right at issue with a high degree of specificity.

*See Kelley v. O'Malley*, No. 22-1688, 2024 WL 1208080, at *3 (3d Cir. Mar. 21, 2024), *cert.*

*denied*, No. 24-266, 2024 WL 4529839 (U.S. Oct. 21, 2024) ("Applying those considerations, the

appropriate framing here is the right to be free from being shot by police officers after refusing

their commands, violently stabbing their K-9 with a knife, and being within eight feet of a nearby

officer with knife still in hand after previously engaging in a struggle with police officers, fending

off several non-lethal attempts at capture, and pointing a knife at an approaching officer.").  The

first potential clearly established right at issue in this case is Anthony Gallo's right to be free from

the use of deadly force where Gallo stood stationary at a distance of approximately two to three

feet from Defendant, where Gallo is wielding a knife at his side, where he had failed to adhere to

the Troopers' instructions to drop the weapon, where he had retreated into a confined space, i.e., a

trailer, after the Troopers first confronted him, where he retreated further down the hall after the

Troopers entered the trailer, and where the Troopers had received a report that Gallo had, prior to

the Troopers' arrival, entered neighboring trailers without permission and was "out of control."

The Court notes that "there need not be a '*precise* factual correspondence between the case at issue

and a previous case' for a right to be 'clearly established.'" *Peroza-Benitez v. Smith*, 994 F.3d 157, 169 (3d Cir. 2021) (quoting *Kopec*, 361 F.3d at 778).

Initially, the Court disagrees with Plaintiff that this is an "obvious case" under *Garner* or *Graham*, cases that set forth clearly established rights at a high level of generality but nonetheless can establish a clearly established right in what are now described as "obvious" situations. *See Gardner v. New Jersey State Police*, Civil No. 15-08982 (RBK/AMD), 2018 WL 5342715, at *11 (D.N.J. Oct. 29, 2018) ("'Obvious' cases are those where, under Gardner's facts here, *a suspect poses no threat of death or serious physical injury to others*." (emphasis added)); *see also Weinmann v. McClone*, 787 F.3d 444, 450 (7th Cir. 2015) ("*Graham* and *Garner* stand for the proposition that a person has a constitutional right not to be shot unless an officer reasonably believes that he poses a threat to the officer or someone else."). In *Garner*, the United States Supreme Court considered the "constitutionality of the use of deadly force to prevent the escape of an apparently unarmed suspected felon[,]" holding that "such force may not be used unless it is necessary to prevent the escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Garner*, 471 U.S. at 3. In *Garner*, a police officer responding to a suspected burglary shot a fleeing teenager in the back of the head where the officer was "reasonably sure" the suspect was unarmed. *Id.* at 3-4. The officer justified the shooting on the basis that he was convinced the suspect would "elude capture" if he were able to climb over a chain link fence. *Id*. The Supreme Court held and explained as follows:

> The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. It is no doubt unfortunate when a suspect who is in sight escapes, but the fact that the police arrive a little late or are

a little slower afoot does not always justify killing the suspect. A police officer may not seize an unarmed, non[-]dangerous suspect by shooting him dead. The Tennessee statute is unconstitutional insofar as it authorizes the use of deadly force against such fleeing suspects.

It is not, however, unconstitutional on its face. Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given. As applied in such circumstances, the Tennessee statute would pass constitutional muster.

*Garner*, 471 U.S. at 11–12.

In *Graham*, a diabetic plaintiff asked his friend to drive him to a convenience store so that he could purchase orange juice to counteract an insulin reaction. *Graham*, 490 U.S. at 388. Due to a long line at the store, the plaintiff quickly exited the store and asked his friend to drive him to another friend's house. *Id.* at 389. After observing this quick entrance and exit from the store, an officer initiated an investigatory stop and, despite being informed of the plaintiff's insulin reaction, required the plaintiff and his friend to remain at the location of the stop until such time as the officer could investigate what had occurred. *Id.* When the officer returned to request backup, the plaintiff exited his friend's vehicle, ran around the car twice, and eventually passed out briefly on the sidewalk. *Id.* Other officers reported to the scene and rolled the plaintiff over and tightly cuffed his hands behind his back, all in spite of his friend's pleas that the plaintiff be provided sugar. *Id.* Ignoring these pleas, an officer stated that the plaintiff was merely drunk, and several officers eventually placed the plaintiff on the hood of his friend's car. *Id.* The plaintiff eventually regained consciousness and asked the officers to check his wallet for a diabetic decal that he carried, but the plaintiff was rebuffed by an officer who shoved the plaintiff's face down against the hood of the car. *Id.* Four officers then grabbed the plaintiff and threw him headfirst into the

police car.  *Id*.  Another of plaintiff's friends brought some orange juice to the car, but the officers refused to allow the plaintiff to consume the orange juice.  *Id*.  Finally, the officer who initiated the stop received a report that the plaintiff had done nothing wrong at the convenience store, and the officers drove him home and released him.  *Id*.  During the course of the encounter, the plaintiff sustained a broken foot, cuts on his wrists, a forehead contusion, a shoulder injury, and a loud ringing in his right ear.  *Id.* at 390.

The Supreme Court explained that "[w]here, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons . . . against unreasonable . . . seizures' of the person."  *Graham* 490 U.S. at 394.  It further held:

> Today we make explicit what was implicit in *Garner*'s analysis, and hold that *all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard. . . .

*Id.* at 395.

In *Brosseau v. Haugen*, a case wherein an officer shot a suspect who was fleeing in an automobile in the back, the Supreme Court explained that "*Graham* and *Garner*, following the lead of the Fourth Amendment's text, are cast at a high level of generality."  *Brosseau*, 543 U.S. at 199.  It went on to state that, "[o]f course, in an obvious case, these standards can 'clearly establish' the answer, even without a body of relevant case law."  *Id*.  The Court held that *Brosseau* presented a situation "far from the obvious one where *Graham* and *Garner* alone offer a basis for

decision." *Id*.[12]  In describing the situation presented, the Supreme Court provided that the officer

had to decide "whether to shoot a disturbed felon, set on avoiding capture through vehicular flight,

when persons in the immediate area are at risk from that flight."  *Id.* at 200.  In comparing that

scenario to other cases, the Supreme Court explained:

> These three cases taken together undoubtedly show that this area is one in which
> the result depends very much on the facts of each case.  None of them squarely
> governs the case here; they do suggest that Brosseau's actions fell in the "'hazy
> border between excessive and acceptable force.'"  The cases by no means "clearly
> establish" that Brosseau's conduct violated the Fourth Amendment.

*Id.* at 201.  The Supreme Court ultimately overturned the Ninth Circuit's decision reversing the

district court's grant of summary judgment in the officer's favor on the basis of qualified immunity.

*Id*.

The United States Court of Appeals for the Third Circuit has reiterated that the standard

articulated in *Graham* is "cast at a high level of generality' and 'can clearly establish the answer,

even without a body of relevant case law,' *only* 'in an obvious case.'"  *El v. City of Pittsburgh*,

975 F.3d 327, 341 (3d Cir. 2020) (emphasis added).  By way of illustration of what might constitute

an "obvious case," the Third Circuit recently identified an "obvious case" in *Russell v. Richardson*,

905 F.3d 239 (3d Cir. 2018), a case relied upon by Plaintiff.  That case is easily distinguishable,

with the Third Circuit recently describing the case as follows:

> *Russell* was an "obvious case" of unconstitutional conduct because the officers
> there shot and paralyzed a minor who posed "no 'serious threat of immediate harm
> to others.'"  905 F.3d at 252 (quoting *Davenport v. Borough of Homestead*, 870
> F.3d 273, 281 (3d Cir. 2017)).  The minor "was relaxing, in his underwear, and
> unarmed" when law enforcement arrived to bring him before a judge.  *Id*. (internal
> quotation marks omitted).  Kelley, by contrast, was a 6'2" man weighing 213
> pounds who physically struggled with an officer, refused repeated commands to
> comply, brushed off pepper spray and taser darts, violently stabbed a police K-9,
> and was within eight feet of a nearby officer while brandishing a knife—a knife

---

[12] It is unclear whether Plaintiff cites *Brosseau* for its holding that *Graham* and *Garner* apply in an obvious case or on the mistaken belief that *Brosseau* itself was an obvious case.  In any event, *Brosseau* is certainly relevant to the Court's consideration of the qualified immunity issue in this case.

he'd previously pointed at another officer. "This is far from an obvious case in which any competent officer would have known that shooting [Kelley] to protect [O'Malley] would violate the Fourth Amendment." *Kisela*, 138 S. Ct. at 1153.

*Kelley*, 2024 WL 1208080, at *4.

In *Russell*, the Third Circuit described the background of the case leading up to the incident at issue as follows:

> At the time of the conduct at issue in this case, L.T. was 15 years old and had been designated by the Virgin Islands Superior Court a "Person in Need of Supervision" (PINS), meaning a "child" who, among other things, "habitually disobeys the reasonable demands of the person responsible for the child's care and is beyond their control." That designation also subjected L.T. to a court order directing him to "follow the reasonable rules of his mother while living with her." Apparently, however, his mother continued to have problems with his behavior.

> One day, concluding she needed "assistance" with ensuring L.T.'s compliance, Russell contacted the Superior Court and "requested that [L.T.] be brought before the judge to answer for his behavior." According to the complaint, she also "advised that her son was at home in his bed." In response to her request, several Superior Court Marshals, including Deputy Marshal Christopher Richardson, arrived at Russell's home later that day. L.T. was at that point "relaxing in his room, in his underwear and unarmed."

*Russell*, 905 F.3d at 244. The complaint in *Russell* alleged that Richardson shot L.T., rendering him quadriplegic, as L.T. was attempting to run past the marshals while unarmed and having never threatened bodily harm to the marshals or third parties. *Id.* at 244-245.

The clearly established constitutional right at issue in *Russell* was "the right of an *unarmed* individual to be free from the use of deadly force unless such force is 'necessary to prevent [his] escape and the officer has probable cause to believe that [he] poses a significant threat of death or serious physical injury to the officer or others.'" *Russell*, 905 F.3d at 252 (emphasis added) (quoting *Garner*, 471 U.S. at 3). *Russell* is readily distinguishable because Anthony Gallo was armed on the day in question, albeit with a modestly sized kitchen knife. The Third Circuit acknowledged that *Garner* lays out excessive force principles at only a general level, but explained

31

that, while "*Garner* usually 'do[es] not by [itself] create clearly established law,' it may do so in an 'obvious case,' for example, where the circumstances reflect 'the absence of a serious threat of immediate harm to others.'" *Id.* (citation omitted) (quoting *Davenport*, 870 F.3d at 281). Finding that *Russell* presented an obvious case, the Third Circuit explained:

> According to the complaint, Richardson used deadly force against L.T. even though there was no indication L.T. was then engaged in any misconduct beyond disobeying his mother; immediately before the incident, L.T. was allegedly lounging in his bedroom; and L.T. allegedly exited his room wearing only underwear, making it implausible to a reasonable officer that he was hiding a weapon on his person. Accepting these allegations as we must at this stage, there was no "serious threat of immediate harm to others," *Davenport*, 870 F.3d at 281, and "[t]he absence of any *Garner* preconditions to the use of deadly force" makes this an "obvious case where . . . *Garner* clearly establishes the law," *Smith v. Cupp*, 430 F.3d 766, 776 (6th Cir. 2005). *See Henry v. Purnell*, 652 F.3d 524, 527, 536 (4th Cir. 2011) (en banc) (holding, where an officer shot "an unarmed man wanted for [a] misdemeanor . . . when he started running away," that "[n]othing removes this case from the straightforward context of *Garner*").

*Id*.

While Plaintiff cites to *El v. City of Pittsburgh*,[13] a case that did not involve the use of deadly force, in support of his "obvious case" argument, the Third Circuit held that *El* did not present an obvious case, explaining:

> This case does not present that kind of situation, but the *Graham* and *Sharrar* factors nevertheless buttress the robust consensus of persuasive authority from our sister Circuits. As discussed above, the factors all tend to show that Officer Welling's force was excessive: there was no serious crime, no immediate safety threat, and no resistance or flight by the Els; they were not armed and were significantly outnumbered. While we would not hold that these factors, by themselves, clearly established Will's right to be free of the kind of force Officer Welling used, they support the consensus of cases that show clear establishment of the right.

*El*, 975 F.3d at 341-42. The Court finds that *El* involved a patently distinguishable factual scenario and does not support Plaintiff's argument.

---

[13] As with *Brousseau*, it is unclear whether Plaintiff cites *El* for its explanation that *Graham* and *Garner* apply in an obvious case or on the mistaken belief that *El* was itself an obvious case. Again, in any event, *El* is certainly relevant to the Court's consideration of the issue of qualified immunity.

The Court believes that its holding that the present case is not an "obvious case" is most readily established by the Supreme Court's decision in *Kisela v. Hughes*, 584 U.S. 100 (2018), an undeniably instructive, analogous, and binding case, though one that Plaintiff attempts to distinguish.  In *Kisela*, officers, including Andrew Kisela, responded to a 911 welfare check call from a neighbor who stated that they had observed a woman, ultimately determined to be Amy Hughes, hacking a tree with a large kitchen knife.  *Kisela*, 584 U.S. at 101.  Upon arriving at the scene, officers observed another woman, Sharon Chadwick, standing near a parked car, with a chain-link fence and a locked gate separating the officers from Chadwick.  *Id*.  Hughes, who matched the description of the woman who was the subject of the 911 call, emerged from a house and approached Chadwick while still holding the large kitchen knife, stopping approximately six feet from Chadwick.  *Id*.

At that time, the three officers who were present for the encounter drew their firearms and instructed Hughes to drop the knife on at least two occasions.  *Kisela*, 584 U.S. at 101.  Construing the facts in a light most favorable to Hughes, the Supreme Court explained that Chadwick told both Hughes and the officers on the scene to "take it easy."  *Id*.  Hughes appeared calm, but she did not acknowledge the officers' presence or drop the knife.  *Id.* at 102.  Because the top bar of the fence obstructed Kisela's line of fire, he dropped to the ground and shot Hughes four times through the fence.  *Id*. The officers then jumped the fence, handcuffed Hughes, and called paramedics, who transported Hughes to a hospital where she was treated for non-life-threatening injuries.  *Id*.  Less than one minute had transpired from the moment the officers saw Chadwick to the moment Kisela fired shots.  *Id*.

Each of the three officers later stated that they believed that Hughes posed a threat to Chadwick.  *Kisela*, 584 U.S. at 102.  They later learned that Hughes and Chadwick were

roommates, that Hughes had a history of mental health issues, and that, on the day in question, Hughes was upset over a purported $20.00 debt. *Id*. Chadwick stated that, on the day in question, her boyfriend had informed her that Hughes had threatened to kill Chadwick's dog. *Id*. Chadwick further stated that she came home to find a "somewhat distressed" Hughes holding the dog in one hand and the knife in the other. *Id*. The officers were not aware of any of this information. *Id*. Chadwick further stated in her affidavit that she did not feel endangered at any point, and that, "[b]ased on her experience as Hughes'[s] roommate, Chadwick stated that Hughes 'occasionally has episodes in which she acts inappropriately,' but 'she is only seeking attention.'" *Id*.

In *Kisela*, the majority found that the officer who shot Hughes was entitled to qualified immunity because he did not violate Hughes's clearly established statutory or constitutional rights of which a reasonable person would have known in shooting her. In her dissent, Justice Sotomayor, joined by Justice Ginsburg, notably described the facts at issue as follows:

> Officer Andrew Kisela shot Amy Hughes while she was speaking with her roommate, Sharon Chadwick, outside of their home. The record, properly construed at this stage, shows that at the time of the shooting: Hughes stood stationary about six feet away from Chadwick, appeared "composed and content," and held a kitchen knife down at her side with the blade facing away from Chadwick. Hughes was nowhere near the officers, had committed no illegal act, was suspected of no crime, and did not raise the knife in the direction of Chadwick or anyone else. Faced with these facts, the two other responding officers held their fire, and one testified that he "wanted to continue trying verbal command[s] and see if that would work." But not Kisela. He thought it necessary to use deadly force, and so, without giving a warning that he would open fire, he shot Hughes four times, leaving her seriously injured.

*Kisela*, 584 U.S. at 108-09 (Sotomayor, J., dissenting). In holding that *Kisela* did not present an obvious case of excessive force, the majority explained:

> Kisela says he shot Hughes because, although the officers themselves were in no apparent danger, he believed she was a threat to Chadwick. Kisela had mere seconds to assess the potential danger to Chadwick. He was confronted with a woman who had just been seen hacking a tree with a large kitchen knife and whose behavior was erratic enough to cause a concerned bystander to call 911 and then

> flag down Kisela and Garcia. Kisela was separated from Hughes and Chadwick by
> a chain-link fence; Hughes had moved to within a few feet of Chadwick; and she
> failed to acknowledge at least two commands to drop the knife. Those commands
> were loud enough that Chadwick, who was standing next to Hughes, heard them.
> This is far from an obvious case in which any competent officer would have known
> that shooting Hughes to protect Chadwick would violate the Fourth Amendment.

*Kisela*, 584 U.S. 105–06.

Even construing the record in a light most favorable to Plaintiff, the situation presented

herein is materially similar to that presented in *Kisela*, which, again, the Supreme Court majority

found was "far" from an obvious case. Anthony Gallo was armed with a kitchen knife that he held

at his side, and he ignored the Troopers' repeated commands that he drop the knife, put his hands

in the air, and lie down. More detrimental to Plaintiff's obvious case argument, the evidence of

record could support Defendant justifiably finding probable cause to believe that Anthony Gallo

may have committed burglary, endangering another person, and terroristic threats when he arrived

at the scene on the day in question. Anthony Gallo eventually retreated into a potentially occupied

residence during the incident, and, when the first volley of shots was fired, he was closer to

Defendant than Hughes was to Chadwick. Hughes appeared calm, made no verbal threat to the

officers or Chadwick, was not suspected to have committed any crime, and held a knife at her side.

Chadwick told the officers to "take it easy." The police in *Kisela* reported to Hughes's location

on a welfare check, and there was no report of criminal activity.

The cases are similar in that both Anthony Gallo and Hughes stopped and stood stationary

while feet away from the individual that the officers purportedly believed to be under threat of

harm, Chadwick in *Kisela* and Defendant in this case. Each possessed a knife at their side. Each

ignored more than one command to drop their weapon. Both encounters lasted less than one

minute. While it is true that officers believed that Hughes posed a threat to a bystander, as opposed

to Defendant's purported fear for his own safety in this case, the Court believes that the same is

not enough to render a clearly established right finding "obvious" in this case. *Kopec*, 361 F.3d at 776 ("Factors to consider in making a determination of reasonableness include the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers *or* others, and whether he actively is resisting arrest or attempting to evade arrest by flight." (emphasis added)); *see also James*, 957 F.3d at 171 (individual with gun pointed at his own head posed threat to officers as opposed to bystanders). In sum, the Court simply disagrees with Plaintiff's argument that "*Kisela* could not be more inapposite," ECF No. 154 at 49, simply because a bystander, as opposed to an officer, was in danger in *Kisela*.

If the fact pattern in *Kisela* is far from an obvious case, the Court believes that this case is also not an obvious one. Given the Supreme Court's holding in *Kisela*, Plaintiff is simply incorrect that it is per se unlawful for an officer to shoot someone who is in possession of a deadly weapon for disobeying police commands. If the suspect is close enough to pose a threat of serious physical injury or death, a subsequent affirmative step or move toward law enforcement or a bystander is simply not required under *Kisela*. Where the Supreme Court has definitively ruled on the issue, it is simply irrelevant that both expert witnesses in this case agreed with Plaintiff's point of view. The Court finds that it is unquestionable that Anthony Gallo posed a threat of death or serious physical injury to Defendant when the two were separated by two or three feet at the end of the trailer's hallway, and further finds that this case is simply not an "obvious one."

It bears noting that the incident at issue in *Kisela* took place in May of 2010. Accordingly, as of that date, there was no clearly established right to be free from the force at issue in that case. Having concluded that *Kisela* involved a situation that is analogous to the situation at issue in this case, the Court will look to cases decided between May of 2010, when the *Kisela* incident took place, and October 1, 2017, when the incident at issue in this case took place, in determining

36

whether Anthony Gallo had a clearly established right to be free from the first volley of shots in this case. It also bears noting that, in *Kisela*, there was no indication that the officer's own unreasonable acts resulted in the necessity for deadly force. In this case, the Court believes that there is evidence of record indicating that Defendant's own actions created the threat that necessitated the use of deadly force. Accordingly, the Court will also, in eventually considering the totality of the circumstances, take into account Defendant's actions on the day in question, and in particular his actions upon entering Trailer 20.

As noted, in determining whether officers violated a clearly established right, courts look for a factually analogous case where an officer acting under similar circumstances was held to have violated the Fourth Amendment. *James*, 957 F.3d at 169–70. The Court must look to whether the state of the law as of October 1, 2017, the date of the incident at issue, gave Defendant fair warning that his conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Plaintiff, opting to rely on his "obvious case" argument, has not attempted to point the Court to, or advanced argument respecting, "analogous cases."[14] In this manner, Plaintiff has adopted an approach similar to that discussed by the United States Court of Appeals for the Third Circuit in *Kelley*, wherein the Third Circuit explained:

> Appellants do not point to a single case from any court clearly establishing the right at issue, a point Appellants repeatedly conceded at oral argument. Instead, Appellants assert this is an "obvious" case of unconstitutional conduct under the general excessive force standards in *Tennessee v. Garner*, 471 U.S. 1 (1985), and *Graham v. Connor*, 490 U.S. 386 (1989). *See Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam) (announcing the "obvious case" exception to the specificity requirement). It is not, and Appellants' sole reliance on *Russell v. Richardson*, 905 F.3d 239 (3d Cir. 2018), is misplaced.

---

[14] That said, a court may consider all relevant cases under the qualified immunity inquiry, not just those cited by the parties. *James*, 957 F.3d at 170.

*Kelley*, 2024 WL 1208080, at *4 (footnotes omitted). In a footnote, the Third Circuit further explained:

> To the contrary, the Supreme Court, this Court, and other courts hold there is no clearly established right against the use of deadly force where a victim brandishes a lethal weapon, defies commands to surrender, and the officer has probable cause to believe a person is in imminent danger. *See, e.g., Kisela*, 138 S. Ct. at 1153; [*City of Tahlequah v. Bond*, 142 S. Ct. 9, 10-14 (2021)]; *James*, 957 F.3d at 168, 170–73; [*Harris v. Serpas*, 745 F.3d 767, 773 (5th Cir. 2014)].

*Kelley*, 2024 WL 1208080 at *4 n.5. Applied to the facts at issue in this case, this footnote suggests that Plaintiff, in the absence of reckless or deliberate police conduct that created the necessity for the use of deadly force, has not proven a violation of a clearly established right with respect to the first volley of five shots, though the Court acknowledges that the instant matter is more factually analogous to *Kisela* than to *Kelley*. *See Kelley*, 2024 WL 1208080 at *3 ("Applying those considerations, the appropriate framing here is the right to be free from being shot by police officers after refusing their commands, violently stabbing their K-9 with a knife, and being within eight feet of a nearby officer with knife still in hand after previously engaging in a struggle with police officers, fending off several non-lethal attempts at capture, and pointing a knife at an approaching officer.").

In *City of Tahlequah, Oklahoma v. Bond*, the Supreme Court considered a situation wherein officers used deadly force against an individual who they knew to be intoxicated and who they knew would not leave his ex-wife's garage. *City of Tahlequah*, 595 U.S. at 10. While the case was considered by the Supreme Court in 2021, the conduct at issue took place in August of 2016. *Id.* In that case, the individual refused a weapons search and repeatedly ignored officer commands as he approached a workbench, retrieved a hammer, and raised it above his head. *Id.* at 11. His initial retreat was in response to one of the reporting officers taking a step toward him. *Id.* The individual then ignored commands that he drop the hammer, and instead took a few steps to his

right to provide an unobstructed path to one of the officers, none of whom was within six feet of the individual. *Id*. When the individual lifted the hammer as though he would throw it or charge the officers, two officers fired their weapons, killing the individual. *Id*. The district court found the use of force reasonable and that, even if it was not, the officers were entitled to qualified immunity. *Id*. The Tenth Circuit reversed, concluding that officer's reckless or deliberate conduct in moving toward and "cornering" the individual created a situation requiring deadly force, thus rendering the use of force unconstitutional. *Id.* at 12. It further held that several cases established that the officers' conduct was unlawful, precluding a finding that the officers were entitled to qualified immunity. *Id*.

The Supreme Court explained that they need not determine "whether the officers violated the Fourth Amendment in the first place, or whether recklessly creating a situation that requires deadly force can itself violate the Fourth Amendment[,]" because, on the record before the Court, the officers "plainly did not violate any clearly established law." *City of Tahlequah*, 595 U.S. at 12. The Supreme Court described the officers' conduct as follows: they "engaged in a conversation with Rollice, followed him into a garage at a distance of 6 to 10 feet, and did not yell until after he picked up a hammer." *Id.* at 13. Distinguishing the cases relied upon by the Tenth Circuit, the Supreme Court explained that "[n]either the panel majority nor the respondent has identified a single precedent finding a Fourth Amendment violation under similar circumstances." *Id*.

In *James v. New Jersey State Police*, a case involving the use of deadly force by an officer in May 2011, the Third Circuit held that an officer did not violate a suspect's clearly established rights where the suspect refused to drop a firearm when ordered to do so. *James*, 957 F.3d at 166-67. Describing the officer's knowledge of the situation at the time of the shooting, the Third Circuit explained that the officer was aware that the suspect, Willie Gibbons: "(1) had violated a

restraining order; (2) was in possession of a firearm that he had brandished within the last hour; and (3) was reportedly mentally ill and may not have been taking his medication." *Id.* at 168. The day before the shooting, officers responded to a report of domestic violence wherein Gibbons's girlfriend reported that Gibbons had struck her and that he had a firearm in his truck. *Id.* at 167. The girlfriend obtained a temporary restraining order prohibiting Gibbons from possessing a gun or returning to his girlfriend's house. *Id.* Gibbons violated the restraining order by returning to his girlfriend's house the next day, and a friend contacted the police to report the same. *Id.* The girlfriend informed reporting officers that Gibbons had waved a firearm during the course of an argument that occurred that day, and further informed them that Gibbons may have been off his schizophrenia medication. *Id.* at 167-68. After receiving a report of Gibbons's location, four officers reported to the scene, with Trooper Bartlet being the first to engage Gibbons. *Id.* at 168. Trooper Bartelt first approached by car and heard Gibbons say, "stay away from me." *Id.* Upon exiting his vehicle, Trooper Bartelt observed that Gibbons was holding a gun pointed at his own head. *Id.* Trooper Bartelt drew his firearm, stood behind his car door, twice told Gibbons to drop his weapon, and ordered him to "come over here." *Id.* Gibbons did not comply with those commands and may have repeated, "stay away from me." *Id.* Within seconds of stopping his car and while separated from Gibbons by seven to fifteen yards, Trooper Bartelt then shot Gibbons twice. Gibbons later died from his wounds. *Id.*

Focusing its analysis on whether Trooper Bartelt violated Gibbons's clearly established rights, the Third Circuit held that, as of May 25, 2011, "no Supreme Court precedent, Third Circuit precedent, or robust consensus of persuasive authority had held that 'an officer acting under similar circumstances as [Trooper Bartelt] . . . violated the Fourth Amendment.'" *James*, 957 F.3d at 170. The Third Circuit found that *Kisela* presented the closest factually analogous Supreme Court case.

*Id.* at 171.  In particular, the Third Circuit focused on the fact that both suspects were armed with a weapon (one with a large knife and the other with a gun), that each suspect ignored multiple orders to drop their weapon, that the suspects were in striking distance of a bystander (in *Kisela*) or the officers (in *James*), and that the entire situation unfolded in less than a minute.[15]  Prior to the first volley of shots, Anthony Gallo was armed with a knife that was not pointed in Defendant's direction, was within striking distance of Defendant, was suspected of committing burglary, had retreated into a potentially occupied trailer, had ignored multiple commands to drop his weapon, and the entire situation unfolded in a matter of seconds.  Again, in the absence of reckless or deliberate police conduct that necessitated the use of deadly force, the scenarios in *Kisela* and *James* are materially similar to that presented herein.

In addressing out of circuit cases involving non-threatening, armed, suicidal suspects, the Third Circuit further explained in *James* that:

> The caselaw of our sister circuits prohibits the use of deadly force against non-threatening suspects, even when they are armed and suicidal.  But none of the cases that stand for this general principle involve the "high 'degree of specificity'" required to clearly establish a right under the circumstances Trooper Bartelt faced.

*James*, 957 F.3d at 173.  The Third Circuit finally concluded that certain cases cited by the plaintiff from sister circuits, while bearing some factual similarity, did not create a clearly established right under the facts presented in *James*.[16]  *Id.*

---

[15] The Third Circuit also distinguished *Bennett ex rel. Est. of Bennett v. Murphy*, 120 F. App'x 914 (3d Cir. 2005) on the grounds of the difference in the responding officers' knowledge, the distance between the officers and the suspects, the degree of noncompliance displayed by the suspects, and the duration of the encounters.

[16] Those cases included: *Weinmann v. McClone*, 787 F.3d 444 (7th Cir. 2015) (affirming denial of summary judgment on qualified immunity where facts could support a finding that an officer made an unannounced entry into a garage where a reportedly suicidal man sat in a chair with a shotgun across his lap, and where the officer made only a limited attempt to view what the suspect was doing and did not try to talk to the suspect, but rather kicked open the door and immediately started firing) and *Cooper v. Sheehan*, 735 F.3d 153 (4th Cir. 2013) (affirming denial of summary judgment on qualified immunity where the facts could support a finding that officers approached a mobile home, never announced their presence or identified themselves as officers, and immediately opened fire without warning when the

While not a Third Circuit or Supreme Court case, *Connor v. Thompson*, 647 F. App'x 231 (4th Cir. 2016) also provides helpful analysis in the context of this case.  In *Connor*, an uncle contacted 911 to request assistance in transporting his nephew to a psychiatric hospital because the nephew was threatening to commit suicide.  *Id.* at 233.  The nephew was drunk, but willing to speak to a doctor.  *Id.*  While several individuals tried to talk the nephew out of suicide, he retrieved a paring knife from the kitchen and unsuccessfully attempted to cut his own wrist.  *Id.* at 234.  Thereafter, an officer arrived at the scene and stood in the entrance foyer.  The uncle ascended four stairs to retrieve his nephew, and then both the nephew and the uncle began descending the stairs, with the nephew still in possession of the paring knife.  *Id.*  When the uncle and nephew were halfway down the stairs, the officer spotted the knife, and then drew his weapon and ordered the nephew to drop the weapon.  *Id.*  The command was repeated by the officer, the uncle, and a third roommate, but the nephew did not comply.  *Id.*  When the nephew reached the bottom of the stairs, the officer fired twice, killing the nephew.  *Id.*  Construing disputed facts in a light most favorable to the non-moving party, the district court described the facts as follows:

> [The officer] testified that he saw [the nephew] with the knife in his hand while [the nephew] was on the second step and while [the officer] had just crossed the threshold of the front door.  The front door remained opened at all times.  The knife [the nephew] had in his hand was a small paring knife.  [The nephew] slowly staggered down two steps while holding on to the wall to support himself.  [The uncle] testified that [the nephew] never rushed toward [officer] or made any aggressive moves or steps.

*Connor*, 647 F. App'x at 234.

---

suspect, responding to the sounds made by the officers on approach but unaware the sounds were made by police officers, emerged from his mobile home with a shotgun pointed at the ground and asked who was there; holding that, while the gun was real, an objective basis for a threat was not – as the suspect made no sudden moves, made no threats, and ignored no commands).  They also included *Connor v. Thompson*, 647 F. App'x 231 (4th Cir. 2016) and *Glenn v. Washington Cnty.*, 673 F.3d 864, 866 (9th Cir. 2011), each of which will be discussed and cited later in this Opinion.

In addressing reasonableness, the Fourth Circuit explained that the nephew was not suspected of a crime, as his uncle had only called 911 because his nephew was suicidal and needed help. *Connor*, 647 F. App'x at 237. The nephew was also not fleeing or attempting to evade arrest, but was rather staggering down the steps at the instruction of his uncle so that he could be transported to a hospital for treatment. *Id*. The analysis thus turned on whether the nephew's actions could be reasonably believed to have constituted an immediate threat to the officer or another person. *Id*. The Fourth Circuit explained that the nephew possessed a paring knife, refused to comply with repeated commands to drop the weapon, and continued down the stairs, but that the nephew never raised his knife, changed hands, or acted aggressively with it, and further could barely walk, undercutting the officer's assertion that deadly force was necessitated by a risk that the nephew would charge and attack the officer. *Id*. at 237-38. The officer was also aware that the nephew was suicidal, thus explaining possession of the knife. *Id.* at 237. The Fourth Circuit concluded as follows on whether the plaintiff had established the violation of a constitutional right:

> [W]e fail to see how [the facts, construed in manner most favorable to plaintiff,] would give a reasonable officer "probable cause to believe that [the nephew] pose[d] a significant threat of death or serious physical injury to the officer or others." Those assumed facts depict a non-aggressive, partially incapacitated, non-criminal holding a knife in his own residence while providing no indication that the knife was about to be used to harm someone else. Using deadly force against such an individual is unconstitutional. . . .

*Id.* at 238 (citation omitted).

As to whether the officer's actions violated a clearly established constitutional right, the Fourth Circuit explained:

> In this case, [the officer] confronted a suicidal and obviously impaired but non-aggressive man who refused to drop a knife held in a non-threatening manner while "slowly stagger[ing]" down stairs. The front door remained open behind [the officer] at all times. We think the unconstitutionality of using deadly force in that specific context was apparent.

*Connor*, 647 F. App'x at 239 (citation omitted).  Apparently finding the case an "obvious" one under *Garner* because the nephew posed no imminent threat, the Fourth Circuit explained that "[n]o reasonable officer could think that a suicidal, non-criminal individual holding a small paring knife and otherwise acting in a nonthreatening manner who had difficulty standing and walking presents justification to deviate from *Garner's* bright-line proscription."  *Id*.

It bears noting that *Connor* is out of circuit, and apparently relies on an "obvious" case finding, a finding that this Court has held is inapplicable in this case in light of the Supreme Court's decision in *Kisela* and the Third Circuit's decision in *James*, cases decided after *Connor*.  The Court again notes that *Connor* is also a case that the Third Circuit rejected in *James* as demonstrating a clearly established right.  That said, the weapon possessed in *Connor* is more similar to the weapon possessed in this case than the weapons in *James* (firearm) or *Kisela* (butcher knife).  The nephew in *Connor* and Anthony Gallo in this case each ignored multiple orders to drop their weapons.  The officer in *Connor* and Defendant were each made aware that they were reporting to scenes to address incidents involving individuals who had threatened suicide.  The similarities end there though, as, when the first volley of shots was fired, Anthony Gallo was suspected of a crime by Defendant, was ignoring commands while retreating, if not actively fleeing to avoid arrest, and was not appreciably incapacitated in the manner described in *Connor*.[17]  The nephew in *Connor* was slowly staggering toward the officer for purposes of being driven to a hospital by the officer, and he was not suspected of a crime.  The nephew was, as the officer knew, intoxicated, suicidal, and partially incapacitated to the extent that he had difficulty standing and could barely walk.  When Defendant fired the first volley of shots, Anthony Gallo was standing,

---

[17] It bears noting that Defendant testified that, before Defendant fired the second volley of five shots, Anthony Gallo appeared incapacitated.  ECF No. 133 at 82.  Focusing on this fact, *Connor* tends to support a violation of Anthony Gallo's clearly established rights with respect to the second volley of shots.

was not appreciably incapacitated, was in possession of a knife, and was separated from Defendant

by a distance of two to three feet.  Simply put, when the first volley of shots was fired, there is a

distinction in the threat level posed to the officer under the facts in this case and the facts in *Connor*.

Again, this Court finds that this is not an "obvious case."

     *Lamont v. New Jersey* is also instructive, particularly because it was decided by the Third

Circuit in 2011.  In that case, a suspected car thief fled into dark and dense woods, became trapped

in a thicket, and was eventually surrounded by five pursuing officers.  *Lamont*, 637 F.3d. at 180.

In describing the officers' use of deadly force, the Third Circuit provided:

> Immediately prior to the shooting, the suspect had been standing with his right hand concealed in his waistband and appeared to be clutching an object.  After being ordered both to show his hands and to freeze, the suspect suddenly pulled his right hand out of his waistband—not as if he were surrendering—but as though he were drawing a gun.  The sudden movement prompted the officers to open fire, leading to the suspect's death.  The officers fired their guns for 10 solid seconds, shooting a total of 39 rounds.  Eighteen bullets hit the suspect, 11 of them from behind.  It turned out that the suspect was not clutching a weapon; he was holding a crack pipe.

*Id.* at 179.

     In discussing the officers' initiation of the use of deadly force on the suspect, the Third

Circuit explained in *Lamont*:

> When they encountered Quick again, the troopers repeatedly ordered him to show his hands and to freeze.  Quick refused to comply.  Instead, he stood with his right hand concealed in his waistband, apparently clutching an object.  He then suddenly pulled his right hand out of his waistband—a movement uniformly described by those on the scene as being similar to that of drawing a gun.  At that point, the troopers were justified in opening fire.  "An officer is not constitutionally required to wait until he sets eyes upon [a] weapon before employing deadly force to protect himself against a fleeing suspect who . . . moves as though to draw a gun." [*Thompson v. Hubbard*, 257 F.3d 896, 899 (8th Cir. 2001)].  Waiting in such circumstances could well prove fatal.  Police officers do not enter into a suicide pact when they take an oath to uphold the Constitution.  *See also Krueger v. Fuhr*, 991 F.2d 435, 439 (8th Cir.1993) (shooting was reasonable where, during a foot chase of an armed assault suspect, the suspect suddenly reached into his waistband despite having been ordered to freeze); *Reese v. Anderson*, 926 F.2d 494, 500–01 (5th Cir.1991) (shooting was reasonable where officers approached the vehicle of

45

a robbery suspect and, after being ordered to show his hands, the suspect reached under his seat multiple times).

*Lamont*, 637 F.3d at 183-84.

The Third Circuit, however, agreed with the plaintiff that a triable issue of fact remained with respect to the officers' continued use of force after the first shots were fired, stating that, "[e]ven where an officer is initially justified in using force, he may not continue to use such force after it has become evident that the threat justifying the force has vanished." *Lamont*, 637 F.3d at 184. As justification for its decision to overturn the district court's decision, the Third Circuit explained:

> Here, the troopers opened fire as Quick yanked his right hand out of his waistband. At that point, the troopers reasonably believed that Quick was pulling a gun on them. But after Quick made this sudden movement, his right hand was visible to the troopers, who were standing between five and eight feet away and had their flashlights trained on him. (Indeed, Modarelli has stated that he could see Quick's right hand while firing his weapon.) Although Quick's weaponless right hand was fully visible immediately after the troopers began firing, the troopers continued to fire for roughly 10 seconds, shooting a total of 39 rounds. On these facts, a reasonable jury could conclude that the troopers should have recognized that Quick was unarmed and stopped firing sooner.

> We have not overlooked the fact that, just as the troopers began firing, Carson's flashlight was struck by a projectile, causing him to fall to the ground. We assume that the troopers could reasonably have believed that the flashlight was hit by return fire, thus justifying the further use of deadly force. But the evidence shows that the flashlight was hit as the first shots were fired. In our view, a jury could find that the troopers should have realized that Quick did not have a weapon some time thereafter and ceased fire.

> We are, moreover, concerned by the fact that 11 of the 18 bullets that struck Quick hit him from behind. The troopers try to explain this by saying that Quick spun around and fell to the ground as the final shots were fired. Frankly, this explanation sounds a bit far-fetched. If the troopers' account were accurate, one might expect to discover that a small number of bullets hit Quick from behind. In fact, more than half of the 18 bullets that struck Quick hit him from behind. In these circumstances, a jury may find that the troopers *improperly continued firing after Quick had turned away from them and no longer posed a threat*.

46

*Id.* at 184-85 (emphasis added).  The Third Circuit explained that the defendant officers could be found to have violated a clearly established right because "[i]t has long been the law that an officer may not use deadly force against a suspect unless the officer reasonably believes that the suspect poses a threat of serious bodily injury to the officer or others."  *Id.* at 185.  In that way, it appears that the continued firing in *Lamont* shifted a case from one where qualified immunity applied because the officers reasonably perceived a threat to an "obvious" case where force was used after a suspect no longer posed a threat.

It bears noting that, in *Lamont*, the Third Circuit also rejected the plaintiff's argument that the officers' decision to pursue the suspect into the woods, as opposed to establishing a perimeter and attempting to flush him out with a K-9 unit, violated standard police procedures and was unreasonable, and that any force utilized was thus unreasonable as a result of the unreasonable pursuit.  Finding that this argument was based upon a flawed understanding of the doctrine of proximate causation, the Third Circuit explained that, "as long as 'the officer['s] use of force was reasonable given the plaintiff's acts, then despite the illegal entry, the plaintiff's own conduct would be a [superseding] cause that limited the officer['s] liability.'"  *Lamont*, 637 F.3d at 186 (quoting *Hector v. Watt*, 235 F.3d 154, 160 (3d Cir. 2000)).  The Third Circuit held that the officers' decision to enter the woods did not proximately cause the suspect's death, but rather the suspect's "noncompliant, threatening conduct in the woods was a superseding cause that served to break the chain of causation between the entry and the shooting."  *Id*.  It explained that, to hold otherwise would serve to discourage police officers "from approaching and detaining potentially violent suspects."  *Id.* (quoting *Hundley v. D.C.*, 494 F.3d 1097, 1105 (D.C. Cir. 2007).

Simply put, in the absence of reckless or deliberate conduct on Defendant's part that created the need for the use of deadly force, Anthony Gallo did not have a clearly established right

of which a reasonable officer would have known to be free from the first volley of five shots. *Kisela*, a case that involved a May 2010 use of deadly force and that is factually analogous to the situation presented herein, makes clear that an officer can fire at an individual who disobeys police commands to drop a deadly weapon in circumstances materially similar to that presented herein. Defendant had probable cause to believe that Anthony Gallo posed a threat of serious bodily injury or death to Defendant when Defendant fired the first volley of shots, and Plaintiff is incorrect that this is an "obvious case" under *Garner* and *Graham* simply because Defendant fired at Anthony Gallo for not complying with Defendant's commands under the circumstances presented herein and under *Kisela*.

### b. Second Potential Clearly Established Right

As noted, the Court believes that it is also necessary, when considering the totality of the circumstances, to look to cases where the need to use deadly force resulted from potentially unreasonable actions on the part of officers, particularly given Defendant's actions following his entry into the trailer.[18]  This implicates another potential clearly established right, whether Anthony Gallo had a clearly established right to be free from reckless and deliberate police conduct (Defendant's continued advancement on Anthony Gallo in Trailer 20 and Defendant's failure to maintain a safe distance) that created the threat to the Troopers and thus the need for the use of deadly force, where Anthony Gallo had retreated into a trailer and the Troopers, (in this Court's estimation) reasonably, pursued him into the trailer, where Gallo was armed with a knife, and

---

[18] The Court notes that Plaintiff advanced argument respecting the same during his closing statement.  *See* ECF No. 139 at 60 ("Again, the crux of this case is Weaver wanted to escalate this, and he did, and *he chases Gallo down the hall violating his own 21-foot rule, escalate, escalate, escalate*.  And then when Gallo doesn't obey his commands, he kills him.  That is excessive force, folks." (emphasis added)).  Defendant also acknowledges such an argument in his briefing.  *See* ECF No. 146 at 12 ("Furthermore, even if officers 'create the need to use' deadly force by trying to disarm a mentally disabled person, the reasonableness of force depends on the threat the person poses prior to the shooting.").  Based on its review of the relevant case law, the Court believes that Defendant is incorrect that the Court should focus only on the moment of the shooting in resolving the applicability of qualified immunity.

where he disregarded police commands, but where he was also alone and cornered in a confined space with no visible means of escape, where he made no verbal threat of violence and made no move toward the officers, where the Troopers knew Gallo was in the midst of a mental health event, and where his ability to attack the officers with a three-to-four inch steak or paring knife was limited and only became possible when Defendant continuously advanced on Gallo in the trailer at a distance of two feet.

In *Ardo v. Pagan,* 652 F. Supp. 3d 545, 552 (E.D. Pa. 2023), two officers used deadly force against a man they knew was suicidal and likely in possession of an explosive device, with the United States District Court for the Eastern District of Pennsylvania explaining as follows:

> The two troopers responded to a call in *May 2017* made by the mother of an emotionally disturbed man who repeatedly threatened suicide and the use of an explosive device. Upon the arrival of the man at his mother's house, the troopers blocked in the man's vehicle while he sat inside, immediately exited their patrol cars wielding guns, shouted conflicting commands at the man, and ultimately fired eight rounds at him upon seeing him move a lit lighter toward a device attached to his neck. After initially falling down in the car after being shot, the man sat back up within four seconds. In response, one trooper, without giving any further verbal commands or confirming whether the man was still a physical threat, fired three more rounds toward him. The man died shortly thereafter from his gunshot wounds.

*Id.* at 549 (emphasis added).

The officers in *Ardo* had essentially set up a sting operation in an effort to arrest and involuntarily commit the suspect. *Ardo*, 652 F. Supp. 3d at 552-53. At the officers' direction, the suspect's mother called the suspect and offered to lend him money if he came to her home. *Id*. The suspect agreed to this proposal, but he informed his mother that he would detonate an explosive device on his neck if he saw law enforcement officers at her house. *Id*. The suspect arrived at his mother's house, where officers intended to apprehend him when he entered the home, but would not leave his vehicle, instead demanding that his mother come to the car and reiterating

his threat to ignite an explosive device if he saw a police officer. *Id.* at 553. The officers, fearing

that the suspect was likely to flee with an explosive device to a more densely populated area if not

apprehended at that time, then utilized their patrol cars to block the suspect's vehicle from moving.

*Id.* They subsequently exited their vehicles and approached the suspect's vehicle while shouting

commands. *Id.* The officers, citing a fear for the harm that could occur to themselves and the

suspect from the detonation of the device, fired eight total shots at the suspect after becoming

aware that the suspect was wearing a device around his neck and had raised a lit lighter near the

device.[19] *Id.* at 554. At that time, the suspect fell over and disappeared from view, and one of the

officers began to approach the vehicle. *Id.* As the officer approached, the suspect began to sit up

at a normal pace, resulting in the officer firing three additional shots without further warning,

without having view of the suspect's hands or face, and without having observed a rekindled lighter

flame. *Id.*

In discussing the clearly established right prong of the qualified immunity analysis, the

*Ardo* court defined the right at issue as follows:

> [A]n officer violates the Fourth Amendment when his or her reckless or deliberate
> conduct results in the need for lethal force or when the officers rely on lethal force
> unreasonably as a first resort in confronting an irrational suspect who is armed only
> with a weapon of short-range lethality and who has been confined on his own
> property.

*Ardo*, 652 F. Supp. 3d at 561 (relying on the same right defined in *Allen v. Muskogee, Okl.,* 119

F.3d 837 (10th Cir. 1997) and quoting *Estate of Ceballos v. Husk*, 919 F.3d 1204, 1219 (10th Cir.

2019) for the proposition that "*Allen* clearly established that constitutional right.")). Finding no

particularly analogous Supreme Court or Third Circuit precedent, the *Ardo* court collected a

---

[19] The "device" was ultimately determined to be an aerial mortar firework that was attached to the decedent's shirt collar. *Ardo*, 652 F. Supp. 3d at 555.

number of cases[20] decided before May 2017 that had cited and recognized the right discussed in

*Allen v. Muskogee, Okl. Id.* at 562.  It further explained that:

> [O]ther circuit courts and district courts within the Third Circuit have found that
> police officers can violate a person's Fourth Amendment rights when their need to
> use deadly force arose from their own unreasonable behavior.  *See, e.g., Estate of
> Starks v. Enyart*, 5 F.3d 230, 234 (7th Cir. 1993) ("Police officers who
> unreasonably create a physically threatening situation in the midst of a Fourth
> Amendment seizure cannot be immunized for the use of deadly force."); *Neuburger
> v. Thompson*, 305 F. Supp. 2d 521, 528 (W.D. Pa. 2004) (stating that officer's
> unreasonable actions creating need to use deadly force "may render the eventual
> use of deadly force by the officer unreasonable in violation of the Fourth
> Amendment" (quoting *Grazier v. City of Philadelphia*, 328 F.3d 120, 129 (3d Cir.
> 2003) (Becker, C.J., dissenting))), *aff'd*, 124 F. App'x 703 (3d Cir. 2005).  While
> such cases may speak about Fourth Amendment rights in more general terms than
> the right this court defined above, they still appear comparable enough to reinforce
> the notion that the right alleged here had been clearly established in law by the time
> that the Troopers used deadly force against Mr. Ardo.

*Id.*

Following its review, the *Ardo* court concluded that there was enough support in the case

law to demonstrate that the right at issue in *Ardo* was clearly established as of May 20, 2017.  *Id.*

at 562-63.  With respect to the first volley of shots fired by the officers, the *Ardo* court ultimately

denied summary judgment to the officers on the issue of qualified immunity, finding neither

qualified immunity prong to be satisfied because the officers "potentially engaged in reckless

behavior that created their need to fire the initial eight shots against [the suspect]" and because the

suspect was "'an irrational suspect . . . armed only with a weapon of short-range lethality and . . .

confined on his [mother's] property.'"  *Id.* at 563.

As noted, the *Ardo* court relied heavily on *Allen v. Muskogee, Okl.*, 119 F.3d 837 (10th Cir.

1997), a case wherein the Tenth Circuit also held that officers violated an individual's clearly

---

[20] *Cunningham v. Gates*, 312 F.3d 1148, 1154 (9th Cir. 2002); *Pena v. Leombruni*, 200 F.3d 1031, 1034 (7th Cir.
1999); *Brown v. Blanchard*, 31 F. Supp. 3d 1003, 1010–12 (E.D. Wis. 2014); and *Buchanan ex rel. Estate of Buchanan
v. Maine*, 417 F. Supp. 2d 45, 68 (D. Me. 2006).

established rights where the officers' need to use deadly force arose from their own unreasonable actions. In *Allen*, the suspect, Terry Allen, left his home while in possession of ammunition and several firearms after an altercation with his wife and children, eventually parking in front of his sister's house. *Allen*, 119 F.3d at 839. Law enforcement officers were informed of the altercation, that the suspect was armed, that he had threatened family members, and that he had an outstanding warrant for impersonating a law enforcement officer. *Id*. Officers later received a 911 call advising them that the suspect was parked in front of his sister's home and threatening to commit suicide. *Id*. An officer responded to the scene and ordered all bystanders near the vehicle to step back, and the bystanders complied with that order. *Id*. At that time, the suspect was sitting in the driver's seat of the vehicle with one foot out of the vehicle and had a firearm in his right hand, which was resting on the console between the seats. *Id*.

A second officer arrived and joined the first officer at the driver's side door of the suspect's vehicle. *Allen*, 119 F.3d at 839. The first officer then reached into the vehicle to attempt to seize the firearm from the suspect's right hand, while the second officer attempted to restrain the suspect's left arm. *Id*. A third officer then approached the vehicle and attempted to open the passenger side door, which led to the suspect then pointing his firearm at that officer, who ducked in response and moved behind the suspect's vehicle. *Id*. The suspect then swung his firearm toward the other two officers, shots were exchanged, and the suspect was struck four times resulting in his death. *Id*. The officers fired a total of twelve shots, and the entire encounter lasted approximately ninety seconds. *Id*.

The Tenth Circuit explained that "[t]he excessive force inquiry includes not only the officers' actions at the moment that the threat was presented, but also may include their actions in the moments leading up to the suspect's threat of force." *Allen*, 119 F.3d at 840. It acknowledged

that the use of force at issue must be considered from the perspective of a reasonable officer on the scene, often involving split-second decisions, but reiterated that "[t]he reasonableness of Defendants' actions depends both on whether the officers were in danger at the precise moment that they used force and on whether Defendants' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." *Id.* (quoting *Sevier v. City of Lawrence, Kan.*, 60 F.3d 695, 699 (10th Cir. 1995). The Tenth Circuit thus considered whether the officers' conduct prior to the suspect's threat of force was "immediately connected" to the suspect's threat of force. *Id*. In deciding that a genuine issue of fact existed with respect to the reasonableness of the officers' actions, the *Allen* court explained that, given differences in witness testimony about the manner in which the officers approached the situation, "a reasonable jury could conclude on the basis of some of the testimony presented that the officers' actions were reckless and precipitated the need to use deadly force." *Id.* at 840-41.

Particularly important to this portion of this Court's inquiry is the Third Circuit's discussion in *Johnson v. City of Philadelphia*, 837 F.3d 343 (3d Cir. 2016), which was decided before the conduct at issue in this case. While the Third Circuit ultimately affirmed the district court's grant of summary judgment in a defendant officer's favor on the basis that the defendant reasonably used deadly force to defend himself, it also discussed at length the issue of proximate causation where officer conduct necessitates the use of lethal force. In that case, an officer reported to a scene where an approximately six-foot tall, 220-pound man who was high on PCP stood naked in front of what was later determined to be his girlfriend's house. *Johnson*, 837 F.3d at 346. This was the third call received by officers about a naked individual in the area, but the only time where the suspect was located. *Id*. The same officer responded to all three calls. *Id*. Upon pulling up to the house, the responding officer exited his vehicle with a taser drawn and directed the suspect to

"come here." *Id*.  The suspect yelled obscenities and flailed his arms, ignored several further directives from the officer, and eventually entered the house for approximately two seconds before reemerging.  *Id*.  During the entirety of the encounter, the suspect remained completely naked, and the officer could see that the suspect was unarmed.  *Id*.

After reemerging from the house, the suspect ran toward the officer while yelling, and he ignored two verbal commands to stop.  *Johnson*, 837 F.3d at 346.  The officer fired his taser into the suspect's chest when the suspect was five feet away, but the suspect continued to run toward the officer.  *Id*.  The suspect struck the officer in the head multiple times, threw him against a parked van, and then pushed him into a parked SUV.  *Id*.  While they wrestled, the suspect reached for the officer's holstered gun, and the officer managed to unholster his gun and then fired two shots into the suspect's chest at a distance of no more than two inches.  *Id*.  The suspect reached for the gun again, and the officer fired another round into the suspect's chest.  *Id*.  While still grappling, the suspect reached for the gun yet again, and the officer fired a final shot into the suspect's chest.  *Id*.  The suspect collapsed and later died from his wounds.  *Id*.

The district court in *Johnson* rejected the plaintiff's argument that the officer should have retreated when he encountered the suspect and awaited backup as opposed to confronting the suspect, holding that the suspect's "violent attack, and particularly his attempt to take [the officer's] gun, severed any causal link between [the officer's] initial actions at the scene and his subsequent use of lethal defensive force."  *Johnson*, 837 F.3d at 346.  The Third Circuit began its analysis with "a proposition that can scarcely be disputed: once [the suspect] began reaching for [officer's] gun, [the officer] was justified in using deadly force to defend himself[,]" and that "no reasonable juror could conclude that it was unreasonable for [the officer] to deploy lethal force in response."  *Id.* at 350.

The Third Circuit did not end its inquiry at that juncture, however, noting that "[a] proper Fourth Amendment analysis requires us to assess not only the reasonableness of [the officer's] actions at the precise moment of the shooting, but the 'totality of circumstances' leading up to the shooting." *Johnson*, 837 F.3d at 350.  The plaintiff in *Johnson* argued that the officer's use of force was unreasonable because the officer never should have confronted the suspect in the first place, citing "a Philadelphia Police Department directive that instructs officers who encounter severely mentally disabled persons (including persons experiencing drug-induced psychosis) to wait for back-up, to attempt to de-escalate the situation through conversation, and to retreat rather than resort to force." *Id*.  The *Johnson* plaintiff further argued that it was unreasonable to disregard that police directive where the officer, based on his experience, should have known that the suspect was disturbed and likely high on PCP; where the officer knew that the suspect was naked and unarmed; and where the officer himself had responded to two prior calls to the same area without receiving any indication that the naked suspect was endangering or threatening anyone. *Id.* at 350-51.

The Third Circuit did not "automatically discount" the plaintiff's Fourth Amendment argument or the two presumptions on which it rested: "that official police department policies may be considered among other things in the reasonableness inquiry and that a 'totality of the circumstances' analysis should account for whether the officer's own reckless or deliberate conduct unreasonably created the need to use deadly force." *Johnson*, 837 F.3d 351.  Similar to *Lamont*, the Third Circuit did not delve any further into such constitutional considerations because it found that the plaintiff's argument failed on the more fundamental tort principle of proximate causation. *Id*.  It noted that the issue of proximate causation is typically one of fact reserved for the jury, but that it can be resolved as a matter of law where there "is no evidence from which a

jury could reasonably find the required proximate, causal nexus between the careless act and the resulting injuries." *Id.* at 352.

In discussing whether the suspect's actions constituted a superseding cause of his own injury, the Third Circuit explained:

> While there is no precise test for determining when a civilian's intervening acts will constitute a superseding cause of his own injury, relevant considerations include whether the harm actually suffered differs in kind from the harm that would ordinarily have resulted from the officer's initial actions; whether the civilian's intervening acts are a reasonably foreseeable response to the officer's initial actions; whether the civilian's intervening acts are themselves inherently wrongful or illegal; and the culpability of the civilian's intervening acts

*Johnson*, 837 F.3d at 352. It further held that the suspect's "violent, precipitate, and illegal attack on [the officer] severed any causal connection between [the officer's] initial actions and his subsequent use of deadly force during the struggle in the street[,]" explaining:

> Whatever harms we may expect to ordinarily flow from an officer's failure to await backup when confronted with a mentally disturbed individual, they do not include the inevitability that the officer will be rushed, choked, slammed into vehicles, and forcibly dispossessed of his service weapon. We therefore have little trouble concluding that [the suspect's] life-threatening assault, coupled with his attempt to gain control of [the officer's] gun, was the direct cause of his death.

*Id*. Sounding a "note of caution," the *Johnson* court went on to explain:

> The question of proximate causation in this case is made straightforward by the exceptional circumstances presented—namely, a sudden, unexpected attack that instantly forced the officer into a defensive fight for his life. As discussed above, that rupture in the chain of events, coupled with the extraordinary violence of [the suspect's] assault, makes the Fourth Amendment reasonableness analysis similarly straightforward. Given the extreme facts of this case, our opinion should not be misread to broadly immunize police officers from Fourth Amendment liability whenever a mentally disturbed person threatens an officer's physical safety. Depending on the severity and immediacy of the threat and any potential risk to public safety posed by an officer's delayed action, it may be appropriate for an officer to retreat or await backup when encountering a mentally disturbed individual. It may also be appropriate for the officer to attempt to de-escalate an encounter to eliminate the need for force or to reduce the amount of force necessary to control an individual. Nor should it be assumed that mentally disturbed persons are so inherently unpredictable that their reactions will always sever the chain of

causation between an officer's initial actions and a subsequent use of force. If a plaintiff produces competent evidence that persons who have certain illnesses or who are under the influence of certain substances are likely to respond to particular police actions in a particular way, that may be sufficient to create a jury issue on causation. And of course, nothing we say today should discourage police departments and municipalities from devising and rigorously enforcing policies to make tragic events like this one less likely. The facts of this case, however, are extraordinary. Whatever the Fourth Amendment requires of officers encountering emotionally or mentally disturbed individuals, it does not oblige an officer to passively endure a life-threatening physical assault, regardless of the assailant's mental state.

*Id.* at 352-53 (footnotes omitted).

It bears noting that *Johnson* was a case where the Third Circuit ultimately determined that there was no genuine material dispute that the officer reasonably used deadly force to defend himself from the suspect's attack. The Third Circuit did not consider whether the officer had violated a clearly established right, but it did acknowledge, and did not discount, the assertion that a "totality of the circumstances' analysis should account for whether the officer's own reckless or deliberate conduct unreasonably created the need to use deadly force." *Johnson*, 837 F.3d 351. *Johnson's* value in this Court's analysis lies in this acknowledgement, and in its "note of caution," but it does not constitute precedent establishing a clearly established right in this case. That said, Defendant was at least on notice under both *Johnson* and *Lamont* that courts in the Third Circuit consider the totality of the circumstances, including officer conduct that occurs leading up to a seizure, in resolving excessive force claims.

*Johnson* is also noticeably factually distinct, particularly in that this case does not involve the "extraordinary" attack at issue in *Johnson*. Here, Anthony Gallo merely retreated until there was nowhere left for him to go. After that, Defendant advanced, closing distance, until Anthony Gallo, who possessed a weapon of only short-range lethality, and who was now trapped alone in a trailer, became, because of Defendant's closing of distance, a threat of serious bodily injury or

death to Defendant.  There was testimony in this case that supports a finding that Defendant's advancement toward Plaintiff once in the trailer, as opposed to simply maintaining his position or retreating and maintaining a perimeter around the trailer, was deliberate, dangerous, and reckless, and that it was inconsistent with Pennsylvania State Police guidance, not "good police work," and gave Defendant no option other than to shoot Anthony Gallo.  *See* ECF No. 137 at 191-96; 204-07; ECF No. 132 at 14-15; 43-46.  While Anthony Gallo's failure to drop the knife in the trailer was certainly a cause of his injury in a manner similar to *Lamont*, the jury would be permitted to conclude, on this record, that it was Defendant's own reckless and deliberate actions, and particularly his aggressive and unnecessary advancement on Anthony Gallo once inside the trailer, that were the proximate cause of the need for deadly force, and, thus, that the use of deadly force violated Anthony Gallo's rights under the United States Constitution.  The issue of proximate causation was one that was properly left for the jury to decide in this case.

There are a number of other relevant decisions that discuss pre-seizure officer conduct and its role in the reasonableness inquiry that could support a finding of a clearly established right in this case.  *See Est. of Singletary v. City of Philadelphia*, No. 19-CV-190-JMY, 2021 WL 5235232, at *8 (E.D. Pa. Nov. 10, 2021)[21] (performing proximate cause analysis and denying summary judgment where, in May 2017, the officer defendants "chose to initiate the one-on-one conflict with [the suspect] in violation of [police policy] even though [the suspect] was confined to his room and posed no threat to other citizens," and holding that "there is clearly established law and a robust consensus of cases supporting the proposition that the decision to storm [a suspect's] room

---

[21] The Court includes citations to cases decided after October of 2017, including *Ardo* above, not for purposes of establishing that Defendant would or should have been aware of such cases before the incident at issue.  Rather, many of these cases involve *conduct* that took place prior to October of 2017.  Accordingly, to the extent that these cases involved a denial of summary judgment on qualified immunity, they tend to support the existence of a clearly established right prior to October of 2017, and they are instructive in that they provide discussion and analysis of cases decided before October of 2017 supporting the existence of such a clearly established right.

when he was a danger to no one and not a flight risk, and subsequent decision to fatally shoot him, if he was no longer a threat from being subdued by a taser, constitutes an unreasonable use of force."); *see also Est. of Starks v. Enyart*, 5 F.3d 230, 232-34 (7th Cir. 1993) (no qualified immunity where officer purportedly jumped in front of fleeing suspect's stolen, speeding vehicle and then utilized deadly force in self-defense where the underlying offense was not violent in nature, noting that "the key dispute for the factfinder will be whether [the officer] stepped in front of [the suspect's] rapidly moving cab, leaving [the suspect] no time to brake[,]" and that, [i]f he did, then [the officer] would have unreasonably created the encounter that ostensibly permitted the use of deadly force to protect him, because the decedent would have been unable to react in order to avoid presenting a deadly threat to [the officer]."); *Neuburger v. Thompson*, 305 F. Supp. 2d 521, 528 (W.D. Pa. 2004) (accepting principle that an officer's actions in unreasonably creating a need to use deadly force in self-defense "'may render the eventual use of deadly force by the officer unreasonable in violation of the Fourth Amendment, even if the officer reasonably believed that such force was necessary to prevent death or severe bodily injury' at the moment it was employed[,]" (quoting *Grazier v. City of Philadelphia*, 328 F.3d 120, 129–30 (3d Cir. 2003) (Becker, C.J., dissenting)), but also holding, as of 2001, "we cannot say that the complaint states a violation of clearly established law."); *Abraham*, 183 F.3d at 291-93 (holding that the events that transpired during an officer's pursuit of a suspect but before the seizure could be considered in evaluating the reasonableness of the use of deadly force, and explaining: "We are not saying, of course, that all preceding events are equally important, or even of any importance.  Some events may have too attenuated a connection to the officer's use of force.  But what makes these prior events of no consequence are ordinary ideas of causation, not doctrine about when the seizure occurred."); *id.* at 295-96 (acknowledging split in authority on relevance to reasonableness inquiry

of officer's actions that create the necessity of deadly force, but not reaching the issue); *Luna-Diaz v. City of Hackensack Police Dep't*, No. CV 16-3270 (EP) (JSA), 2022 WL 18024213, at *16 (D.N.J. Dec. 30, 2022) (denying summary judgment on qualified immunity for 2015 incident relying on *Johnson* causation analysis, acknowledging that the question of whether unreasonable police conduct preceding shooting could be considered remained open and explaining the incident and its holding as follows: "Officers nevertheless entered the House, then followed Elvin into a confined space (the kitchen) where there was at least some possibility of a confrontation, only to deliver a message to call his probation officer. This, coupled with the issue of fact above regarding the events immediately preceding the shooting, is sufficient to preclude summary judgment on qualified immunity and Plaintiffs' excessive force claims."); *Sevier v. City of Lawrence, Kan.*, 60 F.3d 695, 699 (10th Cir. 1995) ("The reasonableness of Defendants' actions depends both on whether the officers were in danger at the precise moment that they used force and on whether Defendants' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." (footnote omitted)); *Est. of Ceballos v. Husk*, 919 F.3d 1204 (10th Cir. 2019) (affirming trial court's June 2017 denial of summary judgment for August 2013 incident where officers used deadly force against an individual who was acting erratically while armed with a bat and pocket knife with no other bystanders in range on basis that a reasonable officer in the defendant's position would have known that his conduct leading up to the seizure, when viewed in the light most favorable to the plaintiff, violated the plaintiff's Fourth Amendment right to be free from excessive force); *Pauly v. White*, 874 F.3d 1197, 1221 (10th Cir. 2017) ("Similarly, in this case, the alleged reckless actions of all three officers were so immediately connected to the Pauly brothers arming themselves that such conduct should be included in the reasonableness inquiry."); *Chamberlain Est. of Chamberlain v. City of White Plains*, 960 F.3d 100, 114 (2d Cir.

60

2020) (reversing district court's grant of 12(b)(6) motion on qualified immunity for 2011 incident, explaining: "We therefore remand the excessive force claim against Officer Martin so the district court may determine in the first instance at the appropriate stage of the proceedings whether Officer Martin is entitled to qualified immunity . . . in light of the totality of circumstances, including the officers' warrantless entry and the justifications therefor, which must be further developed.  The officers' unlawful entry into Chamberlain's apartment, if borne out by proven facts, may affect the balancing of factors bearing on whether the officers' use of force was objectively unreasonable under the circumstances."); *Glenn v. Washington Cnty.*, 673 F.3d 864, 866 (9th Cir. 2011) (Ninth Circuit overturning grant of summary judgment on qualified immunity where officers shot an intoxicated, suicidal 18-year old who was holding a pocketknife with a three-inch blade to his neck and who ignored police commands to drop the knife where teenager was not acting in a threatening manner, where the officers resorted to deadly force rapidly to purportedly prevent a threat of injury or death to teenager's parents, and where the officers may have recklessly provoked the use of deadly force by unconstitutionally firing beanbag rounds at the teenager resulting in the teenager making a move toward the house where his parents were located).

With that background, the first question this Court must answer in determining whether Defendant is entitled to qualified immunity on the first five shots when taking into account Defendant's own actions leading up to the shooting is whether Plaintiff introduced evidence that could establish a violation of Anthony Gallo's Fourth Amendment rights.  Because it is undisputed that a seizure occurred, the Court's inquiry is limited to the reasonableness of Defendant's use of force.  The Court finds that the evidence presented at trial is sufficient to support a finding that Defendant violated Anthony Gallo's constitutional rights by pursuing Gallo at a distance of two

feet down a narrow hallway and by not retreating backward once it became clear that there was no one else in the trailer. The jury could conclude on this record that, in doing so, Defendant's own reckless and deliberate conduct unreasonably created the need for the use of deadly force.

In considering reasonableness under a totality of the circumstances analysis, the Court must look to what the record establishes about what Defendant knew immediately prior to and during the encounter at issue, as well as the facts and circumstances of the encounter itself, all while construing the evidence in a light most favorable to Plaintiff. While the Court's description of the facts above lays out the facts in a light most favorable to Plaintiff, the Court believes, given the importance of Defendant's knowledge to the qualified immunity analysis, it bears reiterating those facts respecting Defendant's background, the incident, and with special attention to what Defendant knew or reasonably should have known about the factual circumstances of the incident at issue: On the day in question, Defendant had been a trooper for approximately nine years. He had received extensive training, including training on the use of force and de-escalation techniques, training on how to deal with individuals in the midst of mental health episodes which instructed officers to pause when dealing with such situations, and trainings on involuntary commitment, barricade situations, and hostage situations. Defendant's lapel microphone failed to record any audio during the incident at issue, purportedly due to a malfunction. The incident at issue was not the first time Defendant's microphone failed in this fashion. Defendant was aware that he could request the presence of a Special Emergency Response Team ("SERT"), which provides specialized backup for someone who is threatening suicide, but he did not think the same was appropriate due to the nature of the situation at issue.

From what he could hear of the 911 call, Defendant stated that Harriett Southall, the 911 caller, sounded flustered during the call. Based upon his conversation with the dispatcher at the

police station, Defendant was informed that there was an individual "running around the trailer park" with a knife or a firearm and that the individual was breaking into or entering trailers. Based upon the dispatch calls the Troopers received after leaving the station, Defendant believed that the individual who was the subject of the 911 call was armed with a knife, breaking into homes, and "out of control." Defendant suspected that the individual who was the subject of the 911 call was potentially committing the following crimes: felony burglary in progress, recklessly endangering another person, and terroristic threats. Defendant had been informed by dispatch that the individual who was the subject of the 911 call was threatening suicide. He was further informed that the individual who was the subject of the call was armed with a knife and that a neighbor possessed a gun and had threatened to use it on the individual with the knife at the time the call was placed. Defendant was thus aware that the individual matching the description of the subject of the 911 call was originally armed with a knife, that a gun was present at the scene at some point, and that a neighbor believed use of the firearm might be warranted. Prior to his arrival at the scene, Defendant was concerned for both officer and public safety based upon this information.

Defendant was in an excited state upon arrival at the scene, which Trooper Shaffer described as chaotic. After parking his vehicle, Defendant armed himself with an AR-15, which was not properly secured in his vehicle, and approached several individuals who motioned to the Troopers, directing them to Anthony Gallo's location near the door of Trailer 20. Betty Gray identified herself as Anthony Gallo's mother and tried to stop Defendant to explain the situation, and Defendant told her to "get the fuck out of the way." The Troopers immediately made contact with Anthony Gallo, with Trooper Shaffer observing a knife in Anthony Gallo's hand and Defendant not being able to see the knife. Upon first making contact, the Troopers were thirty feet away from Anthony Gallo and had their AR-15s aimed at Gallo. Defendant was focused on

gaining control of the situation and did not conduct interviews due to the exigent nature of the situation and his focus on Anthony Gallo.

While outside the trailer, Anthony Gallo made no statement to the Troopers, stood stationary, and made no threats to anyone. He made no slashing movement with the knife toward any individual, and he did not behave erratically or physically aggressive. The Troopers identified themselves and issued commands to Anthony Gallo to drop the knife. Gallo did not comply. The Troopers asked no questions of Anthony Gallo. As the Troopers closed the distance between themselves and Anthony Gallo to approximately ten to fifteen feet, Anthony Gallo entered Trailer 20, and the door slammed behind him. In response to a question from Trooper Shaffer about whether anyone else was inside Trailer 20, Betty Gray told the Troopers that "there's nobody but my son" in the trailer. The Troopers did not know whether the trailer that Anthony Gallo entered belonged to him (it did not), and they did not know for a fact whether anyone else or another weapon was inside the trailer. From the Troopers' arrival to Anthony Gallo entering the trailer, only a few seconds had passed.

Defendant stated to Trooper Shaffer "let's go get him," and the Troopers immediately pursued Anthony Gallo into Trailer 20. As justification for following Anthony Gallo into the trailer, Defendant cited his intention to arrest Gallo for felony burglary, to maintain a visual on Gallo, to protect the public, and to prevent escalation of an already dangerous situation. The trailer was small, dark, and cluttered. Upon entering the living room of the trailer, Defendant observed Anthony Gallo to his left approximately ten feet away at the near end of a narrow, straight hallway. Anthony Gallo then retreated, without running, toward a bedroom at the end of the hall. When looking at the bedroom from the living room, only a portion, approximately a quarter, of the

bedroom would be visible due to the width of the hallway.  That said, the Troopers could maintain a visual on Anthony Gallo as he moved down the hallway without giving chase.

As he retreated, Anthony Gallo said "shoot me, just shoot me" to the Troopers, thus further placing Defendant on notice that Anthony Gallo was in the midst of a mental health event. Defendant found that statement concerning because he believed that it meant that Anthony Gallo was not thinking rationally and that he may pose a threat of violence to Defendant or someone else.  While inside the trailer, the Troopers screamed at Anthony Gallo to drop the knife, show his hands, and identify himself, and he did not comply with their commands.  The Troopers pursued Anthony Gallo, whose back was to the Troopers, down the hallway, moving quickly and maintaining a distance of approximately two feet from him as they followed.  Trooper Shaffer stowed his AR-15 and drew his taser as the Troopers pursued Anthony Gallo down the hallway. As to his rationale for pursuing Anthony Gallo at such a close distance while inside Trailer 20, Defendant cited his inability to view the entire bedroom, his responsibility to protect others, and his concern that Anthony Gallo could escape out of the back of the trailer.  The Troopers did not know whether anyone else was in the trailer at that point, and, outside of pursuing Anthony Gallo to the bedroom, made no efforts to determine whether anyone else was in the trailer.

Anthony Gallo then reached and entered the bedroom at the end of the hallway, at which time he turned around to face the Troopers, who were, at that point, about two to three feet away from him at the threshold of the bedroom.  This was the first time Defendant observed the knife in Anthony Gallo's hand.  Defendant testified that he did not retreat backwards because Trooper Shaffer was directly behind him and because the threat of danger to him was imminent because Anthony Gallo could move faster forward than Defendant could backward.  The Troopers gave several more commands for Anthony Gallo to show his hands, drop the knife, and get on the

ground, and Gallo did not comply.  Anthony Gallo stood stationary, held the knife at his side, and made no movement toward Defendant with the knife.  Defendant then fired five shots from his AR-15 at Anthony Gallo's chest at point-blank range, hitting Gallo in the chest with each of the five shots.  Defendant cited fear of death or serious physical injury as his basis for firing, primarily due to the distance between Anthony Gallo and Defendant, again, approximately two to three feet.

Anthony Gallo fell onto a bed as a result of being hit in the chest by the first volley of shots, landing on his back.  Trooper Shaffer and Defendant testified that they were not aware whether Gallo had been hit by any of the first five shots, but the evidence introduced at trial as to the point-blank nature of the shots, Anthony Gallo's reaction to the shots, his condition after landing on the bed, and Defendant's training could support a finding that Defendant was aware that he hit Anthony Gallo with at least one bullet.  The Troopers then entered the bedroom, with Trooper Shaffer having time to reposition himself.

Anthony Gallo still possessed the knife at all times while on the bed.  His body was spasming and quivering as he lay on the bed.  Defendant testified that Anthony Gallo appeared incapacitated at that juncture.  The Troopers continued to issue commands to Anthony Gallo to drop the knife, and Gallo did not comply with those commands.  Anthony Gallo rolled onto his side and appeared as though he was attempting to sit up.  Defendant then fired five more shots at Anthony Gallo, striking him five more times, including three shots in the lower back and hip area. Defendant testified that he believed Anthony Gallo might be "playing dead" when he fired, but testified that he remained in fear of death or serious physical injury at that time.  Anthony Gallo still held the knife after the second volley of shots.

The Troopers did not, at any point, warn Anthony Gallo that they would shoot if he did not comply with their commands.  The Troopers did not utilize de-escalation techniques.  From the

66

time of their arrival, Anthony Gallo's acts were all passive, and he only ever retreated from the Troopers, moving at a controlled pace instead of running. He was cornered in a small, dark bedroom when Defendant fired the first volley of shots. While Defendant had heard over dispatch that Anthony Gallo was behaving erratically prior to Defendant's arrival at the scene, his behavior after the Troopers arrived at the scene, aside from the "shoot me, shoot me" statement, was not described by any witness as erratic. The entire sequence, from the Troopers' arrival to the second volley of shots, unfolded in approximately twenty-five seconds.

In this case, Defendant stormed a mobile home, shouted at Anthony Gallo, and repeatedly advanced on him until Gallo was essentially backed into a corner. Construing the facts in a light most favorable to Plaintiff, Defendant was told that no one else was in the trailer. Upon entering the trailer, Defendant never shouted out to ask whether anyone else was in the trailer. Defendant did not attempt de-escalation techniques during an encounter that lasted less than one minute. He rushed Anthony Gallo, who was clearly in the midst of a mental health crisis and who had shouted "shoot me, shoot me," until Anthony Gallo reached the end of the trailer and turned to face the officers. At that time, Anthony Gallo possessed a weapon of short-range lethality, a steak or paring knife. While standing stationary and facing the Troopers, Anthony Gallo could not have further armed himself or harmed someone other than the Troopers without the Troopers having an adequate opportunity to respond. Indeed, Defendant repeatedly testified that he was only in fear for his own safety from a knife attack at that juncture. It is true that the distance between Anthony Gallo and Defendant established a risk of serious bodily injury or death to Defendant, but the Court believes that a jury would be warranted in finding that Defendant unreasonably created that risk. It is Defendant's advancement and escalation in spite of the twenty-one foot guidance, as well as his decision not to take steps back when it was plain that Anthony Gallo did not pose a threat to

67

someone other than the heavily armed Troopers, that the Court finds would have justified the jury in finding that Defendant's objectively reckless and deliberate acts unreasonably created the need for deadly force, and that Defendant's use of force against Anthony Gallo on the day in question was unreasonable and, thus, excessive.

Arguably, and as touched upon briefly above, just as the decedent's noncompliant and threatening conduct in *Lamont* constituted a superseding cause breaking the chain of causation between the officers' entry into the woods and the shooting, it is possible that Anthony Gallo's noncompliant behavior once the officers chased him to the end of the trailer served to sever the chain between an unreasonable pursuit of Anthony Gallo down the hallway of the trailer from the shooting at issue in this case.  The Court believes, however, that there exist several important distinguishing circumstances between this case and the situation presented in *Lamont*.  The appellant in *Lamont* argued that the officers in that case acted unreasonably in pursuing a potentially armed individual into the woods as opposed to setting up a perimeter and using K-9 units to track the suspect.  That pursuit culminated in the officers tracking down the suspect, who stopped, ignored police commands, and eventually made a move as though he were about to pull a firearm from his waistband.  The risk of potential harm posed to the officers in *Lamont* was, ultimately, created by the suspect when he made an aggressive move as though he were drawing a firearm.  Accordingly, the Court believes that, in *Lamont*, the officers' pursuit of the suspect into the woods was not so "immediately connected" to the threat of force posed by the suspect to the officers when they finally located the suspect.

Here, the Court believes the opposite to be true.  Anthony Gallo moved down the hallway toward a bedroom until he reached the foot of the bed with nowhere left to go.  At that point, he, predictably, turned to face the Troopers.  Anthony Gallo possessed a weapon of short-range

68

lethality, but he made no move toward the officers. He simply stood still. Defendant advanced on Gallo until he was two or three feet away from him. Eschewing de-escalation, a stand-off, or a nominal retreat of his own, (any one of which might have very reasonably and effectively served the purpose), Defendant essentially left himself with no other option but to shoot Anthony Gallo at that juncture. On the facts presented in this case, the jury would be permitted to find that Defendant's unreasonable actions once he entered the mobile home in advancing on Anthony Gallo at a constant distance of two feet created both the risk to the Troopers and the need for deadly force, and that his conduct was immediately connected to, and the proximate cause of, the threat of force posed by Anthony Gallo. In short, it is Defendant who unreasonably necessitated the use of deadly force with reckless and deliberate conduct. Defendant then fired a total of ten shots at Anthony Gallo in two five-shot volleys. Accordingly, the Court finds that Plaintiff introduced evidence sufficient to establish an unreasonable seizure, and thus introduced evidence sufficient to establish a violation of Anthony Gallo's Fourth Amendment rights on the day in question. Accordingly, the first prong necessary to defeat qualified immunity was satisfied in this case.

The question turns to whether Anthony Gallo had a clearly established constitutional right as of October 1, 2017 to be free from police conduct that unreasonably created the need for the use of deadly force under the facts and circumstances presented herein. That is, did Anthony Gallo have a clearly established right to be free from reckless and deliberate police conduct (Defendant's continued advancement on him in Trailer 20 and Defendant's failure to maintain a larger, safe distance) that created the threat to the Troopers and thus the need for the use of deadly force, where Anthony Gallo had retreated into a trailer and the Troopers, (in this Court's estimation) reasonably, pursued him into the trailer, where Gallo was armed with a knife, where he was suspected of burglary, and where he disregarded police commands, but where he was also alone and cornered

in a confined space with no visible means of escape, where he made no verbal threat of violence and made no move toward the officers, where the Troopers knew Gallo was in the midst of a mental health event, and where his ability to successfully attack the AR-15 armed officers with a three-to-four inch steak or paring knife was limited and only became possible when Defendant continuously advanced on Gallo in the trailer at a distance of two feet.

Of course, the Court has defined this right with a high degree of specificity, and it has located no entirely analogous cases. The same, however, is not required. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."). The Court again acknowledges that the Third Circuit did not set forth a clearly established right in *Johnson* that could apply in this case. That said, *Johnson* made the possibility that an officer's actions preceding a seizure might be considered in a totality of the circumstances analysis clear. In sounding a note of caution, it further provided that:

> Given the extreme facts of this case, our opinion should not be misread to broadly immunize police officers from Fourth Amendment liability whenever a mentally disturbed person threatens an officer's physical safety. Depending on the severity and immediacy of the threat and any potential risk to public safety posed by an officer's delayed action, it may be appropriate for an officer to retreat or await backup when encountering a mentally disturbed individual. It may also be appropriate for the officer to attempt to de-escalate an encounter to eliminate the need for force or to reduce the amount of force necessary to control an individual.

*Johnson*, 837 F.3d at 352-53.

In this Court's estimation, this case is directly analogous to *Ardo*, a case wherein the Eastern District of Pennsylvania found a clearly established right for an incident that took place in May 2017 where officers advanced on a suspect possessing a weapon of short-range lethality until deadly force became necessary. *See also Est. of Ceballos*, 919 F.3d 1204 (10th Cir. 2019) (affirming trial court's June 2017 denial of summary judgment on qualified immunity for August

70

2013 incident where officers quickly approached individual with bat and pocketknife while screaming at him). It is also materially similar to *Allen*, a case wherein officers immediately escalated a situation by approaching a suspect who was armed with a firearm until they were close enough to touch the suspect, creating the need for the use of deadly force. It is further similar to cases cited above where officers chose to pursue a suspect into a confined space such as a bedroom or kitchen and continued to approach the suspect until they became a threat.

To be clear, the Court does not believe or hold that there can never be a situation where an officer who has closely approached an individual armed with a knife can properly use deadly force. In this case, however, Defendant followed a suspect who possessed only a weapon of short-range lethality down a narrow hallway in a confined space at a distance of two feet, stopping only once Anthony Gallo had nowhere left to go in a (now) even more confined space, turned to face Defendant, stood stationary, and ignored three or four more commands. Defendant followed Anthony Gallo despite Pennsylvania State Police guidance that instructs that Defendant should have maintained a greater distance. He never took a step backward. The facts in this case are sufficiently factually analogous to those cases discussing reckless or deliberate officer conduct that necessitates the use of deadly force such that Anthony Gallo had a clearly established right to be free from Defendant's conduct in pursuing him at a distance of two feet and stopping only when Anthony Gallo was a distance of two or three away, thus unreasonably creating the need for deadly force. The Court finds that, under the facts and circumstances in this case, and following a thorough review of relevant case law, there existed a robust consensus of persuasive case law such that Defendant was on notice that his conduct in pursuing Anthony Gallo once inside the trailer and then shooting Anthony Gallo was unlawful on October 1, 2017. Accordingly, the Court finds that the jury's return of a finding in Plaintiff's favor on liability with respect to all ten shots is

supported both factually and legally, and holds that Defendant was not entitled to judgment as a matter of law on the issue of qualified immunity.

### c. Third Potential Clearly Established Right

Notwithstanding the Court's holdings at the end of the preceding section, given the Third Circuit's holding in *Lamont*, the Court feels obliged to address the possibility of a third clearly established right, that is, whether Anthony Gallo had a clearly established right to be free from the second volley of five shots under the circumstances presented herein. Defendant fired those shots seconds after the first volley of five shots knocked Anthony Gallo onto a bed. At that time, Anthony Gallo had been shot five times in the chest, was on his back or side, and appeared incapacitated, but he still grasped a knife in spite of additional commands to drop the knife. Under *Lamont*, the Court believes that the facts surrounding the second volley of shots are unquestionably sufficient, regardless of the Court's analysis above, to support a finding of a violation of Anthony Gallo's clearly established constitutional right to be free from being shot five times, including three times in the back, when he no longer posed a threat to the Troopers.

The *Ardo* court, relying heavily on *Lamont*, found a qualified immunity defense "inapposite" where an officer fired three shots at a suspect who had slumped down in his car seat after officers initially fired eight shots at him, but where the suspect had begun to rise at a normal pace approximately four seconds later. *Ardo*, 652 F. Supp. 3d at 564. This Court also finds that *Lamont* forecloses a qualified immunity defense with respect to Defendant's second volley of five shots in this case. The right at issue at this stage is Anthony Gallo's right to be free from deadly force where he no longer posed a danger to the Troopers after he had been shot five times in the chest, had been knocked over onto his back and was rolling onto his side, but where he still possessed a knife and failed to comply with commands to drop the knife. That right was clearly

established as of October of 2017 under *Lamont*. *See Lamont*, 637 F.3d at 184 ("Even where an officer is initially justified in using force, he may not continue to use such force after it has become evident that the threat justifying the force has vanished."). Because the evidence presented in this case could support a finding that the second volley of shots was fired at a time where Anthony Gallo no longer posed a threat of serious bodily injury or death to the Troopers, the right to be free from deadly force as to the second volley is also established as an "obvious case" under *Graham* and *Garner*.

As to whether Plaintiff introduced sufficient evidence of a constitutional violation, it is beyond dispute that the facts, construed in a light most favorable to Plaintiff, support a finding that Anthony Gallo never stood up again after the first volley of shots. *See* ECF No. 131 at 132 (Trooper Shaffer testifying as to the bullets that struck Anthony Gallo in the back: "Those rounds came from when Mr. Gallo fell off --fell back onto the bed, Mr. Gallo had pulled himself in this manner, and he attempted to roll, Mr. Gallo rolled to his right side, and that's approximately, *laying on the bed*, he's in this position, and then the next five shots were fired upon Mr. Gallo." (emphasis added)). The Troopers had entered the bedroom at that point, and presumably could see that no one else was present in the room or on the bed. In any event, Defendant testified as to only apprehension for his own safety at that juncture. Anthony Gallo possessed a three- or four-inch knife at all relevant times, to be sure, but, again, a knife is a weapon of short-range lethality.

The Court notes that, unlike the cases relied upon by Defendant, there is a clear separation of time between the first and second volleys of shots, with Trooper Shaffer testifying that the Troopers entered the bedroom and repositioned themselves after the first volley, and Defendant testifying that he issued more commands after the first volley. *See also* ECF No. 132 at 47 (Emanuel Kapelsohn testifying, based on his review of the of the 911 call, as to a five second gap

between the first volley of shots and the second volley).  Defendant's citation to cases involving

shots fired in rapid succession is inapposite, and this case is more factually aligned with *Ardo* and

*Lamont*.

Defendant's best possible argument that the second volley of shots was justified is that

Anthony Gallo, possibly, rolled to face him while holding a small knife, ignoring commands, and

laying on a bed after being shot five times.  While Defendant and Trooper Shaffer testified that

they were not sure that Anthony Gallo had been hit at that juncture, the evidence introduced in this

case that Defendant, who testified to having received extensive firearm training, fired five shots at

point blank range at Anthony Gallo's chest, that Anthony Gallo was immediately propelled onto a

bed after the shots were fired, and that Gallo appeared incapacitated would permit the jury, in this

Court's estimation, to impute knowledge on Defendant's part that Anthony Gallo had been shot

during the first volley.  Defendant then fired five more shots at a man that he thought might be

"playing dead" and who he described as appearing "incapacitated," including three shots in the

back, while that individual lay prone on a bed.[22]  A jury would be fully justified in finding in this

case that Defendant improperly fired a second volley of five shots at a time where no reasonable

officer could believe that Anthony Gallo posed any threat of serious bodily injury or death to the

Troopers, i.e., after the threat had been eliminated.  The Court believes that it is plain that

Defendant is not entitled to judgment as a matter of law on qualified immunity as to the second

volley of shots, and the jury was free to find the second volley of five shots unreasonable and thus

unconstitutional.

---

[22] It bears noting that Dr. Eric Vey testified that Anthony Gallo had three entrance wounds on his back and lower buttock area and that it is impossible to determine the sequence of shots.  ECF No. 137 at 156-58.

In a footnote, Defendant argues that the jury should not have been permitted to award damages on *only* the second volley of shots because no medical testimony was presented as to which of the shots caused Anthony Gallo's death.  *See* ECF No. 146 at 19-20 n.2.  This issue is ultimately moot given the Court's holding above that Defendant is not entitled to qualified immunity on any of the ten shots that struck Anthony Gallo.   Further, the Court finds that any such argument comes far too late in this case to be considered by this Court at this juncture.[23] "Rule 50(b) of the Federal Rules of Civil Procedures is clear—a renewed motion for judgment as a matter of law must be just that—a *renewed* motion." *TZE Glob. Dis Ticaret A.S. v. Papers Unlimited, Inc.*, No. CV 20-2600-KSM, 2024 WL 3742715, at *11 (E.D. Pa. Aug. 9, 2024).  While Defendant's Rule 50(a) Motion discussed the reasonableness of both the first and second volleys, Defendant made no argument that, if the Court ruled in Defendant's favor on only the first volley of shots, that the issue of the second volley could not be presented to the jury due to an absence of expert medical testimony.  *See* ECF No. 115.  Defendant thus failed to preserve such an argument for consideration under Rule 50(b).[24]

---

[23] It might be appropriate to infer that the lateness of this argument is the reason the argument is raised by way of a two-sentence footnote, as opposed to in the substance of the brief itself with citations to authority.

[24] It could be argued that Defendant preserved the argument during the following exchange after resting:

> Before we adjourn, just for the record, we don't need argument, I want to renew the Rule 50 at the close of the Commonwealth's case.  The only addition I would make is, and I don't know how this plays, but there's been no evidence presented as to cause of death.  And I think that's problematic for the plaintiff.  I don't know how, quite frankly.  But, I think it is an issue, and I need to preserve that for my client.

ECF No. 133 at 151-52.  Of course, Defense counsel himself alluded to the generality of his statement and advanced no substantive argument in support, and it appears to this Court that his primary point was that the jury heard no evidence that Anthony Gallo died as a result of his gunshots wounds, and thus could not conclude that Defendant intentionally shot *and* killed Gallo, a necessary element of his claim against Defendant.  *See id.* at 153 ("MR. BRADLEY: Manner may be acceptable in lay testimony, but I think cause of death you need expert testimony.  MR. GEARY: For a homicide.  MR. BRADLEY: It's always an element of the case to prove in a murder case.").  At the very least, the issue was not sufficiently presented to the Court such that either the Court or Plaintiff had notice of the nature of the argument at the time Defendant made his Rule 50 motion, and it is thus not preserved for review under Rule 50(b).

Further, qualified immunity should be decided at the earliest possible juncture. *Bennett v. Murphy*, 274 F.3d 133, 136 (3d Cir. 2002). Defendant chose to wait until Plaintiff rested to move for judgment on qualified immunity, raised no argument about the necessity of expert medical testimony as to which shot killed Anthony Gallo, and only now argues that medical testimony should have been introduced as to which of the shots killed Anthony Gallo. The same would, in this Court's estimation, render this particular argument waived. *See Harker v. Chan*, No. 3:15-CV-277, 2018 WL 3599734, at *8 (W.D. Pa. July 27, 2018) ("[I]t is clear that a party who fails to object to errors at trial waives the right to complain about them following trial." (quoting *Waldorf v. Shuta*, 142 F.3d 601, 629 (3d Cir. 1998))). Again, the Court notes that this issue is ultimately mooted by the analysis in the preceding sections.

### d. Defendant's Citations to Authority

Cases relied upon by Defendant in support of his argument that he is entitled to qualified immunity are readily distinguishable. *See Daniels v. City of Pittsburgh*, No. CV 18-1019, 2022 WL 952855, at *5 (W.D. Pa. Mar. 30, 2022), *aff'd*, No. 22-1790, 2023 WL 2707178 (3d Cir. Mar. 30, 2023), *cert. denied sub nom. Daniels v. City of Pittsburgh, Pennsylvania*, 144 S. Ct. 561 (2024) (officer entitled to qualified immunity where he shot fleeing suspect who possessed a firearm and had fired at officers moments before as it was clear officer had probable cause to believe that suspect posed a significant threat of death or serious physical injury to the officer or others); *see also City & Cnty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 613 (2015) (officers' entry and use of deadly force justified where individual with mental health disability made multiple

---

In any event, the Court notes that evidence was introduced that supports a finding that Anthony Gallo survived, at least for some period of time, after the second volley of shots was fired, as he never dropped the knife and officers had to use a ballistic shield to remove it. That evidence alone could support the jury's damages award on a survival theory. Further, evidence respecting the first volley of shots cannot be deemed prejudicial to Defendant because, even if Defendant were entitled to qualified immunity on the first volley of five shots, evidence as to the first volley would be relevant and admissible to establish whether Anthony Gallo posed a threat of serious bodily injury or death when the second volley of shots was fired.

threats to kill officers and another individual and then closed door on officers, officers opened the door a second time instead of awaiting backup to prevent escape or individual gathering more weapons, and individual charged officers with a knife); *Williams v. City of Scranton*, No. 3:10-CV-388, 2013 WL 1339027, at *6 (M.D. Pa. Apr. 1, 2013), *aff'd*, 566 F. App'x 129 (3d Cir. 2014) (use of force reasonable where decedent rapidly approached officer with a large kitchen knife pointed at the officer); *Gregor v. Johnsen*, No. 1:14-CV-219, 2017 WL 11368374, at *6 (M.D. Pa. Nov. 3, 2017), *report and recommendation adopted*, No. 1:14-CV-00219, 2019 WL 3549603 (M.D. Pa. Aug. 5, 2019) (qualified immunity where officer fired three shots in rapid succession after suspect who had slashed police vehicle tires turned to confront officer with a knife after the officer fell to the ground, resulting in aggravated assault charge against the suspect); *Kelley*, 2024 WL 1208080, at *4 ("Kelley, by contrast, was a 6'2" man weighing 213 pounds who physically struggled with an officer, refused repeated commands to comply, brushed off pepper spray and taser darts, violently stabbed a police K-9, and was within eight feet of a nearby officer while brandishing a knife—a knife he'd previously pointed at another officer."); *Birkeland as Tr. for Birkeland v. Jorgensen*, 971 F.3d 787, 791-92 (8th Cir. 2020) (suspect used knife to stab police dog in the face); *Harris v. Serpas*, 745 F.3d 767, 773 (5th Cir. 2014) (suspect got out of bed with knife raised above his head in stabbing position and advanced toward officers); *Salaam v. Wolfe*, 806 F. App'x 90, 94 (3d Cir. 2020) (suspect who had previously discharged firearm turned toward officers while holding the firearm, and officers fired nine total shots in rapid succession where there was no evidence officers intentionally fired after threat eliminated); *Blanford v. Sacramento Cnty.*, 406 F.3d 1110, 1119 (9th Cir. 2005) (qualified immunity where officers shot a man carrying a two-and-a-half-foot sword who disregarded commands and who was moving out of officers' sightline toward the back of a potentially occupied residence); *Chappell v. City of Cleveland*, 585

F.3d 901, 905 (6th Cir. 2009) (individual quickly approached officers wielding a knife held high); *Rucinski v. Cnty. of Oakland*, 655 F. App'x 338, 340 (6th Cir. 2016) (individual with switchblade said "bring it on" or "here we go" and approached officers); *Reich v. City of Elizabethtown, Kentucky*, 945 F.3d 968, 981 (6th Cir. 2019) (individual with schizophrenia "advanced within feet of an officer in a residential neighborhood, ignored commands to drop his knife, stepped toward the officer, raised the knife, and told the officer he would have to kill him."); *Sok Kong Tr. for Map Kong v. City of Burnsville*, 960 F.3d 985, 993 (8th Cir. 2020) (individual ran toward bystanders while armed with a knife); *Est. of Morgan v. Cook*, 686 F.3d 494, 496 (8th Cir. 2012) (suspect with knife made move toward officers).

### e. Conclusion on Defendant's Rule 50 Motion

This Court acknowledges, as other courts that have considered the issue of qualified immunity have, that law enforcement officers are often faced with difficult, split-second decisions in reacting to situations such as that presented in this case. That said, the Court finds in this case, for the reasons discussed above, that Defendant is not entitled to qualified immunity.

### 2. Rule 59(a) Motion for New Trial

Defendant offers two bases for a new trial in this matter: (1) recovery under a wrongful death theory is not cognizable under 42 U.S.C. § 1983 and is otherwise barred by sovereign immunity, and, "because testimony relevant only to the wrongful death claim irreparably tainted consideration of the survival claim," Defendant is entitled to a new trial on any remaining survival claim, Mot. ¶ 12, ECF No. 140; and (2) the trial was irreparably tainted after the Court allowed Plaintiff to admit evidence related to Defendant's prior alleged misconduct on the basis that such evidence was relevant to Plaintiff's supervisory liability claims, which were never presented to the jury after the Court's ruling on the Rule 50 motion that was made during trial. *Id.* at ¶ 18.

As to wrongful death, the Court ruled on the record, ECF No. 138 at 101-102, that it agreed with the analysis set forth in *Price v. Steinmetz*, No. CV 19-3225, 2020 WL 5039447 (E.D. Pa. Aug. 25, 2020), which explained that "a wrongful death claim by itself does not create a cause of action but is merely a vehicle through which this action is brought, and the state governmental immunity statute does not bar a federal civil rights claim . . . ." *Price*, 2020 WL 5039447 at *11; *see also Maldet v. Johnstown Police Dep't*, No. 2:19-CV-325, 2019 WL 2435869, at *7 (W.D. Pa. June 11, 2019) ("The Court finds the Fifth Circuit's reasoning on this point to be insightful: 'the utilization of local death and survival statutes does not do more than create an effective remedy. This is so because the right is surely a federally protected one–the right to be free from deprivation of constitutional rights. The local death or survival statute adopted by reference in this fashion does not add to that substantive right. It merely assures that there will be a 'remedy'–a way by which that right will be vindicated – if there is a violation of it." (quoting *Brazier v. Cherry*, 293 F.2d 401, 405 (5th Cir. 1961)); *id.* at *6 ("The Court is not persuaded by the reasoning in cases that have applied the PSTCA to bar § 1983 claims brought through Pennsylvania's wrongful death and survival statutes.").

While the Court recognizes that there is a split among district courts in this Circuit on this issue, the Court finds that a plaintiff may pursue and recover damages on a wrongful death theory on a Section 1983 claim consistent with the discussion in *Price* and *Maldet*, and that sovereign immunity does not bar Plaintiff's federal civil rights claim. Because the introduction of evidence relevant to Plaintiff's request for damages related to wrongful death was proper, Defendant is not entitled to a new trial on the basis that such evidence "irreparably tainted consideration of the survival claim."

With respect to evidence of Defendant's prior alleged misconduct, Defendant asserts that the Court erred in permitting such evidence to be presented to the jury, and that Defendant was so prejudiced by that error that a new trial is warranted. Defendant is correct that such evidence was introduced by Plaintiff subject to a limiting instruction from the Court. The Court instructed the jury as follows on the third day of trial:

> All right, ladies and gentlemen, Mr. Geary is going to elicit from this witness, I believe, testimony regarding incidents which occurred prior to the shooting that occurred in this case involving the defendant, Weaver. This evidence regarding Defendant Weaver's prior conduct is being offered for a very, I'll say a limited purpose. You can't use it for just any old purpose. And one of the purposes you cannot use it for is as evidence that he -- that if he, for example, if he engaged in a certain type of conduct nine days earlier, then he's more likely to have engaged in the same conduct later.
>
> Now, what you can use it for, however, is the question of the claims against the other defendants who are alleged to have made inappropriate decisions regarding supervising Trooper Weaver.
>
> So this evidence comes in against the supervisor defendants, respecting the judgment and judgments they made regarding the supervision of Trooper Weaver, but not against Trooper Weaver as evidence that, well, if it happened once before, it was more likely to happen on this occasion.

ECF No. 132 at 56-57. In providing the jury with final instructions, the Court further instructed:

> Ladies and gentlemen, as I explained to you yesterday, the claims against Joseph Ruggery, Dale Brown, Steven Driscoll, and John Kean are no longer part of this case. Consequently, any evidence presented or arguments made offered solely in support of claims against those individuals is not to be considered by you.
>
> Initially I had instructed you that evidence directed solely to the claims against Ruggery, Brown, Driscoll and Kean could only be considered for determination of the claims against those individuals. As those individuals are no longer in the case, I'm now instructing you that that evidence cannot be considered for any purpose. I'm also hereby ordering that any reference by any counsel, witnesses or even myself, the Court, to Exhibit 45 or other comments articulating a specific number of instances of unreasonable force utilized or placement in an early intervention program be struck from the record, and I'm instructing you that you must disregard all of those references.

That means that, when you're deciding the case, you must not consider that information in any way. Now, you have heard evidence that Defendant Chad Weaver was allegedly involved in other use of force incidents not at issue in this case. That evidence was received for a limited, particular purpose. This evidence can be considered by you only as evidence that there was an absence of mistake or lack of an accident when the Defendant Weaver allegedly failed to comply with Pennsylvania state policy concerning the use of the MVR microphones during the incident at issue in this case.

It may not be used for any other purpose. For example, you cannot use it as proof that the defendant engaged in an act of unreasonable force in the present case just because he was allegedly involved in other use of force incidents not at issue in this case.

ECF No. 139 at 68-69.[25]

It bears initially noting that Defendant did not file a motion to sever or a summary judgment motion in this case, and, accordingly, the supervisor defendants were still parties at the time the prior misconduct evidence was introduced and when Plaintiff made his opening statement. While Defendant suggests that it was error for the Court to presume that the jury would follow an instruction to consider the evidence as to the supervisor defendants but not Defendant Weaver, the Court finds that he fails to advance a credible argument that the evidence was irrelevant to Plaintiff's then-existing claims against the supervisor defendants. Rather, he relies on an assertion that the Court should have declared a mistrial when the Court entered judgment in the supervisor defendants' favor due to the purportedly overly prejudicial effect on Defendant of the evidence introduced to that point of incidents that occurred prior to October 1, 2017.

The Court notes that nearly all of the testimony as to this issue was elicited outside of the presence of the jury, with only Captain Jeremy Barni offering testimony as to the incident involving Defendant and Jennifer Kostik-Johnson and Chelsea Karichko that had taken place nine

---

[25] This instruction is substantively consistent with a proposal submitted by the Defense via email on May 28, 2024. *See* ECF No. 133 at 137.

days prior to incident at issue in this case.[26] [27]   Captain Barni testified that he believed that the force used during the September 22, 2017 incident was tactically sound, *see* ECF  No. 132 at 88; 99, a statement that was not contradicted by another witness, and further explained that Defendant was not disciplined for the incident.   That testimony, in this Court's estimation, limits the prejudicial effect of the introduction of evidence regarding the September 22, 2017 incident.

Further, the jury was properly instructed on the legal standards they were apply to the facts in determining whether Defendant used excessive force in this case.   The Court's limiting instruction informed the jurors not to use the evidence at issue as propensity evidence, and even Defendant's counsel acknowledged that the evidence bore relevance to argument that could properly be advanced by Plaintiff's counsel.   ECF No. 138 at 21 ("Certainly, he can make that argument in terms of, hey, isn't it odd that on that day, the microphone wasn't working.  You heard his explanation.  You know, can we take that at face value?  I think that's as far as he goes unless he has some evidence that Trooper Weaver deliberately sabotaged, failed to charge, failed to turn on the audio on October 1, 2017.");[28]  *id.* at 26-27 ("Even accepting that, there's a difference

---

[26] The Court notes that Plaintiff's counsel asked Captain Barni several (unobjected to) questions that might arguably be described as testimonial in nature.  *See* ECF No. 132 at 59 ("Q. Okay.  And she also specifically said to you, 'This guy, Weaver, Trooper Weaver, he's going to kill someone.'  She told you that?").  That said, Captain Barni was able to correct any assertions he disagreed with where appropriate.  *See id.* ("A. I don't believe she said he was going to kill somebody.  I believe she said he was going to hurt somebody.").  Plaintiff's counsel also referenced prior discipline and prior allegations of excessive force involving Defendant during his opening statement.  *See* ECF No. 131 at 36-39.  It bears noting that Plaintiff's counsel, at the Court's request, explicitly stated to the jury during his opening statement that the prior discipline/allegations of excessive force evidence was relevant only to his claims against the supervisor defendants, i.e., not Defendant Weaver.  Further, and more importantly, the jurors were properly instructed that opening statements, arguments, and questions by the lawyers are not evidence, and were further properly instructed on how they were to determine whether the force at issue in this case was excessive.  The Court also notes that Plaintiff's counsel did not mention prior discipline in his closing argument, and Defendant's disciplinary report was not admitted into evidence or submitted to the jury during deliberations.

[27] Trooper Dale Brown provided limited testimony about Defendant's microphone not being functional during the September 22, 2017 incident, but did not testify about the incident itself.  *See* ECF No. 138 at 78-89.

[28] That his microphone was not working could support a finding that Defendant engaged in deliberate conduct that unreasonably created the need for deadly force in this case.

82

between making an argument that he failed to do something that would have created a record versus destroying that record.").

Courts in the Third Circuit "presume that jurors follow the instructions given to them by the trial court[,]" and "[t]hat presumption is only overcome where there is an 'overwhelming probability' that the jury was unable to follow the instructions and a likelihood that the evidence wrongfully admitted was 'devastating' to the other party." *Robinson v. First State Cmty. Action Agency*, 920 F.3d 182, 191 (3d Cir. 2019) (citations omitted). There is no evidence or basis to conclude that the jury in this case disregarded or was unable to follow the Court's strongly worded instruction about the limited purpose of the prior conduct evidence, and the instruction itself was nearly identical to that proposed by Defendant's counsel after the Court indicated a willingness to provide the jury such an instruction. The Court likewise finds that the limited testimony of Trooper Barni, as well as Plaintiff's counsel's opening remarks, respecting past disciplinary action, while certainly not beneficial, were not "devastating" to Defendant's case, particularly in light of the Court's cautionary limiting instructions. The jury was properly instructed to focus on the facts and circumstances that existed leading up to Defendant's use of force on the day in question in determining whether Defendant's use of force was excessive. Those facts, when construed in a light most favorable to Plaintiff, were sufficient to support the jury's verdict, and the Court believes that any testimony regarding a prior misconduct was not "devastating" to Defendant's case. Accordingly, the Court will not order a new trial on this basis.

### 3. Rule 59(e) Remittitur Motion

Finally, Defendant argues that each award of damages "was grossly disproportional to the weight of evidence at trial" and requests that the Court reduce the jury's damages awards. Mot. ¶ 28, ECF No. 140. Defendant seeks either a new trial on damages or remittitur. As to the

83

$3,000,000.00 award of compensatory damages on a survival theory, Defendant argues that Plaintiff failed to introduce any evidence of Anthony Gallo's economic loss, and thus the entire award can only reflect pain and suffering. *Id.* at ¶ 29. Defendant argues that, "to that end, the Plaintiff failed to introduce any evidence showing that the decedent suffered a substantial amount of pain and suffering prior to his death." *Id.* With respect to the jury's $7,000,000.00 compensatory damages award on a wrongful death theory, Defendant argues that, while the decedent's relatives "undoubtedly suffered a loss, their testimony did not show that they lost the companionship of a close loved one[,]" and that the jury's award is thus excessive. *Id.* at ¶ 30. Finally, as to punitive damages, Defendant argues that "any reduction in compensatory damages should result in a similar reduction in punitive damages[,]" and that, in any event, the $11,000,000.00 punitive damage award is "impermissibly excessive under both due process and federal common law and must be reduced." *Id.* at ¶¶ 30-31.

The Court disagrees with Defendant, and it finds that the evidence of record supports the jury's damages awards in this case. As noted above, courts trust juries to follow instructions, and the jurors were fully and accurately instructed on the types of damages they could award in this case. Defendant shot Anthony Gallo ten times, with two volleys of five shots being separated by an interval of time that allowed for the Troopers to reposition themselves and issue subsequent commands. The testimony in this case indicates that Anthony Gallo was alive after the first volley of shots, as he was moving and attempting to sit up. It could further support a finding that Anthony Gallo was still alive for some period of time after the second volley, as he held onto the knife until an officer used a ballistic shield to remove it. The jury's $3,000,000.00 award to the Gallo estate for all the mental and physical pain, suffering, inconvenience, loss of life's pleasures, and disfigurement that Anthony Gallo suffered from the moment of his injury until the moment of his

death was fully supported by the evidence of record and the law.  In a case where the decedent was in the midst of a mental health crisis when he was shot ten total times by Defendant with an AR-15, and where the evidence supports a finding that he survived for some period of time, the Court finds Defendant's assertion that there is no evidence that "the decedent suffered a substantial amount of pain and suffering prior to his death" to be meritless.

Moreover, there is ample testimony in this case as to the losses and harm that Paul Gallo, who was fifteen when he prematurely and tragically lost his father, suffered as a result of the loss of his father.  *See* ECF No. 138 at 111-39.  The jury's $7,000,000.00 award to the Gallo estate is supported by both the law and the facts of this case as compensation for Paul Gallo's loss of Anthony Gallo's guidance, teaching, training, advice, education, care, comfort, services, emotional support, and moral upbringing, and for the emotional and psychological loss suffered as a result of Anthony Gallo's death.  The Court finds Defendant's argument that the testimony of Anthony Gallo's loved ones as to the losses and harm suffered by Paul Gallo "did not show that [Paul] lost the companionship of a close loved one" involves a plain mischaracterization of the evidence of record.  While the Court understands the necessity of zealous advocacy, the Court further finds that particular argument to be, at least, insensitively stated, and, more materially, simply unfounded.

Finally, the Court finds that the jury's $11,000,000.00 punitive damages award is not excessive given the facts and circumstances of this case.  The jury found that Defendant used excessive force when he shot Anthony Gallo ten times during the course of a twenty-five second period.  They found that no reasonable officer would have used the amount of force at issue in this case under similar circumstances.  The second volley of five shots was fired as Anthony Gallo lay prone on a bed.  Three shots struck Anthony Gallo in the back.  Defendant never issued a warning

before shooting Anthony Gallo.  The Court believes that the most important factor in awarding punitive damages, the degree of reprehensibility of the defendant's misconduct, quite plainly supports the jury's award.  Whether awarded to punish Defendant, or to deter Defendant and other law enforcement officers from committing such conduct in the future, the jury's award of punitive damages is not excessive.  The Court finds it telling that Defendant relies on cases that did not involve deadly force in making his argument.  In sum, the jury's awards warrant neither a new trial nor remittitur.

### B.  Plaintiff's Motions

As noted, Plaintiff has filed the following motions: a Motion for Delay Damages (ECF No. 128) and a related Motion at ECF No. 155 noting that the original Motion remains uncontested, a Petition for Attorneys' Fees and Costs (ECF No. 134), and Petition for Enhancement of Award of Attorneys' Fees (ECF No. 135).  The related briefing includes Defendant's Response in Opposition (ECF No. 156) to Plaintiff's Delay Damages Motions and Plaintiff's Reply (ECF No. 157) to that Response.

### 1.  Motions for Delay Damages (ECF Nos. 128 and 155)

As noted, Plaintiff's claims were brought pursuant to 42 U.S.C. § 1983 for violations of Anthony Gallo's rights under the Fourth Amendment.  Plaintiff's Motions at ECF Nos. 128 and 155 request delay damages under Pennsylvania Rule of Civil Procedure 238.  Such damages are not recoverable where a plaintiff brings only Section 1983 claims.  *See Simmons v. City of Philadelphia*, 947 F.2d 1042, 1088 (3d Cir. 1991) ("In [*Savarese v. Agriss*, 883 F.2d 1194 (3d Cir. 1989)], we held that, because the application of state substantive law providing for prejudgment interest would destroy the uniformity of damages in federal civil rights cases, Rule 238 does not apply to damages awarded under section 1983."); *see also In re City of Philadelphia Litig.*, 938 F.

Supp. 1278, 1294 (E.D. Pa. 1996) ("However, it is settled that 'Rule 238 does not apply to federal claims, such as the section 1983 count in this case, that are adjudicated in federal courts.'" (quoting *Costello v. Daddario*, 710 F.Supp. 1035, 1042 n. 9 (E.D. Pa. 1989))).  While Plaintiff makes much of Defendant's failure to file a timely response to the delay damages motion, the Court cannot award damages that Plaintiff is simply not entitled to as a matter of law.  Plaintiff specifically and explicitly sought delay damages under Pennsylvania Rule of Civil Procedure 238.  Such damages are not recoverable in this case.  Plaintiff's Motions at ECF Nos. 128 and 155 will be denied.

### 2.  Motions for Attorneys' Fees and Costs (ECF Nos. 134 and 135)

Plaintiff's motions seeking fees and costs are unopposed.  Because Plaintiff prevailed on his 42 U.S.C. § 1983 claim, the Court has discretion to award reasonable fees and costs.  The Court has reviewed the exhibits attached to Plaintiff's Motion at ECF No. 134, and it finds that counsel's fee rate of $700.00 per hour, his hours expended on the case, and his expenditure of costs are reasonable and supported by the record.  Thus, the Court will grant Plaintiff's Motion at ECF No. 134, particularly in light of Defendant's failure to oppose the Motion.

The Court will, however, deny Plaintiff's Motion at ECF No. 135 seeking an enhancement of his attorney's fees award.  While the Court was genuinely impressed with all counsels' zealous advocacy, efforts, and professionalism in this case, the Court, based upon its experience in this case and following an extensive review of the record, believes, respectfully, that this is not a case where Plaintiff's "counsel's superior quality of representation made this one of those 'very rare circumstances where the attorney's work is so superior and outstanding that it far exceeds the expectations of clients and normal levels of competence,' and thus justifies an increase in the awarded fee." *Goodman v. Pennsylvania Tpk. Comm'n*, 293 F.3d 655, 677 (3d Cir. 2002 (quoting *Rode v. Dellarciprete*, 892 F.2d 1177, 1184 (3d Cir. 1990)).  The Court again lauds all counsel's

efforts and professionalism in this case, and further acknowledges that Plaintiff's counsel proved successful in obtaining a substantial verdict that was supported by the evidence in this case. The Court does not believe that explicit findings as to this issue are necessary, and the Court is loath to wade into what might have the potential to unintentionally offend. That said, should any reviewing entity request, the Court will supplement its holdings herein with its specific findings as to why fee enhancement is not warranted in this case. Plaintiff's Motion at ECF No. 135 will be denied.

## III.    Conclusion

For the reasons discussed above, the Court will deny Defendant's Motion at ECF No. 140, grant Plaintiff's Motion at ECF No. 134, and deny Plaintiff's Motions at ECF Nos. 128, 135, and 155. An appropriate Order of Court follows.

BY THE COURT:

*/s/Robert J. Colville*_____
Robert J. Colville
United States District Judge

DATED: February 20, 2025

cc: All counsel of record